**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. 6:18-cv-862-RDI-DCI |
| v. | ) | |
| | ) | |
| MOBE LTD., et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| _____ / | ) | |

**NON-PARTY QUALPAY, INC.'S MOTION FOR EMERGENCY RELIEF FROM**
***EX PARTE* TEMPORARY RESTRAINING ORDER AND, TO THE EXTENT**
**NECESSARY, TO INTERVENE AND MEMORANDUM OF LAW IN SUPPORT**

Non-Party Qualpay, Inc. ("Qualpay") respectfully makes a special appearance in this action for the purpose of obtaining emergency relief from this Court's June 5, 2018 *Ex Parte* Temporary Restraining Order (the "TRO"), or, to the extent necessary, to intervene. The TRO purports to "freeze" millions of dollars of a reserve fund belonging to Qualpay, which Qualpay relies upon to satisfy chargebacks initiated by consumers who made purchases from Defendants. As explained below, continuing to comply with that aspect of the TRO, and leaving the reserve fund untouched, is forcing Qualpay to satisfy rapidly mounting chargebacks from its own operating account. That liability imminently threatens Qualpay's ongoing viability as a company, the jobs of over forty employees, and the stability of hundreds of other businesses that Qualpay supports. Qualpay is in need of emergency relief allowing it to access its own reserve account—which, again, Qualpay was deprived of as a non-party on an *ex parte* basis. To be clear, the *only* thing Qualpay wishes to do with the

reserve funds is satisfy chargebacks initiated by consumers who made purchases from Defendants—the very class of people whom the FTC seeks to make whole in this action.

## MEMORANDUM OF LAW

Qualpay, Inc., pursuant to Local Rule 3.01, submits this Memorandum of Law in Support.

## INTRODUCTION

The FTC filed this action alleging that Defendants engaged in unfair and deceptive practices that caused harm to consumers. As it has done in countless other cases, it sought *ex parte* relief from the Court, including the entry of a form order prepared by the FTC that effects an immediate "freeze" of assets belonging to Defendants. And the Court granted that relief, directing third parties to "[h]old, preserve, and retain":

> (a) . . . any Asset that has been: (i) owned or controlled, directly or indirectly, by any Defendant; (ii) held, in part of in whole, for the benefit of any Defendant; (iii) in the actual or constructive possession of any Defendant; or (iv) owned or controlled by, in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any Defendant[.]

(*See* TRO at Sec. IV(a).) Qualpay takes no issue with that portion of the TRO, which is appropriately directed at corralling all assets over which Defendants have a legal right and preserving them for potential consumer redress.

But the FTC's proposed order went further, and included a second category of "assets" that it implicitly concedes are not "owned or controlled . . . by," "held . . . for," or "in the actual or constructive possession of" any Defendant. Rather, it separately proposed language seeking to "freeze":

2

> (b) . . . Asset[s] associated with credits, debits, or charges made on behalf of any Defendant, including reserve funds held by payment processors, credit card processors, merchant banks, acquiring banks, independent sales organizations, third party processors, payment gateways, insurance companies, or other entities[.]

(*See* TRO at Sec. IV(b).)

As the FTC is aware from prior litigation, the "reserve funds" it seeks to capture are funds over which Defendants have no present legal right. Rather, those funds belong to acquiring banks and payment processors (collectively, "acquirers"), like Qualpay, and are used to cover chargebacks initiated by consumers who have elected to reverse their transactions with Qualpay's customers—*i.e.*, "merchants," like Defendants, that wish to accept credit and debit cards as a form of payment. In other words, when a customer of a Defendant reverses a transaction, Qualpay draws from the reserve fund to give the customer his or her money back. Without the ability to fund those chargebacks through contractually authorized reserves, the debits associated with those chargebacks are taken from the acquirer out of its own operating account, effectively making it the unwilling insurer against merchants' chargeback liability.

In many cases, a TRO freezing those reserve funds is a mere inconvenience for an acquirer, which can "settle up" with the FTC or its receiver later in the case (*e.g.*, by turning over the balance of any reserve funds left after the deduction of intervening chargebacks). But Qualpay is a small business, and it is financially incapable of continuing to pay Defendants' chargebacks out of its operating account until some undetermined future date. Indeed, to avoid employee layoffs or completely shutting down, it needs the ability to use the reserve funds that it and its acquiring bank contractually held for the purpose of funding

3

consumer-initiated chargebacks. It respectfully seeks leave of Court to do so, and commits (a) not to deduct any of its own fees out of the reserve account, and (b) to turn over any balance of the reserve funds to the receiver after the window for chargeback exposure concludes.

Qualpay's requested relief is entirely consistent with the FTC's goal of consumer protection. By granting it, the Court would ensure that 100% of the reserve funds currently held by Qualpay and its acquiring bank goes back to consumers—either through chargebacks those consumers initiate or, if funds remain in the reserve at the conclusion of the applicable chargeback period, through the remedial mechanisms established by the FTC.

## FACTUAL BACKGROUND

### I. The Architecture of the Payments Industry

Some courts have expressed an understandable reluctance to get "lost in the details [of] the credit card industry[, which] involves multiple and inter-related contracts between numerous parties[.]" *Haley v. Chase Bank, U.S.A.*, Case No. 2:11-bk-15482, 2012 Bankr. LEXIS 4027, at *6 (Bankr. D. Ariz. Aug. 10, 2012). The architecture of that industry is, admittedly, complicated. But it is also important to understand in this case.

Payment card processing relies on a "hub and spoke" system that revolves around "payment networks," such as Visa and MasterCard. Those payment networks, as a general rule, do not contract directly with individuals that hold credit and debit cards (known in the industry vernacular as "cardholders"). Nor, generally speaking, do they contract directly with businesses that accept such cards (known as "merchants"). Instead, cardholders obtain payment cards from financial institutions—called "issuing banks"—with which cardholders

have agreements, *e.g.*, to pay back purchases with interest.

On the other side of the equation, there are merchants. As mentioned above, Visa and MasterCard prefer to avoid entering into direct contractual relationships with those entities that want to accept their payment cards. Rather, merchants must sign up with a credit card processor, like Qualpay.

The processor, in turn, must have a "sponsoring bank"—also known as a "member bank" or an "acquiring bank"—that is trusted and approved by the payment networks. And that acquiring bank—like the processor and the issuing bank—are subject to the payment networks' voluminous rules and regulations, as well as state and federal law governing, *e.g.*, consumer chargebacks (such as Regulation Z of the Truth in Lending Act and Regulation E of the Electronic Fund Transfer Act).

Thus, the above-described architecture looks something like this:



With the payment networks serving like a "circuit board," this architecture permits the virtually instantaneous effectuation of credit and debit card purchases. A cardholder presents his or her card to the merchant. That merchant runs the card, and the data flows (through the payment networks' circuitry) from the processor to the issuing bank seeking authorization for that transaction. If it is authorized, that issuing bank signals the card's acceptance and then sends *its* funds (again, through the circuitry of the payment network) to

the *processor's* bank account at its acquiring bank. Usually, within a day or two, the processor then pays the merchant for the value of the transactions, minus fees, through a "batch settlement" to the merchant's account – an account identified by the merchant on its processing application. And, if all goes smoothly, the cardholder pays off the transaction to the issuing bank and the payment cycle is complete. *See generally In re Nat'l Audit Defense Network*, 332 B.R. 896, 908 (Bankr. D. Nev. 2005) (containing oft-cited description of process).

For any number of reasons, however, a cardholder may wish to challenge a particular transaction on her statement. When that happens, the cardholder initiates a "chargeback." From there, the issuing bank – again using the payment network architecture – effectively "debits" the *processor's* account at the acquiring bank and recovers the value of its prior funds transfer. Assuming no reserve account exists, the processor must then look to the merchant who initially ran the transaction to be made whole for its loss. (*See* Ex. 1, Declaration of Craig Gass, "Gass Decl." ¶ 9.)

## II.     The Reserve Account

Given the potential exposure to chargeback liability, virtually all acquirers have a provision in the agreements with their merchant-customers allowing for the creation of a reserve account. Although contract terms vary in specifics, the general concept is that when an acquirer receives periodic credits (or "settlements") related to its merchants' processing activity from issuing bank(s), it will keep a portion of those funds in a separate reserve account held in its name at its acquiring bank. That way, if a merchant goes out of business or encounters a large wave of chargebacks, the acquirer's reserve funds can be used to offset

the debits that are designed to make consumers whole.

Thus, following any settlement, an acquirer will often place some predetermined percentage of each merchant's transaction value in its (*i.e.*, the acquirer's) reserve account. In the ordinary course, the acquirer then subtracts its fees from the remainder of the settlement associated with a particular merchant's transactions and pays the merchant the balance. Until the applicable window for chargeback exposure closes, those reserve funds remain the property of, and in account(s) titled in the name of, the acquirer. The merchant has no right and no ability to access those funds. At best, it has a contingent future interest in the reserve funds—one that materializes only *if* reserve funds remain following the satisfaction of all chargebacks and fees at the conclusion of the applicable chargeback window.

Qualpay's Merchant Card Processing Agreement ("Agreement") with its merchants, including Defendants, follows this general structure. It pertinent part, it provides:

> The Reserve Account will be separate from the [Merchant's] Settlement Account. **Merchant shall have no right of withdrawal from the Reserve Account.** The Reserve Account shall be under the sole control of Merchant Bank [*i.e.*, Synovus Bank], and Processor [Qualpay] shall not have access to or hold funds in the Reserve Account. Any and all earnings from deposits of the Merchant to the Reserve Account shall be the sole property of the Bank.
>
> . . .
>
> Bank without prior notice to Merchant may deduct from the Reserve Account any obligation of Merchant to Bank under this Agreement, including all Processing Fees, Chargebacks, Credit Vouchers, damages, and any and all additional fees, and sums sufficient to reimburse Bank for the amount of any fines, penalty amounts and charges due the Card Networks.
>
> . . .
>
> **Merchant Bank may continue to hold or deposit funds in the Reserve**

**Account after termination of this Agreement, regardless of whether termination is by Merchant or Bank**. Upon termination of the Agreement by Merchant or Bank, Bank may retain sufficient funds to satisfy any and all Processing Fees, Chargebacks, Credit Vouchers, damages, and any and all additional fees, and sums sufficient to reimburse Bank for the amount of any fines, penalty amounts and charges due the Card Networks . . . . The funds will be held by Bank or its designated agent for a period of not less than one hundred eighty (180) days from the date of the last Card Transaction processed under the Agreement, plus the period of any warranty, guarantee, and/or return policy on goods and/or services sold. **Bank will return the balance in the Reserve Account to Merchant after Bank reasonably determines that the risk of Chargebacks and other Processing Fees has ended and after deducting all amounts that Merchant owes to Bank under this Agreement or any other agreement**.

(*See* Ex. 1, Gass Decl. at ¶ 7 and Ex. A thereto at p. 34.) (Emphasis added.)

## III.  These Proceedings and Communications with the FTC and the Receiver

Qualpay first learned of the FTC's interest in MOBE by virtue of a non-public civil investigative demand ("CID"), to which it responded by providing the FTC with several tranches of responsive documents. (Ex. 1, Gass Decl. at ¶ 10.) Then, on June 6, 2018, Qualpay received notice of the *ex parte* TRO, which, *inter alia*, required the disclosure of certain information to the FTC about any assets belonging to Defendants or otherwise associated with their transactions. (*See id.* at ¶ 11; Ex. 2.) Qualpay promptly complied with that directive and, while taking care to clarify that the reserve funds did not belong to the Defendants (now referred to as the "Receivership Entities"), provided the FTC with detailed information about its reserve account. (*See* Ex. 1, Gass Decl. at ¶ 11; Ex. 3; Ex. 7 at email from Theresa Kananen to Bikram Bandy dated June 21, 2018.)[1] The balance of that account

---

[1]  The same day, Qualpay received a demand from the receiver to turn over the reserve funds to the receivership. (*See* Ex. 4.) In response, Qualpay expressed its reservations with certain portions of the TRO, but went on to

is $6.3 million. (Ex. 1, Gass Decl. at ¶ 11; Ex. 7 at email from Theresa Kananen to Bikram Bandy dated June 21, 2018.)

The following Monday, the FTC inquired "whether Qualpay is deducting chargebacks, refunds, or fees from the reserves." (*See* Ex. 6.) In response, Qualpay, through counsel, responded:

> Qualpay has made no deductions from the reserve funds since June 5. I have written the receiver about certain concerns we have with the TRO and a subsequent request to turn over the reserves to the receiver (please see attached), but Qualpay is hopeful that we can come to a mutually agreeable resolution of that issue.

(*Id.*) Shortly thereafter, the parties spoke by phone, with counsel for Qualpay explaining that continuing to abide by the portion of the TRO purporting to freeze its reserve funds threatened the viability of Qualpay's business. (*Id.*) At the same time, Qualpay indicated that it was open to other arrangements, such as, *e.g.*, agreeing to *only* use the reserve funds to pay consumer-initiated chargebacks (without deducting fees) or placing the reserve in a separate escrow account with Synovus Bank that could be debited for chargebacks, with the remainder being automatically turned over to the receiver at the conclusion of the chargeback exposure window. (*Id.; see also* Ex. 5 at p. 5.) Counsel for the FTC expressed a willingness to consider those alternatives, but said that it would require supervisor approval. While unable to commit to a definitive deadline for a response, counsel for the FTC further indicated that he expected to be able to provide an answer by the close of the week (*i.e.*, Friday, June 15, 2018). (*See* Exs. 6 and 7.) In the meantime, the FTC requested certain

---

explain that—even with those provisions in place—the receiver did not have the authority to demand turnover of funds that did not belong to the Receivership Entities. (*See* Ex. 5.)

additional documents, which it said would be useful to prepare for an upcoming preliminary injunction hearing in this case. (*See* Ex. 7.)

On Tuesday, June 19, Qualpay updated the FTC regarding its progress in assembling the requested documents, and emphasized that it was critical to the company to receive an answer regarding the reserve funds. (*See* Ex. 7.) At midnight, counsel for the FTC responded:

> Regarding the reserve, thank you for the additional information. It was helpful, but it does raise additional questions that we would like to discuss . . . . Among other things, we will need to see documentation to support your representations, including how [Qualpay] calculated the estimated CBs, what its capitalization requirements are, and more information as to the financial status of QP so that we can evaluate the data QP is using to argue that liquidation/layoffs will occur if QP is not allowed to use the reserve to pay CBs.

(*Id.*) Although Qualpay has attempted to work cooperatively with the FTC, it is unfortunately in a position where continuing to provide additional documents, await further questions, and hope for supervisor approval is not a viable path forward.

## IV.   Qualpay's Financial Predicament

If Qualpay is prohibited from using the $6.3 million reserve fund to satisfy chargebacks, it faces liquidation. Qualpay is a relatively new company. It was formed in 2014, and raised its first round of equity capital, totaling only $8 million, in September 2015. (*See* Ex. 1, Gass Decl. at ¶¶ 14-15.) The first $5 million of equity (*i.e.*, less than the balance of the reserve) has been used to fund the start-up of the company and to reach the break-even point. (*Id.* at ¶ 15.) The remaining equity balance of approximately $3 million is being used to fund required reserves and meet working capital needs. (*Id.*) Those needs are significant relative to the available pool of funds. (*Id.* at ¶ 16.) For example, Qualpay fronts

interchange fees every month, meaning that it prepays pass-through fees charged by the card brands and collects them at month-end from its customers. (*Id.*) This expense alone generally runs at approximately $1 million per month, and was over $1.2 million in each of April and May 2018. (*Id.*)  In addition, Qualpay is contractually obligated to pay referral fees to its sales partners based on processing volumes. While those fees vary, they peaked over $1 million in each of April and May 2018. (*Id.* at ¶ 17.) Of course, Qualpay also must meet payroll, an expense which, in April and May 2018, cost $469,724 and $481,465, respectively, and must otherwise cover other operating expenses. (*Id.* at ¶ 18.) These costs alone—which are far from being the only ones Qualpay must satisfy—absorb nearly all of its available capital. (*Id.* at ¶ 19.) The company is simply not cash rich, which is precisely why it took the contractual precaution of maintaining a reserve fund. (*Id.* at ¶¶ 9, 14.)

Bearing the chargeback liability associated with Defendants' transactions without resort to the reserve account is crippling Qualpay. (*Id.* at ¶ 21.)  Since June 6, 2018, *nearly $1 million in chargebacks* have come in. (*Id.* at ¶ 13.) Qualpay has covered all of these out of its own operating funds, but that liability is crushing. Qualpay's risk analysis, which it prepared using several different models, projects that chargebacks associated with Defendants' consumer transactions may run from $5.8 million on the low end to $12.6 million in an unlikely worst case scenario, with median numbers in the range of $7 million to $8.7 million. (*Id.* at ¶ 20.) In other words, Qualpay will almost certainly weather this challenge if permitted to use its contractual reserve fund to satisfy chargebacks associated with Defendants' consumer transactions. However, if forced to become Defendants' insurer

(as a non-party subject to an order obtained *ex parte*, moreover), Qualpay may fail. (*Id.* at ¶ 21.)

Thus, Qualpay respectfully requests that the Court grant it emergency relief from the TRO insofar as it operates to freeze assets *not* belonging to Defendants, allowing Qualpay the ability to fund consumer-initiated chargebacks out of the reserve account they created for that purpose. Again, Qualpay will commit (a) not to deduct any of its own fees out of the reserve account; and (b) to turn over the balance of the reserve funds to the receiver after the window for chargeback exposure concludes—ensuring that every penny in the reserve account facilitates the goal of consumer redress.

## ARGUMENT AND CITATION TO AUTHORITY

### I.     To the Extent Necessary, Qualpay Is Entitled to Intervene as a Matter of Right

Insofar as the Court deems intervention necessary for Qualpay to seek the relief requested herein, Qualpay is entitled to intervene as a matter of right.

Federal Rule of Civil Procedure 24(a)(2) provides that, "[o]n timely motion, the court must permit anyone to intervene who: . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest," may, if filed timely, intervene of right in the action." Thus, Qualpay, as the intervenor, must show: (1) that its motion to intervene is timely; (2) that it has an interest relating to the property or transaction that is the subject of the action; (3) that disposition of the action may, as a practical matter, impede or impair their ability to protect that interest; and (4) that its interest cannot otherwise be adequately

represented by an existing party. *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989). It easily meets each of these criteria.

Regarding timeliness, the TRO in question was issued on June 5, 2018, and the Receiver demanded turnover of the reserve fund on June 7, 2018. The parties filed a consent motion extending the TRO until July 17, 2018, which the Court granted on June 18, 2018. [*See* D.E. 27.] Consequently, the TRO remains in effect, and Qualpay timely seeks relief from it.

Regarding the second and third prongs, as explained above, Qualpay holds the reserve fund in an account at Synovus in its own name, which Defendants have no right to access. In other words, the reserve fund is Qualpay's property. Nevertheless, the TRO purports to freeze that property, and the Receiver has demanded that it be turned over. Qualpay has not accessed the reserve fund and is being crippled by the liability of bearing chargebacks from its own operating account. Thus, if not allowed to intervene, the continued prosecution of this action may impair Qualpay's ability to defend its property rights in the reserve fund in the most profound sense—by putting Qualpay out of business. Finally, there is no existing party to this action that can adequately protect Qualpay's rights. Defendants have no right to access the reserve account, and the FTC's and Receiver's position is that the reserve fund belongs to the merchant, not to Qualpay (a position Qualpay submits is incorrect as a matter of law, as explained below). Accordingly, Qualpay respectfully submits that, insofar as the Court finds it necessary, it should be permitted to intervene in this case for the purpose of seeking emergency relief from the TRO.

## II.     Qualpay Is Entitled to Relief from the TRO and Control of the Reserve Fund

13

A.    **Defining the Question: To Whom do the Reserve Funds Presently Belong?**

From Qualpay's perspective, the legal issue presented in this matter is relatively straightforward: Should the FTC be permitted to eliminate private contractual rights, and exercise dominion over property belonging to a non-party to litigation without making any allegations of wrongdoing *vis-à-vis* that non-party or providing that non-party due process? Respectfully, the answer to that question seems self-evident: Of course not. To Qualpay's knowledge, even the FTC has never argued otherwise.

Rather, it has been the FTC's position—as it must be—that acquirer reserve accounts are property of the merchant defendants against which it has brought suit. If that were true, then the Court would have *in rem* jurisdiction over those funds as an extension of the *in personam* jurisdiction it has over the named defendants themselves. *FTC v. NHS Systems, Inc.*, 708 F. Supp. 2d 456 (E.D. Pa. 2009).[2] But if the reserve funds do *not* belong to the

---

[2] Notably, *NHS* is one of only two cases that the FTC frequently cites for the proposition that it is entitled to seize reserve funds held by processors. But upon closer inspection, *NHS Systems* does little to advance the FTC's argument. There, the FTC had shut down a provider of phony "health care plans," which engaged telemarketers to gain access to consumer bank account information and then use ACH withdrawals and "remote checks" to extract money from those accounts. *See* 708 F. Supp. 2d at 459. To effect the extraction, the defendants hired Teledraft, an unsuspecting check processing company. *Id.* Unlike a card processor, Teledraft, through its bank, would initiate debits to be taken directly from consumers' bank accounts. At first, its bank would "provisionally credit" Teledraft's account for the amount of the ACH withdrawal or remote check. *Id.* at 459-60. "If the payment was 'returned' – i.e., if the bank refused to pay (because, e.g., the charge was not authorized by the consumer) – Teledraft's bank would [automatically] deduct the amount it had previously provisionally credited to Teledraft's account." *Id.* at 460. After a "settlement period" of five days, however, those "provisional" credits would become "final" – *i.e.*, "no longer subject to an automatic deduction in the event of a return." *Id.*

In *NHS Systems*, the court handed down a TRO and appointed a receiver to marshal the defendants' assets on May 14, 2008. *Id.* at 461. On May 16, 2008, the president of Teledraft wrote the FTC and disclosed that Teledraft was holding $468,169.83 of the defendants' funds. By May 21, 2008, however, the accounts had been depleted to $222,989.53. *Id.* The FTC then moved the court to compel the turnover of certain funds it claimed were property of the receivership. *Id.* at 459.

Rather than awarding the FTC the entire $468,169.83 in Teledraft's possession on the effective date of the

14

defendants (as Qualpay and countless other acquirers have maintained), and instead belong to the acquirer, then the Court would have no such jurisdiction. Entering an *ex parte* order freezing the assets of Entity A based on the alleged misconduct of Entity X would offend fundamental notions of fairness and due process.

And even apart from considerations of jurisdiction and due process, long established principles of equity hold that a receiver is not entitled to exercise any greater right over property than receivership defendants themselves would be entitled to exercise. *See Escher v. Harrison Sec. Co.*, 79 F.2d 777, 782 (9th Cir. 1935) (holding that receivers "have no greater rights in [a defendant's] property than the [defendant] itself possessed[,]" and that their appointments do not operate to abrogate contractual rights); *accord East v. Crowdus*, 302 F.2d 645, 650 (8th Cir. 1962) ("a Receiver acquires no rights greater than those of the estate to which he has succeeded"). Consequently, neither the FTC nor its receiver can lawfully direct the disposition of property that Defendants themselves would be unauthorized to direct. *See FTC v. Transcontinental Warranty, Inc.*, 2009 WL 5166213

---

TRO, the *NHS Systems* Court ordered the turnover of only $264,244.03. *Id.* at 461 & 472. In doing so, the court implicitly recognized Teledraft's right to effectively "chargeback" *unsettled* transactions per the instructions of aggrieved consumers, explaining:

> After May 21, 2008, any returns would have been due to returns on settled transactions. According to the Receiver, had the funds that were dissipated between May 15, 2008, and May 21, 2008, only been due to returns on unsettled transactions, as opposed to other charges levied by Teledraft against the NHS/PHS Entities, the amount of Receivership funds held by Teledraft as of May 21, 2008 would have been $264,224.03.

*Id.* at 461; *see FTC v. Transcontinental Warranty, Inc.*, No. 09 C 2927, 2009 WL 5166213, at *2 (N.D. Ill. Dec. 22, 2009) (explaining that, in *NHS Systems*, the court held "that 'settled' funds held by a third-party payment processor were receivership property").

  Here, of course, the funds in the Reserve Account were never "settled" to Defendants' account. Rather, the transactions associated with any funds in the reserve account remained *unsettled* until such time as the applicable chargeback period expired. Accordingly, even under the reasoning of *NHS Systems*, the relief requested by the FTC is improper.

(N.D. Ill. 2009) (refusing to allow receiver to compel turnover of refund pool established pursuant to Dealer Agreement or "giv[e] the receiver the Dealer Agreement's benefits without its burdens").

Given the foregoing, the pertinent question becomes: To whom do the reserve funds in this case belong? If the FTC is right, and they currently belong to Defendants, then the Court could appropriately freeze them in their entirety and demand that they be turned over to the receiver *instanter*. Conversely, if the Defendants have no more than a contingent, unliquidated interest in the reserve until the applicable chargeback period expires, then any asset freeze that fails to account for Qualpay's right to debit those funds in the interim would be improper.

### B.     Finding the Answer: The Law, Common Sense, and the FTC's Order Support Qualpay's Position

Admittedly, case law addressing the proper characterization of acquirer reserve funds is sparse. But Qualpay submits that the legally correct, and more practical, view is that reserve funds are property of the acquirer. Merchants with which the reserves are associated have at best a contingent, unsecured, future interest equal to the amount of any reserves that exist at the conclusion of the chargeback period. *See In re Nat'l Audit Defense Network*, 332 B.R. 896, 910 (Bankr. D. Nev. 2005) ("Rather than a series of entrustments of [the merchant's] property, the commercial reality was that the credit card purchases by [the merchant's] customers initiated a complicated series of unsecured obligations among [the merchant], its customers, its customers' bank, [the processor], and the various banks and merchants that [the processor] contracted with to deliver services to [the merchant]. *At no time in this series of events did [the merchant] or the estate have title—legal, equitable or*

16

*otherwise—to money or other funds paid by its customers*.") (emphasis supplied); *accord FTC v. World Travel Vacation Brokers, Inc.*, No. 87 C 8449, 1991 U.S. Dist. LEXIS 17890, at *2 (N.D. Ill. Dec. 6, 1991) (rejecting FTC argument that Wells Fargo violated an asset freeze by retaining (and failing to disclose) a $60,000 certificate of deposit designed "to cover customer chargebacks on credit card sales"); *Haley v. Chase Bank, U.S.A.*, Case No. 2:11-bk-15482, 2012 Bankr. LEXIS 4027, at *7 (Bankr. D. Ariz. Aug. 10, 2012) (dismissing claims challenging propriety of chargeback processing, explaining: "when a credit card customer pays his credit card bill, that payment does not become property of the merchant, such as the debtor here, and even when the proceeds of that payment are transferred to the debtor's merchant banks they are still not property of the merchant") (emphasis added); *see also id.* ("the bottom line here is that the chargebacks . . . did not involve property of the [merchant] debtor").[3]

---

[3] In addition to *NHS Systems*, the FTC has at times cited *FTC v. Productive Marketing, Inc.*, 136 F. Supp. 2d 1096 (C.D. Cal. 2001), as support for its argument that reserve funds are somehow the property of defendant merchants. Its reliance, however, is misplaced. In *Productive Marketing*, the FTC obtained an asset freeze, TRO, and preliminary injunction against a "foreclosure solutions" firm, which had entered into a processing agreement with an ISO referred to throughout the court's opinion as "ACCPC." *See* 136 F. Supp. 2d at 1099-1100. After the FTC receiver (unlike here) established an independent "chargeback" reserve fund to process chargebacks initiated by consumers, *id.* at 1101-02, the FTC sought contempt sanctions against the ISO for: (i) retaining certain "misdirected" deposits intended for the defendant-merchant; and (ii) refusing to turn over the balance of a reserve fund *after expiration of the chargeback period*. *Id.* at 1108-09. The court, unsurprisingly, granted the sought-after sanctions.

   But in *Productive Marketing*, the FTC did not argue, and the court certainly did not conclude, that the ISO acted "improperly" in processing consumer chargebacks during the applicable chargeback period. Nor did the court suggest that compensating consumers through a reserve fund—one comprised of funds associated with transactions that had originated with the defendant-merchant—was in any way impermissible in light of the TRO and asset freeze. Indeed, the FTC receiver *herself* proactively established such a chargeback reserve fund for that very purpose. Rather, what the ISO in *Productive Marketing* did to incur the ire of the court was refuse to return the chargeback reserves *even after* the chargeback period had expired—at a time when the remaining funds contractually belonged to the merchant, not the ISO. *See id.* at 1109; *see also id.* at 1107 ("ACCPC *does not contest* that it holds receivership assets for which it has not properly accounted.") (emphasis added); *see*

17

Common sense, moreover, bolsters the view that reserve funds belong to acquirers, such as Qualpay, as opposed to merchants, such as Defendants. After all, the reserve funds at issue are in Qualpay's accounts with Synovus Bank—its acquiring bank—in Qualpay's name, over which Defendants have no control. (*See* Ex. 1, Gass Decl. at ¶ 7.) Defendants could not demand them from Synovus, nor could they execute any instrument making those funds "theirs." (*Id.* and Ex. A thereto at p. 34.) And the funds are plainly not held for the Defendants' "benefit." Instead, the funds are there to protect Qualpay and Synovus from debits associated with consumer-initiated chargebacks, ultimately ensuring that the consumers pay Defendants *nothing* for properly reversed transactions. (*See* Ex. 1 at ¶¶ 9, 12 and Ex. A thereto a p. 34.) If anything, the reserve funds are held adversely to Defendants, who, again, have only an unsecured contractual right to demand that Qualpay and Synovus pay over an amount equal to the balance of the reserve funds at the conclusion of the contractually contemplated chargeback period. (*See* Ex. A to Gass Decl. at p. 34.)

And here, the language contained in the FTC's template TRO only underscores the reality that an acquirer's reserve funds do *not* belong to its merchant customers. After all, the FTC expansively defines the concept of "Assets" belonging to the Receivership Entities in Section IV(a) of its proposed order, including "any Asset that has been . . . owned or controlled, directly or indirectly, by any Defendant; . . . held, in part of in whole, for the benefit of any Defendant; [or] in the actual or constructive possession of any Defendant[.]" (*See* TRO, Sec. IV(a).) The reserve fund is none of these. Defendants have never owned or

---

*also id.* at 1110 (acknowledging that certain reductions to the funds held by ACCPC may have been proper, stating that "ACCPC . . . should be able to justify and substantiate those deductions").

controlled the reserve fund, directly or indirectly; it has always been in an account at Synovus in Qualpay's name alone, for Qualpay's benefit to satisfy chargebacks.

The TRO order then *separately* includes language purporting to restrict reserve funds, including a distinct category of "Asset[s] associated with credits, debits, or charges made on behalf of any Defendant, including reserve funds held by payment processors"—a description that carefully omits any reference to the Defendants' interest in or ownership of the same. (*See* TRO, Sec. IV(b).) Of course, if the FTC genuinely believed that reserve funds were property of the Defendants, that second subsection would have been entirely unnecessary. It is only because reserve funds are plainly *not* "owned or controlled . . . by," "held . . . for," or "in the actual or constructive possession of any Defendant" that the FTC chose to address them in a distinct clause of the proposed order.

Simply put, this Court's jurisdiction in entering the TRO extended to Defendants and their property. But Defendants have no present property interest in Qualpay's reserve. It belongs to Qualpay. By contract, Defendants have only an unsecured, contingent, future interest equal to the amount of any remaining balance in the reserve account at the conclusion of the applicable chargeback period. An *ex parte* order predicated on allegations of improper conduct by Defendants should not operate to impair Qualpay's right to use *its* reserve funds to satisfy consumer-initiated chargebacks until that period closes. Due process, the boundaries of subject-matter jurisdiction, and principles of equity demand that result.

C.     **Equity Favors Allowing Qualpay to Use Its Own Reserve Fund to Satisfy Chargebacks**

Finally, the equities favor allowing Qualpay to use the reserve fund to satisfy consumer-initiated chargebacks. Setting aside Qualpay's own interests for a moment,

nothing about allowing Qualpay to debit chargebacks from the reserve fund is inconsistent with the goals of consumer redress. Granting the relief Qualpay requests will result in the entirety of the reserve being refunded to consumers, with any remaining balance being turned over the FTC after the chargeback period expires. Second, saddling Qualpay, a non-party, with the chargeback liability through an *ex parte* proceeding in which it was afforded no opportunity to be heard is fundamentally unfair. Allowing Qualpay to use its contractual property so that it may stay in business is the most minimally fair result; any other result would be patently unjust and in contravention of due process.

## CONCLUSION

For the foregoing reasons, Qualpay respectfully moves the Court to (a) grant Qualpay relief from the TRO on an emergency basis; and (b) hold that Qualpay may use the reserve fund to satisfy consumer chargebacks associated with Defendants' transactions. To the extent the Court deems it necessary for Qualpay to intervene for this purpose, Qualpay respectfully requests such intervention here.

Pursuant to Local Rule 3.01(g), Counsel for Qualpay, Inc. certifies that she met and conferred with counsel for the Federal Trade Commission who opposes the relief requested herein.

Dated:  June 22, 2018                                   Respectfully submitted,

*/s/David S. Johnson*
Bonnie C. Daboll        FBN  730521
David S. Johnson        FBN  096423
**JOHNSON DABOLL ANDERSON,
PLLC**
2011 W Cleveland Street, Suite F
Tampa, Florida 33606
Tel:    (813) 377-2499

Fax:    (813) 330-3156
bdaboll@jdalegal.com
djohnson@jdalegal.com

-and-

Edward A. Marshall
Ga Bar No. 471533
(*pro hac petition forthcoming*)
Theresa Y. Kananen
Ga Bar No. 478998
(*pro hac petition forthcoming*)
**ARNALL GOLDEN GREGORY
LLP**
171 17th St. NW, Suite 2100
Atlanta, GA 30363
Edward.marshall@agg.com
Theresa.kananen@agg.com
Tel.:    (404) 873-8536
Fax:    (404) 873-8537

**Counsel for Non-Party Qualpay, Inc.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed on this

22nd  day of June, 2018 using the Court's CM/ECF system which will send electronic

notification to all counsel of record.

*/s/ David S. Johnson*

21