# EXHIBIT 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. 6:18-cv-862-ORL-37DCI |
| v. | ) | |
| | ) | |
| MOBE LTD., et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

**DECLARATION OF CRAIG GASS**

1.     My name is Craig Gass.  I am over 21 years old and the statements in this Declaration are based on my personal knowledge.

A.     **Background on Qualpay**

2.     I am the Chief Executive Officer of Qualpay, Inc.  I have served in that role since Qualpay was founded in 2014, but I have worked in the payments industry for nineteen years.

3.     Qualpay provides payment card processing services to merchants, meaning that it provides that technology that enables merchants to accept credit and debit cards payments from their customers.

4.     As is typical for a payment card processor, Qualpay works with a sponsoring bank, in this case, Synovus.  Qualpay maintains accounts at Synvous in its own name, into which Qualpay receives funds that Qualpay then directs to be settled to the merchants on whose behalf it provides processing services.  Qualpay also uses funds in its account to meet its own business expenses.

B.     **Qualpay provides payment processing services to MOBE**

5.     MOBE, a merchant who provides services in the coaching and mentoring space, applied to Qualpay for payment processing services in or around late November and early December 2016.  Qualpay accepted MOBE as a merchant upon concurrence from Synovus and ultimately set up

seven merchant IDs, or "MIDs" through which MOBE could process payment card transactions. (In early 2018, MOBE applied for additional processing accounts with Qualpay, but Qualpay declined those applications).

6.     MOBE entered into a Merchant Card Processing Agreement ("Agreement") with Qualpay upon opening its merchant accounts. A true and correct copy of the Agreement, together with digital evidence of MOBE's execution of it, is attached to this Declaration as **Exhibit A**.

7.     The Processing Agreement empowers Qualpay and Synovus (referred to in the Agreement as the "Processor" and "Merchant Bank," respectively) to create a "Reserve Account" by withholding in Qualpay's own account at Synovus proceeds that would otherwise be deposited into MOBE's Settlement Account (as defined in the Agreement). Those funds may be used to satisfy chargebacks, among other things, and MOBE would have no control over or right to those proceeds until its liabilities are satisfied. Specifically, the Processing Agreement states as follows:

**Reserve During Term of Agreement.**

Merchant may be required to deposit, or Merchant Bank may deposit by deducting from any payment due to Merchant or from any funds in the Settlement Account or any other deposit account of Merchant, into an account maintained by Merchant Bank (or at another approved depository institution) (the "Reserve Account"), initially or at any time in the future as requested by Bank, sums sufficient to satisfy Merchant's current and/or future obligations as determined by Bank in its sole and absolute discretion.

The Reserve Account will be separate from the Settlement Account. Merchant shall have no right of withdrawal from the Reserve Account. **The Reserve Account shall be under the sole control of Merchant Bank**, and Processor shall not have access to or hold funds in the Reserve Account. Any and all earnings from deposits of the Merchant to the Reserve Account shall be the sole property of the Bank.

**Reserve Account Deposits.**

At any time in Bank's sole and absolute discretion, Bank may (A) designate the minimum balance required to be deposited in the Reserve Account, (B) require that the amount on deposit in the Reserve Account be increased, (C) require that the Merchant deposit, or Merchant Bank may deposit for Merchant into the Reserve Account a

percentage of, or a fixed amount from each Charge processed, or (D) otherwise determine the amount to be deposited in the Reserve Account. Bank at its sole and absolute discretion may require that each month Merchant deposit, or Merchant Bank may deposit by deducting from any payment due to Merchant or from any funds in the Settlement Account or any other deposit account of Merchant sums into the Reserve Account no later than the twentieth (20th) day of the month. Bank shall notify the Merchant as to the amount of the funds to be deposited each month.

Merchant acknowledges and agrees that the Reserve Account may contain both funds deposited by the Merchant and funds of other merchants of the Bank.

**Deductions from Reserve Account.** If funds are not available in the Settlement Account, Bank without prior notice to Merchant may deduct from the Reserve Account any obligation of Merchant to Bank under this Agreement, including all Processing Fees, Chargebacks, Credit Vouchers, damages, and any and all additional fees, and sums sufficient to reimburse Bank for the amount of any fines, penalty amounts and charges due the Card Networks.

…

**Reserve Account After Agreement Terminates. Merchant Bank may continue to hold or deposit funds in the Reserve Account after termination of this Agreement, regardless of whether termination is by Merchant or Bank. Upon termination of the Agreement by Merchant or Bank, Bank may retain sufficient funds to satisfy any and all Processing Fees, Chargebacks, Credit Vouchers, damages, and any and all additional fees, and sums sufficient to reimburse Bank for the amount of any fines, penalty amounts and charges due the Card Networks.** If no funds have been deposited into the Reserve Account before termination, Bank, at Bank's option, may notify Merchant to deposit funds into the Reserve Account upon termination of this Agreement. All provisions which apply to a pre-termination Reserve Account will apply after termination, including replenishment of deficiencies. **The funds will be held by Bank or its designated agent for a period of not less than one hundred eighty (180) days from the date of the last Card Transaction processed under the Agreement, plus the period of any warranty, guarantee, and/or return policy on goods and/or services sold.** Bank will return the balance in the Reserve Account to Merchant after Bank reasonably determines that the risk of Chargebacks and other Processing Fees has ended and after deducting all amounts that Merchant owes to Bank under this Agreement or any other agreement.

(*See* Exhibit A, Agreement at p. 34).

8.      Qualpay has a general policy of reserving one month's worth of transaction volume for merchants in the coaching and mentoring space, and applied that policy to MOBE as well, setting up a reserve account for each of the seven MOBE MIDs.

9.      The establishment of a reserve account is an important means for Qualpay to control its exposure. Without a reserve account, Qualpay can only look to the merchant who initially accepted the transaction to satisfy the chargeback, and if the merchant is no longer in business, Qualpay itself will be forced to bear the loss.

### C.      The TRO and Asset Freeze on the Reserve Account

10.     Qualpay first learned of the FTC's interest in MOBE when Qualpay was served with a non-public civil investigative demand, in response to which it produced documents.

11.     On June 6, 2018, Qualpay received from the FTC a copy of the Temporary Restraining Order ("TRO") entered in this case and requested information about the current balance of any reserve accounts associated with MOBE. Qualpay responded with a letter on June 8, 2018, disclosing the reserve balances.  Unfortunately, though, Qualpay made a mistake in transposing data from a spreadsheet into that letter, so that certain of the balances for the MOBE reserve accounts were incorrect.  As a result, the letter of June 8 overstated the balance of the reserve account, putting it at $7.4 million.  In reality, the reserve balance was $6.3 million on June 8, 2018 and it still is as of the date of this Declaration.

### D.      The Effect of the Asset Freeze on Qualpay's Financial Position

12.     Because the reserve funds have been frozen through the TRO, Qualpay has not handled chargebacks as it normally would—i.e., by debiting them from the reserve it set up pursuant to the Processing Agreement. Instead, Qualpay has funded the chargebacks out of its own operating capital.

13.     The chargeback volume since the TRO froze the reserve account has been nearly $1 million since June 5, 2018.

14.     Qualpay is a relatively new company, and it is not cash rich. If Qualpay cannot use the $6.3 million reserve to satisfy chargebacks, it faces liquidation.

15.     Qualpay was founded in 2014, and raised its first round of equity capital—totaling only $8 million—in 2015. The first $5 million of equity has been used to fund the start-up of the company and to reach the break-even point. The remaining equity balance of approximately $3 million is being used to fund required reserves and meet working capital needs.

16.     Qualpay's working capital needs on a monthly basis absorb nearly all of that $3 million. For example, Qualpay fronts interchange fees every month, meaning that it prepays pass-through fees charged by the card brands and collects them at month-end from its customers. This expense alone generally runs at approximately $1 million per month, and was over $1.2 million in each of April and May 2018.

17.     In addition, Qualpay is contractually obligated to pay referral fees to its sales partners based on processing volumes. While those fees vary, they peaked over $1 million in each of April and May 2018.

18.     Qualpay also must meet payroll, an expense which, in April and May 2018, cost $469,724 and $481,465, respectively, and must otherwise cover other operating expenses.

19.     These costs discussed here alone—which are far from being the only ones Qualpay must satisfy—absorb nearly all of its available capital.

20.     Qualpay's risk analysis, which it prepared using several different models, projects that chargebacks associated with Defendants' consumer transactions may run from $5.8 million on the low end to $12.6 million in an unlikely worst case scenario, with median numbers in the range of $7 million to $8.7 million.

21.     If deprived of the reserve fund and forced to become MOBE's insurer, Qualpay may fail.

[*Signature follows*]

I declare under penalty of perjury that the foregoing is true and correct.

_____          June 21, 2018
Craig Gass

# EXHIBIT A

# Merchant Card Processing Agreement

## Jump to section:

Merchant Card Processing Agreement

Card Not Present Addendum

Special Services Addendum

Merchant Use and Disclosure of BIN Information Addendum

Visa Account Updater Addendum

MasterCard Account Billing Updater Addendum

American Express Card Acceptance Addendum

Patriot Act Notification

## Merchant Card Processing Agreement

This Merchant Card Processing Agreement is for merchant card payment processing services between the merchant ("Merchant") that signed the Application (the "Application") and Synovus Bank (the "Merchant Bank") and Qualpay, Inc (the "Processor"). The Processor and the Merchant Bank are collectively hereinafter referred to as the "Bank". Processor and Merchant Bank reserve the right to allocate Bank's duties and obligations amongst themselves

as they deem appropriate in their sole discretion, and Merchant Bank or Processor may jointly or individually assert or exercise any rights or remedies provided to Bank hereunder.

Notwithstanding the foregoing or any other provision hereof, Merchant understands and agrees (A) that Merchant Bank does not sponsor Processor into the American Express or Diners Club/Carte Blanche or JCB Network, is not providing or agreeing to provide Merchant any services hereunder with respect to American Express or Diners Club/Carte Blanche or JCB Network Card transactions, does not determine or approve or agree upon any fees, charges, pricing, or any other terms and conditions, relating to American Express or Diners Club/Carte Blanche or JCB Network Card transactions, and has no responsibility or liability to Merchant for American Express or Diners Club/Carte Blanche or JCB Network Card transactions; and (B) that Merchant Bank does not provide or agree to provide Merchant any services hereunder or have any responsibility or liability to Merchant with respect to any PIN-based debit or stored value or electronic benefit transfer transactions (except only to the extent, if any, required under Visa's or MasterCard's or Discover's or PayPal In-Store Checkout's Operating Rules or under any mandatory provisions of applicable law), or any other Card type transactions (other than Visa and MasterCard and Discover and PayPal In-Store Checkout credit and non-PIN based debit/stored value Card transactions), or any other services specified in the Application as covered in whole or in part by this Agreement but as not being provided by Merchant Bank; and (C) that to the extent applicable to American Express or Diners Club/Carte Blanche or JCB Network Cards or transactions, or to any of the other types of Cards, transactions or services referred to above or in the Application as not being provided by Merchant Bank, any reference herein or in any of the other documents constituting part of the "Agreement" (as defined below) to the terms "Bank" or "Merchant Bank" (except only to the extent the reference constitutes a complete disclaimer of responsibility or liability on the part of Bank or Merchant Bank, or constitutes an obligation on the part of Merchant to indemnify, defend or hold harmless Bank or Merchant Bank from or against any responsibility or liability) means Processor only.

The appendices, addenda, schedules and FEE SCHEDULE that accompany or are incorporated by reference into this Merchant Card Processing Agreement, as amended from time to time as provided herein, are part of the terms and conditions of this Agreement, as are the Application and the Operating Rules, and with this Merchant Card Processing Agreement are individually and collectively hereinafter referred to as the "Agreement" or as the "Merchant Agreement".

According to the processing services selected by Merchant on the Application and, in accordance with the terms of this Agreement and applicable Operating

Rules, Merchant agrees to participate in the Bank's Card processing program by honoring Valid Cards in accordance with this Agreement; and to submit sales drafts, Credit Vouchers and other electronic data to Bank for the Card Program services provided by Bank.

# With respect to Visa Transactions:

Merchant Bank is responsible for providing settlement funds directly to Merchant, and Processor shall not have access to or hold settlement funds.

# With respect to MasterCard Transactions:

For purposes of the Agreement and performance of the Agreement by the Processor: (1) the Processor is the exclusive agent of Merchant Bank; (2) Merchant Bank is at all times and entirely responsible for, and in control of, Processor's performance; and (3) Merchant Bank must approve, in advance, any fee to or obligation of the Merchant arising from or related to performance of the Agreement.

The Agreement is not effective and may not be modified in any respect without the express written consent of Merchant Bank.

Processor may not have access, directly or indirectly, to any account for funds or funds due to a Merchant and/or funds withheld from a Merchant for Chargebacks arising from, or related to, performance of the Agreement. Merchant Bank may not assign or otherwise transfer an obligation to pay or reimburse a Merchant arising from, or related to, performance of the Agreement to Processor.

Processor may not subcontract, sublicense, assign, license, franchise, or in any manner extend or transfer to any third party, any right or obligation of Processor set forth in the Agreement.

Merchant Bank is responsible for the Program and for the Merchant's participation in the Program.

The Merchant Agreement will not be effective until Acceptance of the first Card Transaction.

## DEFINITIONS

**Acceptance:** Process by which Merchant allows a Card or electronic debit or credit entry to be used by a Cardholder as a means of payment.

**ACH:** Automated Clearing House Network.

**ACH Rules:** Collectively, the National Automated Clearing House Association ("NACHA") Operating Rules and NACHA Operating Guidelines, as the same are amended from time to time.

**Address Verification Service (AVS):** A Card fraud prevention tool designed for mail order, telephone order and electronic commerce (internet) merchants and other electronic transactions. Use of AVS is not a guarantee that a Card Transaction is valid.

**Adjustment:** One or more transactions involving a Credit Voucher, a Chargeback, or a correction to the Settlement Account resulting from a Card Transaction processing error, or from Merchant's failure to follow the Operating Rules.

**Application:** The Application for Merchant Agreement that Merchant completed and signed and which is subsequently accepted by both Processor and Merchant Bank by execution or as otherwise provided herein.

**Authorization:** The process whereby Merchant in compliance with the Operating Rules for each Card obtains approval of a Charge from the Card Issuer. An Authorization indicates only the availability of the Cardholder's credit limit at the time the Authorization is requested.

**Authorization Code:** A message obtained through the Card Networks' Authorization networks that informs Merchant that a Card transaction has been approved.

**Batch:** A term that collectively refers to Card transactions delivered for processing in a file and processed within a given period of time, usually daily.

**Business Day:** Monday through Friday excluding Merchant Bank holidays. Each Business Day ends at the cut-off time specified by Merchant Bank. Charges submitted for processing on a holiday, weekend, or after the cut-off time are treated as received the following Business Day.

**Card:** Any Visa-branded or MasterCard-branded or Discover® Network branded or PayPal-branded Credit and Business Cards or Debit Cards, private-label credit card, ATM/debit Card, PayPal Payment Code, or any other card or code issued by Card Network or by a member of a Card Network which Bank may at any time specify in writing as an additional Card payment option available to Merchant (See also "Valid Card").

**Card Not Present (CNP):** A Card Transaction wherein neither the Cardholder nor the Card is physically present at the Point of Sale. Mail order and telephone order (MO/TO), electronic commerce and Preauthorized Transactions are collectively referred to as "CNP Transactions".

**Card Program:** One or more programs of financial service Cards honored by Merchants and financial institutions for presentment and collection of Cardholder indebtedness.

**Card Transaction:** The honoring of a Card by Merchant to purchase Merchant's goods or services.

**Cardholder:** The person issued a Card and a corresponding account by a Card Issuer.

**Cardholder Account:** The account of a Cardholder as represented by a Card.

**Card Network:** Any entity formed to administer and promote Cards, including, without limitation, MasterCard International, Incorporated ("MasterCard") Visa U.S.A. Inc. and Visa International (collectively, "Visa") and Discover Network and PayPal, Inc. ("PayPal"). In the case of Online Debit Transactions, "Card Network" includes the Debit Networks.

**Card Issuer:** The institution authorized by a Card Network to issue Cards to Cardholders and that has issued a Card presented to Merchant for a Charge or Credit Voucher.

**Card Verification Value (CVV)/Card Validation Code 2 (CVC2)/Card Identification Data (CID):** A unique value encoded on the Magnetic Stripe of a Card used to validate Card information during the Authorization process.

**Card Verification Value 2 (CVV2)/Card Validation Code 2 (CVC2)/Card Identification Data (CID):** A code derived by the Card Issuer and printed on the reverse side of a Card. The CVV2/CVC2/CID is used to deter fraudulent use of an account number in a CNP Transaction.

**Charge:** The evidence of an obligation of a Cardholder arising from a Card Transaction with Merchant which is submitted by Merchant in paper or

electronic form to Bank for processing through a Card Network's interchange system so that payment may be made to Merchant and the amount of the Charge posted to the Cardholder Account. A Charge also may be referred to as a "Charge Record," "sales draft" or "sales slip."

**Chargeback:** A return of a Charge to Merchant, typically initiated by a Cardholder through a Card Issuer, for transmittal to and payment by Merchant under Operating Rules established by the Card Networks.

**Credit and Business Cards:** Any Visa-branded or MasterCard-branded or Discover Network branded or PayPal branded Cards that are adopted by Visa or MasterCard or Discover Network or PayPal for use in connection with their consumer credit and charge Card Programs, any Visa-branded or MasterCard-branded or Discover Network branded or PayPal branded business, corporate or, commercial Card (includes business, corporate and public sector credit, charge or debit Cards), and any other Visa-branded or MasterCard-branded or Discover Network branded or PayPal branded Card that is not defined as a Debit Card.

**Credit Voucher:** The evidence of a partial or total refund of a Charge submitted by Merchant to Bank in paper or electronic form for processing through a Card Network interchange system so that credit may be made to a Cardholder Account. A Credit Voucher may also be referred to as a "Credit Slip".

**Debit Cards:** Visa-branded or MasterCard-branded or Discover Network branded or PayPal branded consumer Cards issued by U.S. Card Issuers that when presented for payment, access, debit, hold or settle funds from a consumer's demand deposit, investment or other asset account. Examples of Debit Cards include: Visa Classic, Gold and Platinum Check Cards; Visa Check Card II Check Cards; Visa Buxx Cards; Visa Payroll Cards; Visa Gift Cards; and MasterCard Standard, Gold, and Platinum debit Cards.

**Debit Network:** An online data processing system used to support PIN based Card Transactions.

**Installment Billing Transaction:** A single purchase of goods that is divided into two or more installment payment transactions made in a Card Not Present environment.

**Magnetic Stripe:** A stripe of magnetic information affixed to the back of a plastic credit or debit Card. The magnetic stripe contains essential Cardholder and account information.

**Merchant Affiliate:** Any entity or account designated as "Affiliated" on the Application and, in addition, any person or entity which is owned or controlled, in whole or in part, by Merchant or any of Merchant's principal business owners identified in the Application ("Principals").

**Merchant Identification Number (MID):** The identification number assigned to Merchant by Bank for the purposes of participation in Bank's Card Program. Merchant may be assigned multiple MIDs.

**Merchant Servicer:** Any contractor, agent, hardware provider, software provider or service provider who is engaged directly or indirectly by Merchant or who otherwise acts for or on behalf of Merchant in connection with Merchant's acceptance of Cards or the submission of Charges or Credit Vouchers to Bank, or who otherwise assists Merchant in the performance of Merchant's obligations under this Agreement, and includes without limitation any "Agent", "Merchant Servicer", "Third Party", "Merchant Processor", "Data Storage Entity", "Payment Service Provider", "Internet Payment Service Provider", "Payment Facilitator" or "Internet Payment Facilitator" who acts for or on behalf of Merchant within the meaning of the Operating Rules, and any other person or entity who will store, transmit, process, or otherwise have access to, any Cardholder or card transaction data in connection with Merchant's performance of Merchant's obligations under this Agreement.

**On-line Debit Card Transaction:** A Card Transaction between the Merchant and the Cardholder that is initiated with a Card that is processed through a Debit Network, and that requires entry of a Cardholder's personal identification number ("PIN") during the transaction process.

**Operating Guide:** Any manuals or guides prepared by Bank from time to time, containing operational procedures, instructions and other directives relating to Card Transactions.

**Operating Rules:** Relevant portions of Operating Regulations, Operating Manuals, Operating Guide, Official Rules, Bulletins, Notices, and similar documents issued by Card Networks, Debit Networks, Merchant Bank or Processor. (Merchant acknowledges that MasterCard has published a "Rules Manual" and a "Chargeback Guide", which are available at the MasterCard web site; and that Visa has published a public version of the "Visa Core Rules and Visa Product and Service Rule" and a "Card Acceptance Guidelines for Visa Merchants" and a "Chargeback Management Guidelines for Visa Merchants", which are available at the Visa website. Merchant represents, warrants and agrees that Merchant has accessed each of these documents, and that Merchant will at all times continue to maintain the capability to access, and will access, each of these documents as in effect from time to time, including any changed versions thereof as may be published from time to time by the applicable Card Network. In the event there shall be any inconsistency between any such published version of a Card Network's Operating Rules and the version made applicable to Merchant Bank from time to time by the applicable Card Network, the version made applicable to Merchant Bank from time to time by the applicable Card Network shall control to the extent of the inconsistency.) The Operating Rules, as in effect from time to time, are

incorporated herein by this reference. References herein to any particular sections of any Operating Rules of a Card Network, are deemed to include any future changed, supplemented and/or re-numbered versions of those sections, when and as made effective from time to time by the applicable Card Network.

Point of Sale (POS): Each location of Merchant where Merchant and Cardholder can jointly complete a Charge or Credit Voucher transaction in connection with the Cardholder's purchase of goods or services provided by Merchant. Preauthorized Health Care Transaction: A Card Transaction for which a Cardholder has given a health care Merchant written permission to the Cardholder Account for services.

Preauthorized Transaction: A Card Transaction for which a Cardholder has given advance permission to periodically charge the Cardholder Account. Preauthorized Transactions include Recurring Transactions, Installment Billing Transactions, and Preauthorized Health Care Transactions.

Processing Fees: The fees payable by Merchant to Bank for the Card Program services Bank provides to Merchant in connection with this Agreement, as specified in the FEE SCHEDULE to the Application or as otherwise provided for in this Agreement or an Addendum thereto.

Recurring Transaction: A Card Transaction where the Cardholder provides permission, in either written or electronic format, to a Merchant to periodically charge the Cardholder Account for recurring goods or services, including, but not limited to, insurance premiums, subscriptions, monthly internet access fees, membership fees, tuition, or utility charges.

Regulation E: The regulations, together with all staff interpretations issued thereunder, published by the Consumer Financial Protection Bureau to implement The Electronic Funds Transfer Act. "Regulation E" includes specific rules for all parties involved governing the issuance and use of Debit Cards and the processing of On-line Debit Card Transactions. Settlement Account: The checking account or other acceptable deposit account Merchant maintains at a depository institution acceptable to Bank for credit of Charges by Merchant Bank and debit of Credit Vouchers, Chargebacks, Processing Fees and any fines or fees assessed by Card Networks or other governmental agency or entity having authority.

Valid Card: A Card that is (1) properly issued under the authority of a Card Network (not counterfeit); (2) "current" according to any beginning and expiration dates on the Card; (3) signed by the Cardholder named on the front or other authorized signer, or in the case of CNP Transactions, in compliance with the applicable Operating Rules; (4) not listed at the time of a Charge in a warning bulletin or notice issued by a Card Network; and (5) not visibly altered or mutilated when physically present at the POS.

MERCHANT'S APPLICATION AND INFORMATION.

By completing and signing the Application, Merchant applies for the Card Program services covered by the Application and this Agreement. In its sole and absolute discretion, Processor and/or Merchant Bank may accept or reject Merchant's Application. Merchant may present Charges to Bank only for the activities and in the volumes described on the Application, including the percentage of mail/phone order and electronic commerce (internet) transactions. (Without limiting the generality of the foregoing, Merchant understands and agrees that Merchant shall not present Charges to Bank which arise from any internet gambling transactions, or any other form of gambling transactions, unless (i) such activities by Merchant are described in the Merchant Application and (ii) there shall first have been entered into a separate agreement with Merchant with regard to such transactions, signed by both Processor and Merchant Bank.)

MERCHANT'S GENERAL DUTIES.

Merchant will comply with this Agreement for submitting and processing Charges and Credit Vouchers with Bank. Bank is responsible to Merchant for processing Card Transactions under the Operating Rules for the Card Program services to which Merchant subscribes, which may vary among Card types.

Merchant may choose to accept (in the case of Visa or MasterCard acceptance) (i) Debit Cards only, or (ii) Credit and Business Cards only or, (iii) both Debit Cards and Credit and Business Cards, in each case of the Card Networks designated by Merchant on the Application (if Merchant has chosen to accept Discover Card Transactions or PayPal In-Store Checkout Transactions in the Application, Merchant agrees to accept all Discover Cards, and all PayPal Cards used for PayPal In-Store Checkout Transactions, as the case may be). The applicable discount rates for Debit Cards and Credit and Business Cards, and for all other Cards, are stated on the FEE SCHEDULE provided in or with the Application, as the same may be modified from time to time as provided herein. Merchant shall designate which Card type(s) Merchant will accept upon the signing of the Application.

For Card Transactions, Merchant agrees (in the case of each of the following, to the extent such agreement is not prohibited by mandatory provisions of applicable law) to: (i) honor all Valid Cards of the Card type(s) selected under Section 3.b; (ii) with respect to the Card Networks whose Cards Merchant so selects, honor all Cards, regardless of type(s), issued by a non U.S. Card Issuer; (iii) not accept Cardholder payments for previous Card charges incurred at the Merchant location; (iv) not establish minimum or maximum amounts for Card Charges or Credit Vouchers unless otherwise required or allowed by the Operating Rules; (v) not impose any surcharge or convenience fee on Card Charges or transactions if the surcharge or convenience fee is prohibited by

the Operating Rules; (vi) not require a Cardholder to complete a postcard or similar device that includes the Cardholder Account number, Card expiration date, signature or any other Card account data in plain view when mailed; (vii) not add any tax to transactions, unless applicable law expressly requires that Merchant be permitted to impose a tax; any tax amount, if allowed, must be included in the Charge amount and not collected separately; (viii) not request or use a Cardholder Account number for any purpose other than as payment for Merchant's goods or services; (ix) not disburse funds in the form of travelers cheques or other non-cash media, if the sole purpose is to allow a Cardholder to make a cash purchase of goods or services from Merchant; (x) not use a Charge to make a cash advance to any person or to disburse funds in the form of cash, except for specialized transactions previously authorized by Bank in writing; (xi) not require a Cardholder to provide fingerprints or other personal information, such as address, license, telephone number or social security number as a condition for honoring a Card, unless required to do so by the Operating Rules; (xii) not make a photocopy of a Card or require the Cardholder to provide a photocopy or facsimile of a Card unless the photocopy or facsimile is needed for a Card recovery program of Bank or a Card Network; (xiii) not submit Card Charges for processing without physical possession of a Card unless pre-approved in writing by Bank, either on the Application or in other written form; (xiv) comply with all laws in completing Card Transactions, performing obligations under this Agreement, and otherwise conducting Merchant's business; (xv) not accept Cards for transactions that are classified as "Quasi-Cash Transactions" including, but not limited to, the sale of casino gaming chips, money orders, opening deposits on financial or other accounts, wire transfer money orders, or the issuance of scrip; (xvi) not accept a Card to collect or refinance an existing debt that has been deemed uncollectible by Merchant; (xvii) not enter into interchange a Charge that represents collection of a dishonored check or a Chargeback; (xviii) not require a Cardholder, as a condition of honoring a Card, to sign a statement that waives the Cardholder's rights to dispute the transaction with the Card Issuer; (xix) as applicable, accept CNP Transactions in accordance with the terms of the CNP ADDENDUM; (xx) provide Bank with evidence of the original purchase.

Merchant, and not Bank, is responsible for any advice from, acts of, as well as omissions, acts of fraud or acts of misconduct by Merchant's employees, processors, consultants, advisors, contractors, agents, officers and directors. Merchant, and not Bank, is responsible for the use, unauthorized use or misuse of Merchant's equipment, POS terminals, or software.

Merchant consents to receiving electronically rather than in paper form all written notices, disclosures and other documents ("Documents") which are to be provided by Bank to Merchant under this Agreement. Bank will notify Merchant that a Document is available at Processor's web site with a link to

that specific page of the web site containing the Document. Merchant agrees that such notification will be sent to Merchant at the e-mail address provided as part of the Application.

Merchant understands and acknowledges that access to the Internet, e-mail and the worldwide web are required for Merchant to access a Document electronically and Merchant confirms that Merchant has such access. Merchant understands that there are costs related to access Documents electronically and Merchant agrees that Merchant is responsible for these related access costs.

At any time and without giving Merchant advance notice, Merchant Bank and/or Processor may elect not to send a Document electronically, in which case a paper copy of the Document will be sent to Merchant or such Document shall otherwise be provided as provided for herein.

PROCEDURES FOR CARD TRANSACTIONS.

Operating Procedures for Card Transactions. In accepting Cards for the purchase of Merchant's goods and services, Merchant shall comply with the requirements of this Agreement, including but not limited to the Operating Rules and applicable law, as the same are revised from time to time. Authorization. Unless specifically exempted by Operating Rules, Merchant agrees to obtain Authorization for the total amount of the transaction, including the tip and tax, if applicable, and shall record the positive Authorization Code on the sales draft prior to completing the transaction. Such Authorization must be obtained for every Card Transaction on the transaction date and prior to completing the transaction, unless otherwise specified in the Operating Rules. Procedures for obtaining Authorizations are set forth in the Operating Rules. If a Merchant completes a Charge without Authorization, Merchant will be responsible for any Chargeback of the Charge and this Agreement shall be subject to immediate termination without notice. Obtaining Authorization does not assure that the person using the Card is the Cardholder and will not prevent a Chargeback to Merchant for any of a variety of reasons under the Operating Rules, including use of the Card by an unauthorized user or a Cardholder claim or defense relating to the Charge. Merchant shall use its best efforts, by reasonable and peaceful means, to retain or recover any Card, (a) if Merchant is advised by the authorizing center to retain it, (b) if Merchant has reasonable grounds to believe such Card is counterfeit, fraudulent or stolen, or (c) if the Card's embossed account number, indent printed account number and/or encoded account number do not match, or an unexpired Card does not have the appropriate hologram on the Card face. Merchant's efforts to recover a Card will at all times be reasonable under the circumstances. The obligation of Merchant of retain or recover a Card imposed by this section does not authorize a breach of the peace or any injury to persons or property,

and Merchant will hold Bank harmless from any claim arising from any injury to person or property or other breach of the peace.

<u>Recording a Charge</u>. Merchant must record each Charge and Credit Voucher by following procedures in a format and manner specified by Bank and using records such as sales drafts, sales slips or electronic processing records and methods, as set forth in the Operating Rules. Merchant will complete each sale as a single Charge, except as alternative methods are specifically approved by Bank in writing. Merchant will deliver to the Cardholder an accurate and complete copy of the Charge, no later than the time of delivery of the goods or performance of services, using a format approved by the Card Networks and supplied by Bank. Merchant must provide on the Cardholder's copy of the Charge the truncated Card account number of the Cardholder and must not provide the Card expiration date, in accordance with the Operating Rules and applicable law. Merchant is responsible for ascertaining whether applicable law requires copies of transaction receipts retained by Merchant to truncate card numbers and suppress expiration dates, and for complying with all such laws. For receipts completed by Internet Payment Service Providers, Payment Service Providers, or Payment Facilitators, see additional requirements set forth in the Operating Rules.

<u>Refunds; Adjustments; Credit Vouchers.</u>
Merchant Policy: Merchant may limit returned merchandise or limit price adjustments, to the same extent as for sales not involving a Card, provided Merchant properly discloses its policy to the Cardholder before the sale, the limits are properly disclosed on the Charge Record before the Cardholder signs it, and the purchased goods or services are delivered to the Cardholder at the time the Charge takes place. Proper disclosure means the words "NO REFUND," "EXCHANGE ONLY," or "IN STORE CREDIT ONLY" are printed in large letters near the signature line on all copies of the Charge Record prior to obtaining the Cardholder's signature on the Charge Record. Merchant will submit any changes to its return policy to Bank in writing at least thirty (30) days before the change and will not implement any change to which Bank reasonably objects. Merchant's policies will not override the Operating Rules and will not prevent Chargebacks to Merchant under those rules.

Credit Vouchers: Merchant will not make a refund or Adjustment for a Charge in cash (except when required by law), but will deliver to Bank a Credit Voucher for a refund or Adjustment to the Cardholder Account within three (3) days of the refund or Adjustment and deliver to the Cardholder a copy of the Credit Voucher at the time the refund or Adjustment is made. Card numbers shall be truncated and expiration dates suppressed on copies provided the Cardholder in accordance with Operating Rules and applicable law. Merchant is responsible for ascertaining whether applicable law requires copies retained by Merchant to truncate card numbers and suppress expiration dates, and for

Case 6:18-cv-00862-RBD-DCI   Document 32-2   Filed 06/22/18   Page 21 of 83 PageID 4838

complying with all such laws. Merchant will include the refund date and amount and a brief description of the refund or Adjustment on the Credit Voucher in sufficient detail to identify the Card used and original Charge. The amount of the Credit Voucher must not exceed the amount of the original Charge except for any amount which Merchant agrees to reimburse the Cardholder for return postage. Merchant may not deliver a Credit Voucher to Bank for any refund or Adjustment of a purchase not originating as a Charge with the same Cardholder requesting the refund or Adjustment, a Charge not made with Merchant, or a Charge not originally processed by Bank. Merchant will not complete a Credit Voucher for a Card issued to it or its Principals or employees except for a valid refund of a Charge originating with Merchant. Merchant may not receive money from a Cardholder and subsequently deliver to Bank a Credit Voucher to make a deposit to the account of the Cardholder. Bank may delay processing Credit Vouchers on any day to the extent they exceed the total of valid Charges presented on that day and the balance in the Settlement Account available to cover the Credit Vouchers, until the sum of valid Charges and the balance in the Settlement Account is sufficient to cover the Credit Vouchers.

Credit Vouchers After Agreement Termination: After this Agreement terminates, Bank is not obligated to process any Credit Vouchers that Merchant submits. All Chargebacks related to Credit Voucher disputes will be Merchant's responsibility. If Merchant enters into a new card processing service agreement with a new processor and provides Bank the name and address of Merchant's new processor, Bank will work with the new processor at Merchant's expense to reasonably resolve disputes.

Submission of Valid Charges. Merchant will submit to Bank a Charge only if the Charge is made or approved by the Cardholder who is issued the Card used for the Charge. Except as otherwise permitted by the Operating Rules and as approved by Bank in advance, Merchant will not submit a Charge for processing by Bank until Merchant has delivered or shipped the goods and/or performed all its services. Merchant will not submit directly or indirectly: (1) any Card Transaction previously submitted to Bank; (2) any Card Transaction that Merchant knows or should have known to be fraudulent or not authorized by the Cardholder; (3) any Card Transaction that results from a transaction outside of Merchant's normal course of business, as described on the Application; (4) any Card Transaction that results from a transaction not involving Merchant or not originated as the result of an act between Merchant and a Cardholder; or (5) any Card Transaction containing the account of a Card issued to Merchant or any account numbers issued to Merchant's business owners, family members and Principals for transactions that do not represent a purchase of goods or services from Merchant or a related credit. Merchant is responsible for its employees' actions while in Merchant's employ. Merchant will submit Charges and Credit Vouchers within the applicable time limits specified in the

applicable Operating Rules (including, without limitation, those referred to in Section 4.a.vi below).

Deposit Requirements and Restrictions. Merchant must deposit only transactions that directly result from cardholder transactions with Merchant. However, a Merchant Servicer which acts in the capacity of an Internet Payment Service Provider (IPSP) or Internet Payment Facilitator (IPF) or Payment Facilitator (PF) or Payment Service Provider (PSP) in accordance with the applicable Operating Rules, may deposit transaction receipts on behalf of Merchant, as long as such Merchant Servicer has been approved in advance by the Merchant Bank (in accordance with the provisions of this Agreement including but not limited to Section 7.f) to act in such IPSP, IPF, PF or PSP capacity for the Merchant. Except as otherwise set forth in the Operating Rules: such Merchant Servicer's name may appear in the clearing record only if both these conditions are met: Cardholder accesses the web site of the Merchant Servicer directly, and the name of the Merchant Servicer is visible to the cardholder during the selection, order, and payment processing services; if the cardholder accesses the Merchant's web site and is then linked to the web site of the Merchant Servicer for payment, the Merchant Servicer's name must appear in the clearing record in conjunction with the Merchant's name. Merchant must not deposit a transaction until it does one of the following: (a) completes the transaction, (b) ships or provides the goods, (c) performs the purchased service, or (d) obtains the cardholder's consent for a recurring transaction. Merchant may deposit a prepayment, within the time limits specified in Section 4.a.vi below, if the Merchant advises the cardholder of the immediate billing at the time of the transaction, for (1) Prepayment of services, excluding estimates for services to be provided, and (2) Full prepayment of custom- ordered merchandise, manufactured to the cardholder's specifications. For prepayment of services, the transaction date is considered to be the date of cardholder prepayment. An Advance Payment Service Merchant must only deposit a transaction representing a partial or complete advance payment, provided Merchant informs the cardholder of the following, (1) Total price of the services or activity, (2) Advance payment amount, (3) Advance payment confirmation code, and (4) Cancellation terms. For more information on restrictions related to Advance Payment Service transactions, see the Special Services Addendum, section 2. In the case of Installment Billing Transactions, Merchant must not deposit the first Installment Billing Transaction with Bank until the shipment date of the goods. The Merchant must deposit subsequent Installment Billing Transaction Receipts at either of the following intervals: (1) 30 calendar days or more; or (2) Monthly anniversary of the shipment date (same day of each month). For more information on restrictions related to Installment Billing Transactions, see the Card Not Present (CNP) Addendum, section 5. If Merchant has multiple outlets, Merchant must ensure that Processor and Merchant Bank are able to: 1) Identify the location of each

transaction on the transaction receipt, and 2) Include this identification in the clearing record.

Visa Deposit Time Limits. Except as may otherwise be set forth in the Visa Operating Rules or as may otherwise be required by applicable law: (1) Merchant must deposit Charge transaction receipts within 5 calendar days of the transaction date and Credit transaction receipts within 3 calendar days of the transaction date, except as specified below; (2) Merchant must deposit Charge transactions for Delayed Delivery Transactions within 5 calendar days of the date of both the deposit and final payment; (3) Merchants with multiple outlets (and which accumulate transaction receipts at a central office or facility) and these business types: transportation companies subject to federal or foreign regulations, oil companies, car rental companies, hotels, motels, and restaurant chains, must deposit transactions as follows: (a) Charge transaction receipts within 15 calendar days of the transaction date. (b) Credit transaction receipts within 5 calendar days of the transaction date.

Payments to Merchant for Valid Charges.
(A) Merchant Bank will provide provisional credit to Merchant for each valid Charge which Merchant submits to Bank by crediting Merchant's Settlement Account, provided Merchant Bank has received settlement for the valid Charge through the interchange procedures specified by the Card Network applicable to the Card used for the Charge (Bank does not provide payment for all Card types for which Authorization services are provided). Merchant Bank is not obligated to provide provisional credit to Merchant for Charges submitted that are not valid Charges, and may suspend or discontinue any provisional credit in Merchant Bank's and/or Processor's sole and absolute discretion, including for any reason that would justify termination of this Agreement. Each provisional credit from Merchant Bank to Merchant will be subject to Adjustment, including revocation, upon Bank's further review and verification. Provisional credit to Merchant for a Charge disputed by a Cardholder for any reason is not final.

Merchant Bank may deduct from any payment to Merchant the amount of any Credit Voucher processed for Merchant, any Chargeback to Merchant, any amount to be deposited in the Reserve Account and any Processing Fees and Card Network fines or charges due from Merchant or due from an entity related to Merchant under a separate agreement with Merchant Bank. Merchant must immediately pay Bank the amount by which a Credit Voucher processed on any day exceeds valid Charges submitted on that day. Without limiting Bank's remedies, Merchant Bank may obtain the amount due by deducting it from the Settlement Account, Reserve Account or other accounts of or funds due Merchant.

(C) Merchant acknowledges that all payments and credits provided to Merchant are provisional and subject to suspension, to Chargebacks and to Adjustments in accordance with this Agreement and the Operating Rules.

<u>Retrieval Requests.</u> If Merchant deposits Charge Records with Bank through magnetic tape, electronic transmission, or electronic data capture terminal, upon the request of a Card Network or Bank, Merchant shall respond to all transaction documentation (retrieval) requests within the time frames specified in the applicable Operating Rules. If Merchant does not respond or responds late to a transaction documentation request, Merchant may be without recourse as Chargebacks for "non receipt of requested item" in most cases, cannot be reversed.

Procedures for On-Line Debit Card Transactions. Merchant must obtain Authorization for each On-line Debit Card Transaction before Merchant can complete the transaction. Merchant will not complete an On-line Debit Card Transaction unless it has been authorized by the Card Issuer by using the POS Equipment (defined in Section 4.d) and following the procedures of the Card Network. Merchant may not complete an On-line Debit Card Transaction without entry of the PIN by the Cardholder. Merchant will comply with Regulation E, all applicable law, and all applicable Operating Rules in connection with each On-line Debt Card Transaction.

CNP Transactions. The CNP ADDENDUM applies to all Card Transactions wherein neither the Cardholder nor the Card is physically present at the Point of Sale. CNP Transactions include mail order and telephone order, electronic commerce (internet), and Preauthorized Transactions. A Merchant may only accept CNP Transactions if the Merchant has completed the appropriate areas on the Application and has been authorized by Merchant Bank and Processor to accept such Card Transactions.

Equipment; Supplies; Displays.

At Merchant's request, Processor will supply Merchant with POS equipment and/or Software, including electronic terminals, other processing equipment and, for On-line Debit Card Transactions, PIN pads (collectively "POS Equipment") that comply with the Operating Rules. Processor will use good faith efforts to program the POS Equipment to operate at Merchant's location in compliance with the Operating Rules. However, Processor makes no representations or warranties that Processor's programming of the POS Equipment furnished by Processor will operate in compliance with the Operating Rules. Merchant acknowledges and agrees that it is Merchant's obligation to operate in compliance with the Operating Rules.

All third party software, equipment and services provided or procured by Processor under this Agreement are provided "AS-IS" but Processor will, at Merchant's expense, use reasonable commercial efforts to assist Merchant in

enforcing any warranty offered by the third party supplier of such software, equipment or services.

Merchant will use only the forms for Charges and electronic processing formats provided or approved in advance by Bank. Bank may change the forms from time to time, and, upon notification, Merchant will comply with any changes. Merchant will use Charge forms or materials provided by Bank only for Charges which Merchant submits to Bank.

iv. Merchant shall display Visa, MasterCard, Discover Network, PayPal and, if applicable, other Card Network decals, program marks, and advertising and promotional materials in compliance with the Operating Rules. Merchant shall only display Visa and MasterCard and Discover Network and PayPal approved decals, program marks and advertising and promotional materials for the Card type(s) that Merchant selected under Section 3.b. Merchant is prohibited from using each Card Network's program marks other than as expressly authorized in writing by Merchant Bank. Program marks mean the brands, emblems, trademarks and/or logos that identify the applicable Card Network's Cards. Additionally, Merchant shall not use the program marks other than to display decals, signage, advertising and other forms depicting the program marks that are provided to Merchant by Merchant Bank pursuant to the Merchant program provided for in this Agreement, or otherwise approved in advance in writing by Merchant Bank. Merchant may use the program marks only to promote the services covered by the program marks by using them on decals, indoor and outdoor signs, websites, advertising materials and marketing materials; provided that all such uses by Merchant must be approved in advance by Merchant Bank in writing. Merchant shall not use the program marks in such a way that customers could believe that the products or services offered by Merchant are sponsored or guaranteed by the owners of the program marks. Merchant recognizes that it has no ownership rights in the program marks. Merchant shall not assign to any third party any of the rights to use the program marks.

Merchant may not (a) indicate or imply that the Card Networks or Bank endorses any Merchant goods or services, (b) refer to a Card Network or Bank in stating eligibility for Merchant's products, services or membership, or (c) use any marks, symbols or logos owned by any Card Network or Bank for any purpose other than those permitted in the Operating Rules.

vi. "PayPal Marks" mean the brands, emblems, trademarks, and/or logos that identify PayPal Acceptance. The PayPal Marks are described in Appendix A of the PayPal Operating Regulations. Merchant may use the PayPal Marks only to promote PayPal products offers, services, processing and/or acceptance. Merchant use of the PayPal Marks is restricted to the display of decals, signage, advertising, and marketing materials provided or approved by PayPal in writing pursuant to the process set forth in the PayPal Operating Regulations.

Merchant shall not use the PayPal Marks in such a way that PayPal Account Holders could believe that the products or services offered by Merchant are sponsored or guaranteed by the owners of the PayPal Marks. Merchant recognizes that it has no ownership rights in the PayPal Marks. Merchant shall not assign to any third party any of the rights to use the PayPal Marks. Merchant is prohibited from using the PayPal Marks, not permitted above, unless expressly authorized in writing by PayPal.

CHARGEBACKS.

Bank will charge back to Merchant and Merchant will pay Bank, the amount of each Charge which Merchant or a Merchant Affiliate submits to Bank for processing that is subject to Chargeback to Bank for any reason under the Operating Rules, or to the extent Bank receives claims regarding the Charges from Cardholders under other provisions of law.

A Chargeback may occur for any one or more of several reasons under the Operating Rules or through operation of consumer protection laws, such as the Truth in Lending Act and the Fair Credit Billing Act. Chargeback reasons include, without limitation:

The Charge Record or any material information it contains as provided by Merchant (such as the Card account number, expiration date of the Card, merchant description, purchase amount, Charge date and Authorization date) is illegible, incomplete, incorrect, or unsigned, or is not transmitted to Bank within the required time limits;

Merchant knew or, by following proper practices, should have known that the Card was not to be honored;

The Charge was completed with a counterfeit or altered Card or before the valid date or after the expiration date of the Card;

Merchant did not obtain Authorization, or did not provide a correct and legible Authorization Code on the Charge Record;

The Charge Record is a duplicate of another Charge Record, represents one of two or more Charges arising from a single purchase, or the Charge has been submitted to another merchant card processor; vi. The Cardholder disputes participating in or approving the Charge, signing the Charge Record, or the sale, delivery, quality or performance of the purchase; the Cardholder alleges that return of goods or a Credit Voucher was improperly refused; or the Cardholder alleges that a Credit Voucher issued by Merchant was not processed for the Cardholder Account;

The amount on the Charge Record submitted to Bank differs from the amount on the copy required to be delivered to the Cardholder;

The Charge was fraudulent or the related purchase was not a bona fide purchase in Merchant's ordinary course of business, was subject to any claim

of illegality, cancellation, avoidance, or offset for any reason, including, without limitation, negligence, fraud or dishonesty on the part of Merchant or Merchant's agents or employees or was submitted in violation of Section 6;

The Cardholder has asserted what the Cardholder believes is a good faith claim or defense against the Charge;

The Charge is in violation of any law;

The Card Transaction is one that Bank, for any reason, is or would be required to pay, repurchase or Chargeback by virtue of Operating Rules or otherwise, and was processed under this Agreement or any agreement with any Merchant Affiliate.

Merchant may not enter into interchange any Charge for a Card Transaction that was previously charged back to the Merchant Bank and returned to Merchant, irrespective of Cardholder approval.

If Bank determines that Merchant has or is reasonably likely to have a monthly ratio of Chargebacks to Charges exceeding one percent (1%), Bank, may, but is not obligated to, notify Merchant of new procedures it should adopt and additional Processing Fees imposed for processing Chargebacks, and/or may terminate this Agreement, at Merchant Bank's or Processor's discretion, without advance notice. Merchant must immediately pay any fines or fees imposed by a Card Network or Bank relating to Chargebacks to Merchant.

The Card Networks have established guidelines, merchant monitoring programs and reports to track merchant activity such as, but not limited to excessive credits and Chargebacks, and increased deposit activity. In the event Merchant exceeds the guidelines or submits suspicious transactions as identified by a Card Network or any related program or reports, Merchant may be subject to: (a) operating procedure requirement modifications; (b) incremental Chargebacks and/or fees; (c) settlement delay or withholding; (d) termination of this Agreement; and/or (e) audit and imposition of fines. Merchant hereby releases Bank from any and all damages, liability, costs or expenses that Merchant may incur as a result of Bank's compliance with Card Network directives.

Each Chargeback to Merchant is immediately due and payable by Merchant. Without limiting Bank's other remedies or Bank's security interest described in Section 16 below, Merchant Bank may deduct, debit and withhold the amount of a Chargeback or anticipated Chargeback from the Settlement Account, Reserve Account, or any Merchant account at Merchant Bank, or other property of Merchant held by Bank, or any Settlement Account or Reserve Account of a Merchant Affiliate. Bank will send Chargeback reports to Merchant as debits occur. To the extent funds are not available from the previously described accounts of the Merchant or Merchant Affiliate, Merchant irrevocably authorizes Merchant Bank to attach and initiate withdrawals of

funds from Merchant's accounts at other financial institutions, by ACH entry, sight draft, preauthorized checks, reverse wires or otherwise to cover the Chargebacks, and Merchant hereby irrevocably authorizes the other financial institutions to withdraw the funds from Merchant's accounts and pay Bank the amount of the Chargebacks. Merchant Bank will release to Merchant any of Merchant's deposits, funds or property after Bank determines in its sole and absolute discretion that the deposits, funds or property are not likely to be needed to cover any Chargebacks.

MERCHANT'S WARRANTIES.

Upon signing the Application, and each time Merchant submits a Charge, Merchant represents and warrants that:

Merchant has abided by this Agreement, and all applicable laws and Operating Rules for the Charge;

Each statement made on the Application was true as of the date Merchant signed the Application agreeing to be bound by this Agreement;

There have been no materially adverse changes in information provided in the Application or in Merchant's financial condition, or management;

Merchant does not do business under a trade name or style not previously disclosed in writing, and there has been no change in the nature of Merchant's business or the product lines that Merchant sells not previously disclosed;

The Charge is genuine and arises from a bona fide sale of merchandise or services by Merchant, represents a valid obligation for the amount shown on the Charge Record and does not involve the use of the Card for any other purpose;

Merchant has title to the Charge, there are no liens or other encumbrances on it, and Merchant has the authority to convey the Charge for processing;

The Charge is not subject to any dispute, set-off or counterclaim;

The Charge has not been previously presented for processing unless allowed by the Operating Rules;

Each statement on the Charge is true, and Merchant has no knowledge of facts that would impair the validity or collectability of the amount of the Charge;

Merchant has completed only one Charge per sale, or one Charge per shipment of merchandise where the Cardholder has agreed to partial shipments;

The person who executes the Application on behalf of the Merchant has the full power and authority to execute the Application and to enter into this Agreement;

This Agreement is the legal, valid, and binding obligation of the Merchant enforceable against the Merchant in accordance with its terms;

Merchant shall submit transactions and/or Charges only in accordance with the information contained in the Application and this Agreement;

Merchant has the power and authority to authorize the automatic funds transfer provided for in Section 14.h;

The Settlement Account described in Section 14 is owned and controlled by the Merchant and is a valid account for processing debit and credit transactions under this Agreement.

That Merchant will immediately notify Merchant Bank and Processor of any material changes to any information provided herein including but not limited to a change in Merchant's legal entity, location, business type, or the types of goods and services offered for sale by Merchant.

Merchant is not (i) a Sanctioned Person, under any of the regulations of the Office of Foreign Assets Control of the U.S. Treasury, (ii) located in or operating under a license issued by a jurisdiction whose government has been identified by the U.S. Department of State as a sponsor of international terrorism under 22 U.S.C. 2371 or 50 U.S.C. App. 2405(j), (iii) located in or operating under a license issued by a jurisdiction that has been designated as non-cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization of which the U.S. is a member, or (iv) located in or operating under a license issued by a jurisdiction that has been designated by the U.S. Secretary of Treasury pursuant to 31 U.S.C. 5318A as warranting special measures due to money laundering concerns.

CONFIDENTIALITY; DATA SECURITY.

Merchant will retain in a secure and confidential manner original or complete and legible copies of each Charge Record, and each Credit Voucher required to be provided to Cardholders, for at least two (2) years or longer if required by law or the Operating Rules. Merchant shall render all materials containing Cardholder Account numbers unreadable prior to discarding.

Merchant will store Charge Records in an area limited to selected personnel, and when record-retention requirements have been met, Merchant will destroy the records so that Charge Records are rendered unreadable.

Merchant will not:
Provide Cardholder Account numbers, personal Cardholder information or Card Transaction information to anyone except Bank, Card Networks, or Merchant's agents/Merchant Servicers (but only those who have been approved by Bank as required under this Agreement and are properly registered with the Card Networks) for the purpose of assisting Merchant in completing Card Transactions, or as specifically required by law.

Retain or store Card Magnetic Stripe, CVV, CVV2, CVC2 or CID data (including Track Data) subsequent to Authorization for a Card Transaction.

Sell, purchase, provide or exchange Card account number information or other Card transaction or Cardholder information to any third party, or to any entity other than Merchant's authorized agents/Merchant Servicers (but only those who have been approved by Bank as required under this Agreement and are properly registered with the Card Networks), the Bank, the Card Networks, or in response to valid legal process or subpoena.

Release any Cardholder information over the telephone under any circumstances.

Merchant may not, in the event of its (and Merchant shall ensure, and by contract provide, that Merchant's agents/Merchant Servicers shall not, in the event of their or Merchant's) failure, including bankruptcy, insolvency, or other suspension of business operations, sell, transfer, or disclose any materials that contain Cardholder Account numbers, personal information or Card Transaction information to third parties. In the event that Merchant's (or such an agent's/Merchant Servicer's) business fails or ceases to exist, Merchant is required to return (and shall ensure and by contract provide, that such agent/Merchant Servicer shall return) to Bank all such information or provide proof of destruction of this information to Bank.

Merchant confirms that it is, and shall be, in full compliance during the term of this Agreement with all federal, state and local statutes, rules and regulations (including without limitation the information privacy and security requirements of the Gramm Leach Bliley Act and regulations thereunder), as well as all rules and operating regulations and bylaws of the Card Networks, relating to the establishment and maintenance (pursuant to a comprehensive written information security program, to the extent required by any of such laws, rules or regulations, or by any such rules, operating regulations or bylaws of the Card Networks) of appropriate administrative, technical and physical security procedures and safeguards to ensure the security, confidentiality and integrity of Card transaction and Cardholder information and Merchant shall comply, and shall demonstrate its compliance with, with the Visa Cardholder Information Security Program ("CISP"), MasterCard's Site Data Protection ("SDP") Program, Discover Information Security Compliance Program ("DISC"), the data security requirements of the PayPal Operating Rules ("PayPal Data Security"), the Payment Card Industry Data Security Standard (PCI DSS) and Payment Application Data Security Standard (PA-DSS), and any other similar requirements contained in the Operating Rules. Merchant may find the details of the CISP program at www.visa.com/cisp.  Merchant may find details of the DISC program at http://www.discovernetwork.com/fraudsecurity/disc.html. Merchant may find details of the SDP program at http://www.mastercard.com/us/sdp/merchants.  The Card Networks or Bank,

and their respective representatives, may inspect the premises of Merchant or any independent contractor or agent or Merchant Servicer engaged by Merchant for compliance with security requirements. Merchant acknowledges that any failure to comply, or to demonstrate compliance, with security requirements may result in the imposition of restrictions on Merchant or the permanent prohibition of Merchant's participation in Card acceptance programs by the Card Networks. Without limitation as to Merchant's obligations or liabilities under other provisions hereof, (i) Merchant hereby agrees to indemnify Processor and Merchant Bank, including their officers, directors, employees, and agents, and to hold them harmless from any fines and penalties that may be assessed by the Card Networks or any governmental agency in regards to PCI-DSS or PA-DSS or otherwise in regards to data security or any actual or suspected data breaches that may occur, as well as all costs of forensic exam/audit, card replacement fees, all claims and demands of cardholders, card issuers, Card Networks, governmental agencies, or others, and all litigation costs and expenses including reasonable attorneys fees, and all other costs of any kind, associated with any actual or suspected data security breach or noncompliance with Card Network data security requirements or data security requirements of applicable law; and (ii) in the event of a computer or other data security breach, or suspected computer or other data security breach, Merchant agrees to abide by Card Network requirements which may include without limitation a forensic network exam by a Qualified Incident Response Assessor (QIRA), and (iii) Merchant agrees to cooperate with Processor and Merchant Bank in order to effectively manage breach response. Merchant shall obtain a written acknowledgement from any Third Party Service Provider as defined in the Operating Rules that the Third Party Service Provider is responsible for the security of cardholder data the Third Party Service Provider possesses or otherwise stores, processes or transmits on behalf of the Merchant or to the extent that they could impact the security of the Merchant's cardholder data environment. Exact wording of the written acknowledgement will depend on the agreement between the two parties, the details of the service being provided, and the responsibilities assigned to each party.

Mandatory Payment Card Industry Data Security Standard (PCI DSS) and Payment Application Data Security Standard (PA-DSS) and PIN Security Compliance. Without limiting the generality of the foregoing, Merchant understands that the payment card industry requires all merchants to be PCI DSS compliant. Processor and Merchant Bank, in compliance with payment brand mandates, will not board merchants for the Card Program services provided for in this Agreement, who are not PCI DSS compliant. In signing this Agreement, Merchant and Merchant's principals agree that they are PCI DSS compliant. Processor and Merchant Bank also require compliance with the PA-DSS in compliance with industry mandates, and with all applicable Card Network mandates relating to PIN and PIN entry device (PED) security,

including without limitation, and as applicable, the applicable Payment Card Industry PCI PIN Security Requirements, PCI PIN-Entry Device Security Requirements, and PCI Encrypting PIN Pad Security Requirements. Security Requirements, and PCI Encrypting PIN Pad Security Requirements. Merchant agrees that all point-of-sale (POS) and/or terminal hardware and software (make and version) is PA-DSS compliant, and compliant with all applicable PIN and PED security requirements, and that any future changes in POS hardware or software will be in compliance with the PA-DSS and all applicable PIN and PED security requirements.

Bank confirms that it will comply with all PCI DSS requirements to the extent that Bank handles, has access to, or otherwise stores, processes or transmits cardholder data or sensitive authentication data, or manages Merchant's cardholder data environment on behalf of Merchant.

Merchant must notify Bank and receive Bank's approval prior to engaging, directly or indirectly, any independent contractor or agent or Merchant Servicer in connection with Merchant's acceptance of Cards or the submission of Charges or Credit Vouchers to Bank, or otherwise to assist Merchant in the performance of Merchant's obligations under this Agreement, and including without limitation any such person or entity who will have access to Cardholder or card transaction data. Such third parties may include, but are not limited to, Merchant's software providers and/or equipment providers. Merchant shall provide Merchant Bank and Processor at least sixty (60) days advance written notice of Merchant's election to use an agent or independent contractor or Merchant Servicer. Merchant Bank and/or Processor may individually approve or deny the use of an agent, independent contractor or Merchant Servicer in their sole and absolute discretion and at any time. If any such entity is required to be designated a service provider or Merchant Servicer under any applicable Operating Regulation or is otherwise required to certify, register, or act in any fashion pursuant to the Operating Rules, Merchant shall cause such Agent to cooperate with Merchant Bank in completing any steps required for registration and/or certification and/or action. Merchant is solely responsible for any and all applicable fees, costs, expenses and liabilities associated with such registration and/or certification and/or action. Bank shall in no event be liable to Merchant or any third party for any actions or inactions of any agent, independent contractor or Merchant Servicer used by Merchant, and Merchant hereby expressly assumes all such liability. Merchant's agreement with any such third party must contain provisions obligating the third party to comply with applicable law, with CISP and SDP and DISC and PayPal Data Security and PCI-DSS, PA-DSS, PIN and PED security requirements, and all other Card Network requirements pertaining to confidentiality and security and integrity of Cardholder and Card transaction data, with all rules

prohibiting storage of certain Card transaction data, and with all other applicable Operating Rules.

Merchant will immediately notify Bank if Merchant decides to use electronic authorization or data capture software or terminals provided by any entity other than Bank or its authorized designee ("Third Party Terminals") to process transactions, including leasing a terminal from a third party. If Merchant elects to use Third Party Terminals, (i) the third party providing the terminals will be Merchant's Merchant Servicer in the delivery of Card transactions to Bank; and (ii) Merchant assumes full responsibility and liability for any failure of that third party to comply with the requirements of Bank, the Operating Rules, applicable laws, rules or regulations, or this Agreement. Bank will not be responsible for any losses or additional fees incurred by Merchant as a result of any error by a third party agent or Merchant Servicer or a malfunction in a Third Party Terminal.

The use of an agent or Merchant Servicer or an agent's or Merchant Servicer's software application that has connectivity to the Internet poses an increased risk, and Merchant assumes all liability for such increased risks. If Merchant utilizes software or hardware with a connection to the Internet and such hardware or software interacts in any capacity with the provision of services contemplated pursuant to this Agreement, Merchant is solely liable without limitation for any and all consequences of such interaction.

Merchant agrees and shall ensure (and by contract shall require) that Merchant's agents and Merchant Servicers provide the same levels of security as those required of Merchant, and that such agents and Merchant Servicers transmit data in accordance with: (1) the required format(s) of the Card Networks; (2) the Operating Rules; and (3) the requirements of Bank.

Merchant must immediately notify Merchant Bank and Processor of any suspected or confirmed loss or theft of materials or records that contain Cardholder Account numbers or Card Transaction information. In the event of a suspected or confirmed loss or theft Merchant shall provide immediate access to all facilities, systems, procedures, equipment, and documents as may be deemed appropriate by Bank or its designated representatives for inspection, audit, and copying as deemed appropriate by both Merchant Bank and Processor in their individual sole discretion. Merchant shall be responsible for all costs associated with such inspection, audit, and copying however such costs may occur.

Merchant authorizes Bank to release its name and address to any third party whom the Bank determines needs to know such information in order for Bank to perform the Card Program services under this Agreement and who has requested such information. Merchant authorizes Bank to disclose Card Transaction data and other information relating to the Merchant, Guarantor and each of their principals, to the Card Networks, current and prospective

Card Issuers, current and prospective acquirers, regulatory authorities, and other entities to whom Bank or any such entity may be required to provide such information and to Bank's and each such entity's affiliates, agents, subcontractors and employees, for purposes Bank or such other entities deem necessary in Bank's or their reasonable discretion, including without limitation, in connection with the performance of their various obligations hereunder or under their other applicable agreements or under the Operating Rules or applicable law.

[Intentionally Omitted]

Federal regulations enacted pursuant to the USA PATRIOT Act and other applicable laws require financial institutions to verify the identity of every person who seeks to open an account with a financial institution. As a result of Merchant's status as an account holder with Merchant Bank, Merchant shall provide documentary verification of Merchant's identity, such as a driver's license or passport for an individual and certified copy of organization documents for an entity in manner acceptable to Bank. Bank reserves the right to verify Merchant's identity through other non-documentary methods as Bank deems appropriate in its sole discretion. Bank may retain a copy of any document it obtains to verify Merchant's identity with the financial institution.

Merchant is responsible for ensuring its Merchant Identification Number ("MID") is kept confidential. When a change to a Merchant account is required, Merchant shall disclose its MID to the Bank representative as confirmation that the person requesting the change has authority. If the person requesting the change discloses the proper MID, Bank shall assume that person has the proper authority to make the change. Merchant shall be fully liable for any changes to its account after disclosure of the MID. Bank may request from Merchant additional information to further verify Merchant's identity.

MasterCard: Merchant must not store in any system or in any manner, discretionary card-read data, CVC2 data, Card Identification Data (CID), PIN data, Address Verification Service (AVS) data, or any other prohibited information as set forth in the MasterCard Merchant Rules Manual, except during the Authorization process for a Transaction, that is, from the time an Authorization request message is transmitted and up to the time the Authorization request response message is received. MasterCard permits storage of only the card account number, expiration date, cardholder name, and service code, in a secure environment to which access is limited, and then only to the extent that this data is required for bona fide purposes and only for the length of time that the data is required for such purposes. The MasterCard Merchant Rules Manual may be accessed at: http://www.mastercard.com/us/merchant/support/rules.html.

Merchant will not contact any Cardholder with respect to any matter arising under the Operating Rules, except as required or permitted under the Operating Rules.

OPERATING RULES.

Merchant must comply with the Operating Rules, as the same may be amended from time to time. The Operating Rules may change with little or no advance notice to Merchant and Merchant will be bound by all such changes. If Merchant objects to any change in the Operating Rules, it must immediately stop accepting new Charges for Cards governed by the change. The Operating Rules will govern in the event that there is any inconsistency between this Agreement and the Operating Rules. However, nothing in this Agreement shall be construed to impose on Merchant a requirement (including a requirement under the Operating Rules) the imposition of which on Merchant is prohibited by mandatory provisions of applicable law (i.e., where the applicability of such provisions of law to this Agreement, and of the law's prohibition to the particular requirement which otherwise would be imposed on Merchant hereunder, cannot lawfully be waived by agreement), but the requirement hereunder shall be construed to continue in effect and to be imposed on Merchant in all respects and at all times to the fullest extent possible without violating the law's prohibition, with only those particular applications of the requirement which would violate the law's prohibition deemed severed from the provisions hereof.

Operating Rules of the Debit Networks may differ among them with respect to the transactions they allow. Bank, at its discretion, may require that the most restrictive requirements of one Debit Network apply to all of Merchant's On-line Debit Card Transactions, regardless of Card type.

If Merchant selects, and Bank provides Card Program services for, any one or more of American Express, Diners Club/Carte Blanche or JCB as payment options and Merchant's selection is approved by Bank, Merchant understands that Merchant's acceptance of any of those payment options may require execution of a separate merchant card acceptance agreement with those individual Card Issuers, as applicable, and that agreement will govern the completion, processing, settlement and other procedures relating to transactions with those Card Issuers. If Merchant experiences problems with transmission or delivery of those Card Issuers' transactions, Merchant will be obligated to contact the appropriate service provider(s) for service.

MERCHANT'S BUSINESS; OTHER PROCESSORS.

Merchant will comply with all laws, rules and regulations, including but not limited to laws and regulations regarding anti-money laundering compliance and Office of Foreign Asset Control compliance, in completing Charges,

submitting them to Bank, performing its obligations under this Agreement, and otherwise conducting its business.

Merchant will give Merchant Bank and Processor at least thirty (30) days' prior written notice before any change in Merchant's name or location, any change in ownership or management of Merchant's business, any sale, assignment, rental, lease or transfer of ownership of any location that accepts Cards, or any material change in information concerning Merchant in the Application, and material change in the type or nature of the business carried out by Merchant or otherwise required to be provided to Bank.

Merchant, to the extent permitted under applicable law, agrees that it will not participate in a Card Program (involving a Card for which the Network and Card type is one Merchant has selected under this Agreement as provided in Section 3.b) with another financial institution or processor without Bank's written approval.

## CREDIT REPORTS AND OTHER INFORMATION.

**Reports about Merchant**. From time to time, Bank may obtain credit and other information on Merchant, owners of Merchant and officers of Merchant, from others (such as customers and suppliers of Merchant, lenders and credit reporting agencies), and furnish information on Merchant's relationship with Bank and Bank's experience with Merchant to others seeking the information.

**Reports from Merchant**.  Merchant will provide Bank with updated business and financial information concerning Merchant, including financial statements, tax returns, evidence of required licenses and other information and documents Bank may reasonably request from time to time. All material marked "confidential" which Bank receives from Merchant will be used only by Bank or Card Network in performing the Card Program services under this Agreement or related services and reporting, or as necessary to comply with any requirements of applicable law or of a Card Network or of any state or federal governmental agency with supervisory authority over Merchant Bank. At any reasonable time, Bank, any Card Network or any other entity having authority has the right to audit Merchant's records relating to this Agreement. Merchant understands and agrees that if at the time of signing this Merchant Agreement Merchant is undergoing a forensic investigation, Merchant must **notify Bank and must** fully cooperate with the investigation until it is completed.

## ASSIGNMENT; BANKRUPTCY.

**Assignment**.  This Agreement is binding upon the successors and assigns of Bank and Merchant. Merchant will not assign this Agreement to another entity without Bank's prior written consent and any purported assignment made without Bank's consent will be void.

Bankruptcy.

Merchant will notify Bank immediately if any bankruptcy, insolvency or similar petition is filed by or against Merchant. Merchant acknowledges that this Agreement constitutes an executory contract to extend credit or financial accommodations as defined in 11 U.S.C. §365(c)(2) and that the Agreement cannot be assumed or assigned in the event of bankruptcy. Merchant and Bank agree that in the event of Merchant's bankruptcy, Bank shall be entitled to suspend further performance under this Agreement.

Merchant acknowledges and agrees that in the event of a bankruptcy proceeding, Merchant must establish a Reserve Account or maintain a previously established and then current Reserve Account in amounts required by Bank and in accordance with any Reserve Account provision specified in this Agreement. Merchant Bank will have the right to setoff against the Reserve Account for any and all obligations which Merchant may owe Bank, without regard as to whether the obligations relate to Charges initiated or created before or after the filing of the bankruptcy petition.

AMENDMENTS; WAIVERS.

Amendments. Unless otherwise provided for in this Agreement, Bank may amend this Agreement at any time by providing Merchant with fifteen (15) days' prior notice by: (a) sending Merchant written notice of such amendment, or (b) posting such amendment to the Processor's web site and providing Merchant with electronic notice as provided in Section 3.e. The amendment will become effective unless Bank receives Merchant's notice terminating this Agreement before the effective date. Bank may amend this Agreement upon less than fifteen (15) days' prior notice if Bank reasonably determines immediate modification is required by laws, Operating Rules or any adverse change in Merchant's financial condition. Amendments submitted by Merchant will bind Bank only if in writing and approved and signed by Merchant Bank and Processor.

Waivers. Bank's failure to enforce this Agreement will not waive Bank's rights under this Agreement. Waivers of any provision of this Agreement must be in writing and signed by Merchant Bank and Processor. A waiver in one instance will not apply to other occasions unless that intent is clear from the signed waiver.

TERM; TERMINATION.

Term/Renewal. The initial term of this Agreement shall be for the term of one (1) year (the "Intitial term") commencing on the date of Merchant's Acceptance of the first Card Transaction which is processed by Processor and Merchant Bank (each of whom by processing such first Card Transaction, will signify their approval and acceptance of Merchant's Application, with such processed first

Card Transaction deemed to constitute their express written consent to this Agreement becoming effective). At the expiration of the Initial Term, this Agreement will automatically renew for successive one (1) year periods ("Renewal Term") unless a party provides the other parties with notice of its intent not to renew this Agreement at least ninety (90) days prior to the expiration of the then current term.

Termination.

Termination without Cause. Processor may terminate this Agreement as to all Card types or individually specified Card types, without cause, upon thirty (30) days advance written notice. Merchant Bank may terminate this Agreement as to Visa and MasterCard and Discover and PayPal Card types without cause upon thirty (30) days advance written notice.

Termination for Cause by Bank. Merchant Bank or Processor may terminate this Agreement in either's sole and absolute discretion, effective immediately, upon written, electronic or oral notice to Merchant if Merchant Bank or Processor reasonably determines that any of the following conditions exists: Merchant has violated any provision of this Agreement or any Card Network requires Bank to terminate this Agreement as to any Card type.

There is a material adverse change in Merchant's financial condition or a change in Merchant's products/services or volume or mix thereof, or otherwise in Merchant's business, or in Merchant's customer acceptance policy which increases Processor's or Merchant Bank's risks.

A petition in bankruptcy has been filed by or against Merchant, the Merchant is generally unable to pay its debts as they become due, a receiver, custodian, trustee, liquidator or similar official is appointed for a substantial portion of Merchant's business, there is a general assignment for the benefit of creditors, Merchant transfers assets in a fraudulent transfer, or the Merchant's business terminates.

Any information which Merchant provided to Bank, including Application information, was false, incomplete or misleading when received.

At any time during the term of this Agreement, Merchant has had a monthly ratio of Chargebacks to Charges exceeding one percent (1%), or Chargebacks are in excess of three percent (3%) of any monthly dollar amount of Charges.

There is an overdraft for three (3) days or more in the Settlement Account, or overdrafts in the Settlement Account are otherwise excessive.

Merchant or any of Merchant's officers or employees has been involved in processing Charges with Bank or other parties arising from fraudulent or otherwise unauthorized transactions.

Merchant is or will be unable or unwilling to perform its obligations under this Agreement or any applicable laws.

Merchant has failed to pay Bank any amount when due.

Merchant has failed to promptly perform or discharge any obligation under this Agreement, the Settlement Account or the Reserve Account.

Any of Merchant's representations or warranties made in connection with this Agreement was not true or accurate when given.

Merchant has defaulted on any agreement it has with Bank.

Bank is served with legal process seeking to attach or garnish any of Merchant's funds or property in Bank's possession, and Merchant does not satisfy or appeal the legal process within fifteen (15) days of the Bank being served.

The Operating Rules are amended in any way so that the continued existence of this Agreement would cause Bank to be in breach of such Rules.

Any Guaranty supporting Merchant's obligations is breached, revoked, withdrawn or terminated or altered in any way.

If any circumstances arise regarding Merchant or its business that create harm or loss of goodwill to any Card Network, or Merchant Bank, or Processor, or the payment system.

Merchant engages in any activity which causes Bank to be in breach of the Operating Rules.

The circumstances otherwise warrant immediate termination.

Merchant appears on any Card Association's security reporting.

If a judgment in excess of $1,000 is entered against Merchant or any Guarantor and not discharged or bonded off within fifteen (15) days after the entry of the judgment.

If Merchant submits for processing Charges that were not originated as a result of a direct Charge transaction between a Cardholder and Merchant in the normal course of business.

<u>Termination for Cause by Merchant.</u> Merchant may terminate this Agreement in the event of a material breach of the terms of this Agreement by Bank, provided Merchant gives Bank written notice of any alleged breach and such breach remains uncured for a period of thirty (30) days following receipt of written notice by the Bank.

<u>Early Termination Fee for Termination by Merchant.</u>
Bank and Merchant acknowledge and agree that in addition to all other remedies available to Bank under this Agreement or as otherwise available in law or equity, if this Agreement is terminated by Merchant prior to the expiration of the applicable Term of the Agreement or for any reason other

than for a material, uncured breach by Bank, Merchant agrees to pay Bank an Early Termination Fee of $150 (except to the extent prohibited by law).

Notwithstanding the foregoing, if Merchant is located in Arkansas, the Early Termination Fee shall be $50.

Bank's rights of termination under this Agreement are cumulative. A specific right of termination shall not limit any other right of Bank to terminate this Agreement expressed elsewhere in this Agreement. Notice of termination may be given orally or in writing, and if given orally, shall be confirmed in writing.

Upon termination, Merchant's rights to complete Charges and Credit Vouchers and submit them to Bank, and to use Charge form or formats, promotional material and any other items provided by Bank, will cease. Termination of this Agreement will not terminate the rights and obligations of Merchant and Bank relating to acts or omissions occurring before termination, including for example, any Processing Fees or other service fees owed to Bank, any Charges processed for Merchant by Bank (whether before or after termination), Merchant's Chargeback and indemnity obligations, and the Security Interest granted to Bank in this Agreement.

It is understood that a file for terminated merchants referred to herein as "MATCH" (whether referred to by the applicable Card Network as "MATCH" or as "Consortium Merchant Negative File", or by any other name) is maintained by Card Networks containing the names of any business (and its principals) which have been terminated for certain reasons, including fraud, depositing excessive counterfeit paper, excessive unauthorized transactions, depositing paper for others (laundering), bankruptcy or breach of Merchant Agreement. Merchant acknowledges that Bank is required to report Merchant to the MATCH if this Agreement is terminated for any of the foregoing reasons or other reasons as may be modified by the Card Networks. Merchant agrees and consents to such reporting in the event of the termination of this Agreement for any of the foregoing reasons.

Sections 5, 7, 10.a, 13, 14, 15, 16, 17, 19, 20, 21, 22 and 25 will survive termination of this Agreement.

SETTLEMENT ACCOUNT.

Merchant must maintain a Settlement Account in Merchant's name in satisfactory condition at a depository institution under arrangements acceptable to Bank. The Settlement Account will be subject to the provisions of Section 16.

[Intentionally Omitted].

Subject to the terms and conditions of this Agreement, Bank agrees to provisionally credit Merchant for each Charge that Bank accepts from Merchant. Merchant agrees that the Merchant Bank may charge the Settlement

Account for the amount of any sales draft processed under this Agreement, or any agreement Bank may have with any Merchant Affiliate that results in a Chargeback, or for any Credit Voucher or other reimbursement or Processing Fees to which Bank may be entitled.

Merchant agrees that Bank may audit all Charge calculations and that Merchant Bank shall have the right, without notice, to make withdrawals, deposits, or other Adjustments to or from the Settlement Account for any deficiencies or overages.

Bank shall presume that any amounts the Bank pays to or debits from Merchant are correct unless Merchant disputes these by sending Bank written notice within thirty (30) days of the date of the applicable statement containing any disputed payments or debits.

If Merchant chooses to rent or lease processing equipment from Processor or utilizes software provided by Processor for use in processing transactions, Merchant agrees to pay Bank: (1) a pre-determined monthly rental fee; (2) any initial upfront costs as required; and (3) all applicable taxes for such Card processing equipment or software utilization.

If the Settlement Account is closed, Merchant Bank or Processor may terminate this Agreement, effective immediately, upon written or oral notice (with written confirmation in the event of oral notice) unless Merchant opens another Settlement Account acceptable to Bank. Merchant may change the Settlement Account upon prior written approval by Bank, which approval will not be unreasonably withheld.

Merchant authorizes Merchant Bank or its agents or designated representatives to initiate debit and credit entries and Adjustments to the Settlement Account or the Reserve Account (described in Section 15) through the ACH settlement process for amounts due under this Agreement. This authorization will remain in full force and effect until termination of the Agreement and the full and final payment of all obligations of Merchant due under this Agreement. Merchant agrees to be bound by all applicable terms and provisions of the ACH Rules or other applicable network(s), in effect from time to time. Merchant acknowledges and agrees that Bank will not be liable for any delays in receipt of funds, any failure by Merchant to receive funds, or errors in debit or credit entries caused by Merchant, or third parties, including but not limited to any Card Network or any financial institution.

ADDITIONAL COLLATERAL SECURITY; RESERVE ACCOUNT.

As a condition for providing Card Program services, Merchant may be required to provide additional collateral security for Merchant's obligations hereunder, which additional collateral security shall be of a kind, and in amounts, satisfactory to Bank in Bank's sole discretion, and which shall be in addition to all other collateral provided for in Section 16 hereof. Such additional collateral

security may include, for example, (A) a letter of credit, if issued in an amount and on terms acceptable to Bank by a letter of credit issuing bank acceptable to Bank, or (B) the pledge to Bank of a certificate of deposit owned by Merchant in amount satisfactory to Bank and provided all agreements (including agreements of third parties) in form and substance satisfactory to Bank and all filings and/or other actions necessary in order to perfect in Bank a continuing first priority security interest therein on terms acceptable to Bank, are entered into, made and/or taken as the case may be. Bank may require that all or any part of the additional collateral take the form of a Reserve Account, established as hereinafter set forth in this Section 15, at any time when:(i) the Agreement, or the provisions of Card Program services hereunder, shall have terminated for any reason or any party hereto shall have given notice of termination thereof, or (ii) there shall have occurred an event which entitles Bank to terminate this Agreement or the provision of Card Program services hereunder or which, with the giving of notice and/or the passage of time would entitle Bank to terminate this Agreement or the provision of Card Program services hereunder, and Merchant has not provided alternative additional collateral security of a kind, and in amounts, satisfactory to Bank as set forth above in this Section, or (iii) neither (i) nor (ii) above in this Section is applicable, but Bank has determined that additional collateral security is required, has requested that Merchant provide same, and Merchant has failed to provide alternative additional collateral security of a kind, and in amounts satisfactory to Bank as set forth above in this Section. Any Reserve Account that is established shall be subject to the terms and conditions of Section 16 and all other terms and conditions of this Agreement relating to the "Reserve Account". Whenever Bank requires that additional collateral security take the form of a Reserve Account, the following provisions of this Section 15 shall apply:

Reserve During Term of Agreement.

Merchant may be required to deposit, or Merchant Bank may deposit by deducting from any payment due to Merchant or from any funds in the Settlement Account or any other deposit account of Merchant, into an account maintained by Merchant Bank (or at another approved depository institution) (the "Reserve Account"), initially or at any time in the future as requested by Bank, sums sufficient to satisfy Merchant's current and/or future obligations as determined by Bank in its sole and absolute discretion.

The Reserve Account will be separate from the Settlement Account. Merchant shall have no right of withdrawal from the Reserve Account. The Reserve Account shall be under the sole control of Merchant Bank, and Processor shall not have access to or hold funds in the Reserve Account. Any and all earnings from deposits of the Merchant to the Reserve Account shall be the sole property of the Bank.

Reserve Account Deposits.

At any time in Bank's sole and absolute discretion, Bank may (A) designate the minimum balance required to be deposited in the Reserve Account, (B) require that the amount on deposit in the Reserve Account be increased, (C) require that the Merchant deposit, or Merchant Bank may deposit for Merchant into the Reserve Account a percentage of, or a fixed amount from each Charge processed, or (D) otherwise determine the amount to be deposited in the Reserve Account. Bank at its sole and absolute discretion may require that each month Merchant deposit, or Merchant Bank may deposit by deducting from any payment due to Merchant or from any funds in the Settlement Account or any other deposit account of Merchant sums into the Reserve Account no later than the twentieth (20th) day of the month. Bank shall notify the Merchant as to the amount of the funds to be deposited each month.

Merchant acknowledges and agrees that the Reserve Account may contain both funds deposited by the Merchant and funds of other merchants of the Bank.

Deductions from Reserve Account. If funds are not available in the Settlement Account, Bank without prior notice to Merchant may deduct from the Reserve Account any obligation of Merchant to Bank under this Agreement, including all Processing Fees, Chargebacks, Credit Vouchers, damages, and any and all additional fees, and sums sufficient to reimburse Bank for the amount of any fines, penalty amounts and charges due the Card Networks.

Replenishment of Reserve Account Deficiencies. Whenever the balance in the Reserve Account is less than the minimum balance required, or is otherwise deficient, Merchant Bank may, without prior notice, deposit the deficiency into the Reserve Account by reducing any payment to Merchant required by this Agreement or deduct the deficiency from the Settlement Account or any other deposit account of Merchant with another depository institution (including accounts of general partners if Merchant is a partnership) and deposit it into the Reserve Account. Merchant authorizes deductions from its accounts by ACH entry, sight draft, preauthorized check, reverse wire, or otherwise as Bank deems appropriate under the circumstances. In addition, Merchant will deposit any deficiency into the Reserve Account within one (1) Business Day after receiving Bank's oral or written request. Without limiting Bank's remedies, Merchant's failure to deposit any deficiency on time will permit Bank, without advance notice, to suspend or cease processing additional Charges and Credit Vouchers. Bank will give Merchant written notice of any suspension or cessation of processing.

Additions to Reserve Account. If Bank has reason to believe that Merchant may be liable to customers or to Bank for Chargebacks exceeding the balance in the Reserve Account, Merchant Bank may: (A) immediately place in the Reserve Account payments due to Merchant and/or stop processing

transactions for Merchant until such time as the extent of Merchant's obligations to Bank, or Merchant's liability for Chargebacks, or Merchant's liability to customers are known, and Bank no longer deems itself insecure, and/or (B) demand from Merchant an amount that in Bank's judgment is needed to ensure payment of Merchant's obligations and liabilities. Merchant's failure to pay any amount will permit Merchant Bank or Processor to terminate this Agreement immediately without advance notice.

**Reserve Account After Agreement Terminates.** Merchant Bank may continue to hold or deposit funds in the Reserve Account after termination of this Agreement, regardless of whether termination is by Merchant or Bank. Upon termination of the Agreement by Merchant or Bank, Bank may retain sufficient funds to satisfy any and all Processing Fees, Chargebacks, Credit Vouchers, damages, and any and all additional fees, and sums sufficient to reimburse Bank for the amount of any fines, penalty amounts and charges due the Card Networks. If no funds have been deposited into the Reserve Account before termination, Bank, at Bank's option, may notify Merchant to deposit funds into the Reserve Account upon termination of this Agreement. All provisions which apply to a pre-termination Reserve Account will apply after termination, including replenishment of deficiencies. The funds will be held by Bank or its designated agent for a period of not less than one hundred eighty (180) days from the date of the last Card Transaction processed under the Agreement, plus the period of any warranty, guarantee, and/or return policy on goods and/or services sold. Bank will return the balance in the Reserve Account to Merchant after Bank reasonably determines that the risk of Chargebacks and other Processing Fees has ended and after deducting all amounts that Merchant owes to Bank under this Agreement or any other agreement.

SECURITY INTEREST.

Merchant's Grant of Security Interest.

To secure Merchant's performance of its obligations under this Agreement, and any other agreement with Bank, Merchant grants Bank a security interest in each Charge and its proceeds, the Settlement Account, the Reserve Account and any other deposit account of Merchant with a financial institution, whether now existing or established in the future, and in the proceeds of all those accounts, any funds due Merchant from Bank and any of Merchant's property held by Bank. Bank may enforce these security interests without notice or demand. The security interests granted under this Agreement will continue after this Agreement terminates, until Merchant satisfies all its obligations to Bank.

Furthermore, and with respect to any security interests granted herein, Bank will have all rights afforded under the Uniform Commercial Code, as the same may, from time to time, be in effect in the State of Georgia; provided, however,

in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of the security interests granted herein is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Georgia, then Bank will have all rights afforded under the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions relating to such attachment, perfection or priority of the security interests, as well as any other applicable law.

Perfection of Security Interest.  Upon request of Bank, Merchant will execute one or more financing statements or other documents to evidence the security interests granted to Bank under this Section 16. Merchant shall cooperate with Bank in obtaining any control agreement or similar agreement with a depository bank necessary to perfect the security interests granted herein. In addition, Merchant agrees that its signature on the Application will be considered Merchant's signature agreeing to any control agreement as defined in Article 9 of the Uniform Commercial Code among Merchant, Bank and any other financial institution under which Bank, Merchant and any other financial institution agree to the disposition of funds in the Settlement Account, the Reserve Account or any other deposit account without further consent by Merchant.

CUSTOMER CLAIMS.

To the extent that Bank has paid or may pay a Chargeback or Credit Voucher, Merchant will be obligated to reimburse Bank for any sums Bank pays. If Merchant does not reimburse Bank, Bank will have all of the rights and remedies of Cardholders, including the Cardholders' rights under 11 U.S.C. §507 (a)(6). Bank may assert any claim on behalf of a Cardholder individually or on behalf of all Cardholders as a class.

PROCESSING FEES.

Merchant will pay Processing Fees in the amount specified in the FEE SCHEDULE attached to the Application or as otherwise provided for in this Agreement or an Addendum thereto. Merchant Bank may increase the Processing Fees by giving Merchant thirty (30) days advance written notice effective for Charges and Credit Vouchers submitted on and after the effective date of the increase.

Bank will not be required to provide the Merchant with thirty (30) days notice of an increase in Processing Fees in the event that any Card Network, or any other entity having such authority increases the Processing Fees and the effective date for implementation of the increase in the Processing Fees is less than thirty (30) days. In such cases, the Bank shall make reasonable efforts including, but not limited to, written correspondence, notification on statements, website notification, email, fax and direct contact via the telephone

or otherwise, to provide reasonable notification to Merchant. However, failure to provide advance notice of the increase in Processing Fees will not affect Merchant's obligation to pay the increased Processing Fees. The increase(s) in Processing Fees shall be effective on the date specified by Bank.

Processing Fees and other service charges owed by Merchant to Bank may be deducted by Merchant Bank from amounts due Merchant, or from the Settlement Account or from the Reserve Account. Merchant will pay the amounts due by the next Business Day if sufficient funds are not available in the Settlement Account.

In the FEE SCHEDULE, "Discount" refers to a percentage of the gross dollar bankcard sales processed by Merchant. "Per Item" refers to a fee per bankcard transaction processed by Merchant. "Interchange" refers to the fees assessed by the Card Networks on all bankcard sales that are paid to the bankcard issuing financial institution. "Assessments" refers to the fees assessed and retained by the Card Networks on all bankcard sales. "Fees" or "Processing Fees" refers to all the foregoing and, in addition, to amounts charged for any other purposes or services as described in the Merchant Account Application.

ii. The Visa and MasterCard and Discover and PayPal interchange fees and assessments are based on the current interchange rates and assessments set by Visa and MasterCard and Discover Network and PayPal. Any increases in these interchange fees and assessments will be passed through to Merchant either as part of the separately stated interchange fees and assessments or as an increase in any percentage-based or per item processing fee. Merchant acknowledges that whenever Merchant's transactions fail to qualify for any reduced interchange fees, Bank will process such transactions at the applicable interchange fees as set by the applicable Card Network, and Merchant will pay Bank the corresponding increased interchange fees (or as an increase in any percentage-based or per item processing fee based on the corresponding interchange fees). Merchant acknowledges that the fees specified as "qualified" or "mid-qualified" in the Application, as they may be updated or amended from time to time, are basic fees which will apply only to Card transactions which exactly meet certain processing criteria or "qualify" or (in the case of "mid-qualified") partially qualify for those basic fees according to the Rules. Criteria for determining qualification will include, but not be limited to, whether a Card transaction is: (1) hand entered (the required data is not electronically captured by a point-of-sale device reading the information encoded in or on a Card); (2) voice authorized; (3) not authorized; (4) transmitted for processing within twenty-four (24) hours of the Card transaction; or (5) deemed "Non-Qualifying" by the Rules, such as, but not limited to, Card transactions involving foreign Cards or Cards issued as business, commercial, purchasing or government Cards. In the event that Card transactions submitted to Bank for processing only partially qualify or do not at all qualify for the qualified discount rate quoted in accordance with the Application and/or the Operating Rules,

Merchant may be assessed, and agrees to pay, an additional Non-Qualified or Mid-Qualified Surcharge as set forth on the Application (or, if not set forth therein, or if set forth therein at a rate or in an amount less than that specified in the Operating Rules) as set forth in the Operating Rules.

Initial Discount: Merchant understands that initial discount rates assessed by Bank are based on Merchant's projected sales volume, average transaction amount, and card acceptance practices. If Merchant's actual sales volume and average transaction amount are less than Merchant's projected sales volume and average transaction amount, Bank reserves the right to adjust discount rates to reflect Merchant's actual sales volume and average transaction amount with 30 days advanced written notice.

INDEMNIFICATION; LIMITATION OF LIABILITY; WARRANTY.

**Indemnification.** Merchant agrees to indemnify Bank, including their officers, directors, employees, and agents against and to hold them harmless from any and all claims and demands of any party arising from or based upon any act or omission of Merchant, Merchant's employees, Merchant's designated representatives or agents, or Merchant's Merchant Servicers in connection with or arising out of this Agreement, the duties to be performed by Merchant pursuant to this Agreement, any Charges which Merchant submits to Bank, or Merchant's violation of the Operating Rules or any applicable law. In the event that Bank shall be made a party to any litigation, proceeding, arbitration, bankruptcy proceeding, or other legal process (collectively "Actions") commenced by any third party, Merchant shall protect and hold Bank harmless from and with respect to the Actions and shall pay all costs, expenses, and attorney's fees incurred or paid in connection with the Action, together with any judgments rendered. Merchant shall indemnify, defend, and hold harmless Bank for any hacking, infiltration, or compromise of Merchant's systems or the systems of Merchant's Merchant Servicers, designated representatives, or other agents.

**Limitation of Liability.** Bank will not accept responsibility for errors, acts, or failure to act by others, including but not limited to, agents, third party suppliers of software, equipment or services; or, banks, communication common carriers, data processors or clearinghouses through which transactions may be passed, originated and/or authorized. Bank will not be responsible for any loss, liability or delay caused by fires, earthquakes, war, civil disturbances, power surges or failures, acts of governments, acts of terrorism, labor disputes, failures in communication networks, legal constraints or other events beyond the reasonable control of Bank. Bank undertakes no duties to Merchant other than the duties expressly provided for in this Agreement, and any and all other or additional duties that may be imposed upon Bank in law or equity are hereby irrevocably waived and released to the maximum extent permitted by law. In any event, Bank's cumulative liability to Merchant, whether arising in contract,

tort (including, without limitation, negligence and strict liability) or otherwise, shall not exceed the lesser of $10,000 or, an amount equal to the aggregate of monthly net Processing Fees paid by Merchant in the three (3) month period prior to the month that the incident giving rise to liability occurred.

IN NO EVENT SHALL BANK BE LIABLE FOR SPECIAL, INCIDENTAL, INDIRECT, CONSEQUENTIAL OR EXEMPLARY DAMAGES OR FOR ANY INTERRUPTION OR LOSS OF USE, DATA, BUSINESS OR PROFITS, WHETHER OR NOT SUCH LOSS OR DAMAGES WERE FORESEEABLE OR BANK WAS ADVISED OF THE POSSIBILITY THEREOF AND REGARDLESS OF WHETHER ANY LIMITED REMEDY HEREIN FAILS OF ITS ESSENTIAL PURPOSE.

BANK SPECIFICALLY DISCLAIMS ALL WARRANTIES OF ANY KIND, EXPRESSED OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE SERVICES PROVIDED HEREUNDER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BANK DOES NOT GUARANTEE OR WARRANT THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE.

NOTICES.

Except to the extent oral or electronic notice is explicitly authorized herein, each notice required by this Agreement will be in writing and will be effective when delivered, addressed to Merchant Bank at the address designated on the Application, to Processor at the address designated on the Application and to Merchant at Merchant's address designated in the Application, or at such other address as any party may provide by written notice to the other parties. Any address Merchant designates will also be the address to which Bank mails Merchant's statements, if a mailed statement is required. Otherwise, merchant statements are made available to Merchant by Processor through Processor's website Delivery by facsimile transmission will be considered effective when the sender receives electronic confirmation of the transmission.

GEORGIA LAW; JURISDICTION; VENUE.

This Agreement is made at Columbus, Georgia and this Agreement is governed by Georgia law, as applied to agreements made and performed entirely in Georgia without reference to conflict of laws provisions. All performances due and transactions undertaken pursuant to this Agreement shall be deemed to be due or have occurred in Columbus, Georgia, and Merchant's entry into this Agreement, and any Guarantor's entry into a Continuing Guaranty relating to this Agreement, shall conclusively be deemed to be a transaction of business in Georgia within the meaning of Official Code of Georgia Annotated §9-10-91 or any successor statute. Merchant and any Guarantor agree that the exclusive venue and place of jurisdiction for any litigation arising from or relating to this Agreement shall be the county and district courts in and for Columbus,

Georgia, and Merchant and any Guarantor irrevocably and unconditionally submit to the jurisdiction of such courts with respect to any such litigation.

ATTORNEY FEES; ARBITRATION.

**Attorney Fees.** Merchant and/or Guarantor will be liable for and will indemnify and reimburse Bank for all attorneys' fees and other costs and expenses paid or incurred by Bank in the enforcement of this Agreement or in matters relating to this Agreement, in collecting any amounts due from Merchant to Bank, or arising from any breach by Merchant of this Agreement, or any other wrongdoing by Merchant or Guarantor.

Arbitration. Any controversy or claim between or among the Merchant and/or any Guarantor, on the one hand, and Processor and/or Merchant Bank, on the other hand, including, but not limited to, those arising out of or relating to this Agreement or any agreements or instruments relating hereto and any claim based on or arising from an alleged tort, shall at the request of a party be determined by arbitration. The arbitration shall be conducted in Columbus or Atlanta, Georgia in accordance with the United States Arbitration Act (Title 9, U.S. Code), notwithstanding any choice of law provision in this Agreement, and under the auspices and rules of the American Arbitration Association then in effect. Each party may serve a single request for production of documents. If disputes arise concerning these requests, the arbitrators shall have sole and complete discretion to determine the disputes. The arbitrators shall give effect to statutes of limitation in determining any claim, and any controversy concerning whether an issue is arbitrable shall be determined by the arbitrators. The arbitrators shall deliver a written opinion setting forth findings of fact, conclusions of law and the rationale for the decision. Judgment upon the decision rendered by the arbitrators may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of either party to submit the controversy or claim to arbitration if the other party contests such action for judicial relief.

ADDENDUM.

The following Addenda are made a part of this Agreement: CARD NOT PRESENT (CNP) ADDENDUM; SPECIAL SERVICES ADDENDUM; MERCHANT USE AND DISCLOSURE OF BIN INFORMATION ADDENDUM; VISA ACCOUNT UPDATER ADDENDUM; MASTERCARD ACCOUNT BILLING UPDATER ADDENDUM; AMERICAN EXPRESS CARD ACCEPTANCE ADDENDUM. The applicability of these Addenda depends upon the Merchant's business, and the Card Program services requested by Merchant. In its sole and absolute discretion (except as otherwise set forth in the Merchant Use and Disclosure of BIN Information Addendum), Bank may accept or reject Merchant's request for services provided in the Addenda. Merchant understands and agrees that any

attached Addendum is considered a part of the Agreement and Merchant will comply with the terms therein. In the event of conflict between the provisions of this Agreement and the provisions of an Addendum, the provisions of the Addendum will control.

FINAL AGREEMENT; EFFECTIVE DATE.

This Agreement is the complete and final agreement between Merchant and Bank for the Card Program services covered by this Agreement and supersedes all prior or contemporaneous negotiations, stipulations or agreements. If any provision of this Agreement is invalid or unenforceable, the other provisions remain effective. This Agreement will not be effective until Acceptance of the first Card Transaction.

CONTINUING GUARANTY.

As a primary inducement to Bank to enter into this Agreement, and to approve the Application of Merchant, the Guarantor(s), individually and severally, who signed on the Guarantor signature line(s) on the Application, agree to be bound by all terms and provisions of this Agreement to the same extent and in the same manner as Merchant, and unconditionally and irrevocably, personally guarantee the continuing full and faithful performance and payment by Merchant of each and all of Merchant's duties and obligations to Bank under this Agreement or any other agreement currently in effect or in the future entered into between Merchant or its Principals and Bank, as such agreements now exist or are amended from time to time, with or without notice to Guarantor(s).

Merchant and Guarantor(s) further agree to be bound by the terms and provisions of any Merchant Card Processing Agreement between Bank and any Merchant Affiliate (as that term is defined in this Agreement), regardless of whether such agreement currently exists or is executed, amended or supplement at some future date. Merchant and Guarantor(s) unconditionally and irrevocably guarantee the full payment and performance of each and all duties and obligations owed to Bank by Merchant Affiliate pursuant to any Merchant Card Processing Agreement. The provisions of Section 25.c apply to the guarantee by Merchant and Guarantor(s) of the Merchant Affiliate's obligations to Bank under any Merchant Card Processing Agreement.

Guarantor(s) understands that Bank, without notice to Guarantor(s), may from time to time renew or extend the Agreement, modify rates, limits, charges and fees, or modify the amount or type of services provided to Merchant all of which may increase the Guarantor's obligations under this Guaranty. Guarantor(s) further understands that Bank may proceed directly against Guarantor(s) without first exhausting Bank's remedies against the Merchant, any other person or entity responsible to Bank or any security held by Bank, all rights of the Guarantor(s), and each of them, under O.C.G.A. 10-7-24 being hereby

expressly waived and relinquished. This Guaranty is a continuing guaranty and will not be discharged or affected by the release or discharge of Merchant or the death of the Guarantor(s). This Guaranty will bind all heirs, administrators, and representatives of the Guarantor(s) and may be enforced by or for the benefit of any successor of Bank. To the fullest extent permissible under applicable law, Guarantor(s) waives any and all rights of subrogation, reimbursement or indemnity derived from Merchant, all other rights and defenses available to Merchant, and all other rights and defenses available to Guarantor(s).

# CARD NOT PRESENT (CNP) ADDENDUM

This CARD NOT PRESENT (CNP) ADDENDUM is made a part of the terms and conditions of the Merchant Card Processing Agreement (the "Agreement") and the Application for processing services signed by Merchant (the "Application"). Under the Agreement, Merchant has agreed to comply with all terms and conditions of the Addendum. The following terms and conditions describe the procedures for CNP transactions. All capitalized terms used in this Addendum and not otherwise defined herein shall have the meanings assigned to them in the Agreement or Application. Requirements set forth herein are in addition to requirements set forth in the Agreement, the Operating Guide and the Operating Rules.

Additional Definitions.

3-D Secure – A Visa-approved method that is the global authentication standard for Electronic Commerce Transactions.

Authentication Request – A request for Cardholder authentication from a Merchant utilizing 3-D Secure to a Card Issuer.

Deferred Payment Transaction – A CNP Transaction for which the Cardholder is billed once no more than 90 days after the first shipment of merchandise.

Electronic Commerce Transaction – A Card Transaction conducted over the Internet or other network.

Order Form – A document bearing the Cardholders signature, either written or electronic, authorizing goods or services to be charged to his or her account. An Order Form may be: (a) a mail order form, (b) a Recurring Transaction form,

Case 6:18-cv-00862-RBD-DCI   Document 32-2   Filed 06/22/18   Page 52 of 83 PageID 4869

(c) a Preauthorized Health Care Transaction form, or (d) an e-mail or other electronic record that meets the requirements of applicable law.

Permanent Establishment – a fixed place of business through which an Electronic Commerce or Mail Order/Phone Order Merchant conducts its business, regardless of its Web site or server locations.

Acceptance of Card Not Present (CNP) Charge Transactions.

Merchant may accept Card Not Present (CNP) transactions and related Charges ("CNP Transactions") based upon the description of Merchant's business ("Business") on the Application and as authorized by the Bank. Bank reserves the right to terminate CNP Transactions in the event that there is any material change in the Business, including any material change in the customers, products, management or employees of the Business.

Merchant agrees that, except as expressly permitted by the Operating Rules, no CNP Transactions shall be submitted for processing prior to shipping of the product purchased and/or the implementation of the service offered.

Merchant understands and agrees that CNP Transactions: (1) do not require the Cardholder's signature on the Charge, sales draft or sales slip (with the exception of Order Forms referred to in Section 1.e above); (2) require the Merchant to obtain the valid Expiration Date for each Card used for a CNP Transaction; and (3) require the Expiration Date of the Card be submitted as part of the Authorization process.

**Merchant understands and agrees that Authorizations for CNP Transactions are subject to Chargeback and such Authorizations do not guarantee the validity or collectability of the Card Transaction.** Merchant agrees to take reasonable additional steps to verify the identity of the authorized Cardholder on these types of transactions, especially when merchandise is shipped to a third party. Merchant acknowledges and agrees that the receipt of an Authorization Code indicating approval does not guarantee Merchant against Chargebacks. Merchant is encouraged to use (when not prohibited under applicable law) fraud reduction systems offered by the Card Networks, such as AVS and CVV2/CVC2 in CNP Transactions.

Generally, in order to satisfy a retrieval request for CNP Transactions, the following transaction receipt information must be provided by Merchant: (1) the Cardholder Account number, (2) the Card expiration date, (3) the Cardholder name, (4) the transaction date, (5) the Transaction amount, (6) the Authorization Code, (7) Merchant's Name, (8) Merchant's location, (9) a description of the goods or services, (10) the "ship to" address, and (11) the AVS response code (if AVS was used). Merchant is responsible for ascertaining whether applicable law requires copies of transaction receipts retained by Merchant to truncate card numbers and suppress expiration dates, and for complying with all such laws.

Processing Restrictions. If at any time the volume of CNP Transactions, substantially exceeds the projected annual volume stated on the Application, or if at any time Bank suspects fraud, money laundering or violations of the Operating Rules, Bank may, in its sole and absolute discretion and in addition to other remedies that the Bank may have: (1) refuse to process the excessive or suspect CNP Transactions; (2) process the CNP Transactions and retain the funds received from processing until such time as the excess or suspect Charges are found to be valid or invalid and processed in accordance with the Operating Rules; (3) suspend the CNP Transactions and/or terminate the Agreement; or (4) amend the Agreement to protect the interests of Bank.

Electronic Commerce Transactions.

If Bank authorizes Merchant to accept Electronic Commerce Transactions, Merchant agrees to comply with all the provisions of the Operating Rules pertaining to Electronic Commerce Transactions.

Merchant shall at all times maintain a secure site for the transmission of data relating to the processing of Electronic Commerce Transactions. Merchant shall be responsible for ensuring, obtaining and maintaining site security, for the encryption of all data, and for any and all storage of data both in electronic and physical form.

Each Electronic Commerce Transaction must be identified as such when submitted by Merchant by using the appropriate Electronic Commerce Transaction indicator values specified by the Card Networks.

Merchant may not submit a request for Authorization for an Electronic Commerce Transaction that has failed a 3-D Secure authentication request.

Merchant shall display on Merchant's web site in a prominent manner: (I) the address of the Merchant's Permanent Establishment, including Merchants country of domicile, located on the same screen view as the checkout screen used to present the total purchase amount, or within the sequence of web pages the Cardholder accesses during the checkout process; (2) a complete and accurate description of the goods or services offered; (3) Merchants merchandise return and refund policy clearly displayed on either the checkout screen, or on a separate screen that allows the purchaser to click an acceptance button; (4) Merchant's consumer data privacy policy and the method of transaction security used to secure cardholder account data during the ordering and payment process; (5) a customer service contact, including electronic mail address or telephone number; (6) transaction currency; (7) export restrictions (if known); (8) Merchant's delivery/fulfillment policy.

Merchant shall provide Cardholders a secure transaction method, such as Secure Socket Layer or 3-D Secure.

Each web site operated by Merchant must display the marks of the Card Networks for the Card types which are accepted by the Merchant, as specified in the Operating Rules.

Merchant cannot refuse to complete an Electronic Commerce Transaction using a MasterCard-branded Card solely because the Cardholder does not have a digital certificate or other secured protocol.

Merchant agrees to include, in addition to the other data required under the Operating Rules, the following data on a transaction receipt completed for an Electronic Commerce Transaction: (1) Merchant's name most recognizable to the cardholder, such as: Merchant "doing business as" name or Merchant's "universal resource locator" (URL), or Merchant name used in the VisaNet Clearing Record. (2) Customer service contact information including telephone country code and area code. If Merchant delivers goods or services internationally, Merchant must list both local and internationally accessible telephone numbers. (3) Terms and conditions of sale, if restricted. (4) The exact date any free trial period ends, if offered. (5) Cancellation policies. (6) Merchant's online address. (7) A unique transaction identification number. For receipts completed by Internet Payment Service Providers, Payment Service Providers, Internet Payment Facilitators or Payment Facilitators, see additional requirements set forth in the Operating Rules.

Merchant will provide a completed copy of the transaction record to the Cardholder at the time the purchased goods are delivered or services performed. Merchant may deliver the transaction receipt in either of the following formats: (1) electronic (e.g., e-mail or fax), or (2) paper (e.g., hand-written or terminal-generated). Merchant may not transmit the Cardholder Account number or card expiration date to the Cardholder over the Internet or on the transaction receipt. Merchant is responsible for ascertaining whether applicable law requires copies of transaction receipts retained by Merchant to truncate card numbers and suppress expiration dates, and for complying with all such laws.

Installment Billing Transactions.
If Merchant is so permitted by Bank, Merchant may offer Cardholders involved in Electronic Commerce Transactions or mail order/telephone order transactions an Installment Billing Transaction option. If Merchant offers an Installment Billing Option, Merchant must comply with the requirements set forth in the Operating Rules, including without limitation, those set forth or referred to at Visa Core Rules and Visa Product and Service Rules 5.9.8, "Prepayments, Repeated Payments and Deferred Payments".

Deferred Payment Transaction.
Merchant shall comply with all applicable Operating Rules, including without limitation those set forth or referred to at Visa Core Rules and Visa Product and

Service Rules 5.9.8 "Prepayments, Repeated Payments and Deferred Payments".

Recurring Transactions.
Merchant must complete a Recurring Charge in accordance with the requirements set forth in the Operating Rules, including without limitation, those set forth or referred to at Visa Core Rules and Visa Product and Service Rules 7.4.9 "Recurring Transactions" and 5.9.8 "Prepayments, Repeated Payments and Deferred Payments".

Delayed Delivery Transactions.
Merchant must comply with the requirements set forth in the Operating Rules, including without limitation, those set forth or referred to at Visa Core Rules and Visa Product and Service Rules 5.9.8 "Prepayments, Repeated Payments and Deferred Payments".

MasterCard Direct Mail Cardholder Solicitation Merchant.
Merchant, if a Direct Mail Cardholder Solicitation Merchant (as defined in the MasterCard Operating Rules), agrees that: Merchant acknowledges that the trademark "MasterCard" and the corresponding logotype are the property of MasterCard International Incorporated. Merchant shall not infringe upon the mark or logo, nor otherwise use the mark or logo in such a manner as to create the impression Merchant's goods or services are sponsored, produced, affiliated with, offered, or sold by MasterCard. Merchant shall not use the mark or logo on its stationery, letterhead, envelopes, or the like nor in its solicitation; provided, however, that Merchant may use one of the mark or logo in close proximity to the payment or enrollment space in the solicitation in a size not to exceed 1 1/4 inches in horizontal length if a logo is employed, or, if a mark is used, in type not to exceed the size of the type used in the major portion of the text on the same page; provided further that the legend, "Accepted for Payment" must accompany the mark or logo used and must be the equivalent size of the mark or logo. In no case, however, shall Merchant use any of the logo on the front or first page of its solicitation. One truthful statement that Merchant is directing or limiting its offer to MasterCard Cardholders may appear in the body of the solicitation, other than in close proximity to the payment or enrollment space, subject to the limitation that: (i) only the word mark may be used; (ii) the word mark may not (a) exceed in type size the size of any other type on the same page, (b) differ in color from the type used in the text (as differentiated from the titles) on the same page, (c) be as large or as prominent as the name of Merchant, (d) be the first item appearing on any page, nor (e) in any other way be the most prominent element of the page; (iii) Merchant's name and/or logo must appear prominently on the same page as the mark; and (iv) the following disclaimer must appear in close proximity to the mark on the same page and in an equal size and type of print: "MasterCard

International Incorporated is not affiliated in any way with Merchant and has not endorsed or sponsored this offer."

Merchant further agrees to submit its first direct mail solicitation(s), prior to mailing, to the MasterCard Law Department, to be reviewed only for compliance with MasterCard's trademark rules and shall furthermore not distribute in any manner such solicitations until Merchant shall have obtained MasterCard's written approval of the manner in which it uses MasterCard mark and logo on such solicitations. Merchant shall likewise, upon request, submit to the Corporation any amended solicitations prior to mailing.

## Delegation Of Duties.

Card Program duties may, from time to time, be delegated to and among the Processor's business units without giving notice to Merchant, provided, however, Bank will remain responsible for any obligation owed by Bank under the Agreement.

## Suspension and Termination.

Should Merchant, at any time, fail to agree or comply with this Addendum, Bank shall have the right to immediately and without prior notice suspend and/or terminate CNP Transactions and/or the Agreement.

# SPECIAL SERVICES ADDENDUM

This SPECIAL SERVICES ADDENDUM is made a part of the terms and conditions of the Merchant Card Processing Agreement (the "Agreement") and the Application for processing services that Merchant signed (the "Application"). Under the Agreement, Merchant has agreed to comply with all terms and conditions of the Addendum. This Addendum describes additional requirements that Merchant is to follow for the special card processing services referred to herein. Requirements set forth herein are in addition to requirements set forth in the Agreement, the Operating Rules. All capitalized terms used in this Addendum and not otherwise defined herein shall have the meanings assigned to them in the Agreement or Application.

Definitions.

Account Funding Transaction – Use of a Card to find another account, such as a prepaid Card account.

Advance Payment Service – A Visa service that allows a Cardholder to use his or her Card for a partial or complete advance payment for recreational services or activities provided by an Advance Payment Service Merchant.

Advance Payment Service Merchant -A non-T&E Merchant participating in the Advance Payment Service, whose primary function is to provide recreational services to tourism and travel.

Advance Payment Service Transaction – A Transaction completed by an Advance Payment Service Merchant.

Car Rental Company – A merchant whose primary business is the rental of passenger vehicles.

Central Reservations Service – An entity that acts as a reservations resource for lodging establishments located in close proximity to each other.

CPS/Small Ticket – A Visa-offered service designed to meet the special Card acceptance and operating procedures of certain Merchants involving small dollar transactions.

Dynamic Currency Conversion – A conversion of currency in which goods or services are normally priced into a different currency, as agreed upon by the Cardholder and Merchant.

Visa Easy Payment Service – a Visa service that permits certain Merchants to process specified types of small dollar Card Transactions using special procedures as outlined in the "Visa Core Rules and Visa Product and Service Rules".

Lodging Merchant – A merchant that sells overnight accommodations intended for a limited period of time.

[Intentionally Omitted]

Priority Check-Out Service – A Visa service provided that allows a Cardholder to authorize the use of the Cardholder's Card for payment of the total obligation to the Lodging Merchant with or without prior knowledge of the total amount, by signing a completed Priority Check-Out Agreement.

Priority Check-Out Agreement – A written agreement that, when bearing the Cardholder's signature, authorizes a Lodging Merchant participating in Visa's Priority Check-Out Service to deposit a Charge without the Cardholder's signature for the total amount of the Cardholder's obligation.

Supermarket Incentive Program – A Visa program that permits certain supermarket merchants to qualify' for reduced interchange reimbursement fees.

T&E Advance Deposit Service – A Visa service that a Lodging Merchant or Car Rental Company provides to a Cardholder, allowing use of a Visa Card to pay in advance deposit required to reserve accommodations or a vehicle.

[Intentionally Omitted]

T&E Merchant – A merchant whose primary function is the provision of travel related services.

Telephone Service Transaction – A Card Transaction in which a Cardholder uses a Visa Card to purchase a telephone call.

Visa Cash Back Service – A Visa service whereby cash in obtained from a qualified Merchant through the use of a Visa Check Card II in conjunction with, and processed as a PIN-based transaction.

## Advance Payment Service.

A Merchant participating in the Advance Payment Service must comply with all applicable Operating Rules, including without limitation those set forth or referred to at Visa Core Rules and Visa Product and Service Rules 5.9.8 "Prepayments, Repeated Payments and Deferred Payments." The copy of the transaction receipt mailed to the Cardholder along with the written confirmation and cancellation policy, must have the card expiration date and all but the last four digits of the card number suppressed). In event of cancellation, the copy of the credit transaction receipt mailed to the Cardholder must have the Card expiration date and all but the last 4 digits of the Card account number suppressed. Merchant is responsible for ascertaining whether applicable law requires copies of transaction receipts retained by Merchant to truncate card numbers and suppress expiration dates, and for complying with all such laws.


## Reservation Service.

If Merchant provides lodging (hotel, motel, resort or inn) or car rentals only for "Specialized Vehicles" (e.g., a unique class of vehicle not in the Merchant's main rental fleet and not constituting more than five percent (5%) of Merchant's rental fleet), Merchant may use certain Card types specified by Bank to guarantee a reservation by obtaining the name of Cardholder, the Card account number and expiration date, and the Cardholder's address if written confirmation is requested, and by complying with all applicable Operating Rules, including without limitation the procedures and requirements set forth or referred to in Visa Core Rules and Visa Product and Service Rules as applicable to "Visa Reservation Service", "Hotel Reservation Service" and "Specialized Vehicle Reservation Service", as applicable". A written confirmation or the written confirmation of a cancellation provided the cardholder should suppress the card expiration date and all but the last four digits of the card number to the extent such suppression is required by applicable law. Merchant is responsible for ascertaining whether applicable law requires copies of transaction receipts retained by Merchant to truncate card numbers and suppress expiration dates, and for complying with all such laws.

**T&E Advance Deposit Service.**

Merchants shall comply with the Operating Rules, including without limitation those set forth or referred to at Visa Core Rules and Visa Product and Service Rules as applicable to "T&E Advance Deposit Service" and "Advance Deposit Transactions". The copy of the Charge (reflecting the advance deposit) mailed (together with the Merchant's cancellation policy) to the Cardholder must have the card expiration date and all but the last four digits of the card number suppressed. In the event of cancellation, in the copy of the credit transaction receipt mailed to the cardholder the card expiration date and all but the last four digits of the card number must be suppressed. Merchant is responsible for ascertaining whether applicable law requires copies of transaction receipts retained by Merchant to truncate card numbers and suppress expiration dates, and for complying with all such laws. Merchant indemnifies and holds harmless Bank and any Card Organization from any loss, damage, claim or suit (including reasonable attorney fees) arising from use of a Card for a Deposit.

**Central Reservation Service:**

After application to and approval by Merchant Bank (which shall be in Merchant Bank's absolute discretion), and performance of a site inspection, Merchant may participate in the Central Reservation Service. Merchant shall comply with all applicable Operating Rules, including without limitation those set forth or referred to at Visa Core Rules and Visa Product and Service Rules as applicable to "Central Reservation Service".

**Priority Check-Out Service.**

Any lodging merchant participating in the Central Reservation Service or T&E Advance Deposit Service participating in the Priority Check-Out Service, must comply with all applicable Operating Rules including without limitation those set forth or referred to at Visa Core Rules and Visa Product and Service Rules as applicable to "Priority Check-out Service". The merchant must ask the Cardholder to complete, sign and return a Priority Check out Agreement v which provides for at least the following: (a) The Card account number; (b) Merchant name, location and telephone number, (c) The departure date of the Cardholder: (d) The Cardholder name and room number; (e) A statement authorizing Merchant to charge the Cardholder Account for the amount of the bill without the Cardholder's signature on the Charge; (f) The Cardholder's signature on the Priority Check-Out Agreement; and (g) A provision allowing the Cardholder to request from Merchant specific billing receipts, including the name and address where Merchant should mail the receipts. The transaction receipt copy to be mailed to the Cardholder with the itemized bill and (if requested) signed Priority Check out Agreement, should have the card expiration date and all but the last four digits of the card number are suppressed. Merchant is responsible for ascertaining whether applicable law

requires copies of transaction receipts retained by Merchant to truncate card numbers and suppress expiration dates, and for complying with all such laws.

## Account Funding Transaction.

Merchant must comply with all applicable Operating Rules including without limitation those set forth or referred to at Visa Core Rules and Visa Product and Service Rules 7.4.1 "Account Funding Transactions".

## CPS/Small Ticket.

A qualified merchant (refer to Visa Core Rules and Visa Product and Service Rules, 9.4.5, "CPS/Small Ticket – US Region") which participates in this service must comply with all applicable Operating Rules, including without limitation those set forth or referred to at Visa Core Rules and Visa Product and Service Rules 9.4.5 "CPS/Small Ticket – US Region".

## Dynamic Currency Conversion.

A Merchant that offers Dynamic Currency Conversion services must comply with all applicable Operating Rules including without limitation those set forth or referred to at Visa Core Rules and Visa Product and Service Rules 5.9.7 "Dynamic Currency Conversion". Merchant must not misrepresent, either explicitly or implicitly, that its Dynamic Currency Conversion service is a Visa service. The copy of the transaction receipt provided to the cardholder must have the card expiration date and all but the last four digits of the card number suppressed. Merchant is responsible for ascertaining whether applicable law requires copies of transaction receipts retained by Merchant to truncate card numbers and suppress expiration dates, and for complying with all such laws.

## Visa Easy Payment Service.

A qualifying Merchant (refer to Visa Core Rules and Visa Product and Service Rules 5.9.9 "Visa Easy Payment Service (VEPS)) may participate in the Visa Easy Payment Service on qualifying transactions subject to the requirements set forth in the Operating Rules, including without limitation those set forth or referred to at Visa Core Rules and Visa Product and Service Rules 5.9.9 "Visa Easy Payment Service (VEPS)".

## Preauthorized Health Care.

Participating Health Care Merchants must comply with all applicable Operating Rules including without limitation those set forth or referred to at Visa Core Rules and Visa Product and Service Rules at 5.9.12.1 Preauthorized Health Care Transactions – US Region".

CPS/Supermarket Incentive Program. A merchant location may participate in the CPS/Supermarket Incentive Program, provided Merchant is assigned a Merchant Category Code of 5411 and meets the criteria and requirements set forth in the Operating Rules, including without limitation those set forth or referred to at Visa Core Rules and Visa Product and Service Rules 9.4.3 "CPS/Supermarket – US Region".


Telephone Service Transactions.
A telephone service Merchant must comply with all applicable Operating Rules including without limitation those set forth or referred to at Visa Core Rules and Visa and Product Service Rules as applicable to "Telephone Service Transactions".


Visa Cash-Back Service.
A qualified Merchant may offer this service provided Merchant meets the conditions and complies with the requirements set forth in the Operating Rules, including without limitation those set forth or referred to at Visa Core Rules and Visa Product and Service Rules 5.9.1.6 "Cash-Back Requirements".


VisaNet Copy Request and Fulfillment Service.

Prior to participating in this service, Merchant must execute and deliver to Visa a VisaNet Letter of Agreement Merchant will not have any property or other right, claim, or interest, including any patent right, trade secret right, or copyright interest, in the V.I.P. System, BASE II, or in any systems, processes, equipment, software, data, or materials that Visa U.S.A. or its subsidiaries use with the V.I.P. System, BASE II, or in connection with a Visa program, except for Merchant-supplied data or equipment.

The V.I.P. System and Base II consist of confidential and proprietary information belonging to Visa. Merchant must take appropriate action, by agreement or otherwise, to ensure that its employees or agents with access to the V.I.P. System or BASE II or related documentation: (1) are advised of the confidential and proprietary nature of these systems and documentation; (2) are prohibited from: (a) providing access to or disclosing these systems and documentation to any third party and (b) using these systems and documentation for any purpose not authorized in the Operating Rules; and (c) use their best efforts to protect the VisaNet Access Points. Merchant must not disclose any confidential information of Visa International, Visa U.S.A., or their subsidiaries to a nonmember.

Merchant's right to use the V.I.P. System or BASE II is not assignable and its duties are non-delegable without prior written consent from Visa. However,

Merchant may use a nonmember processing organization that has executed and delivered a VisaNet Letter of Agreement to Visa.

Merchant must restrict its use of the V.I.P. System or BASE II to purposes specifically approved by Visa.

Merchant must not make or attempt to make any repair, adjustment, alteration, or modification to a VisaNet Access Point, except as expressly authorized by Visa.

Merchant must provide the same level of security for its VisaNet Access Points that it provides to its other proprietary systems.

Merchant must not modify or enhance Visa-owned software without the prior written consent of Visa U.S.A.

Merchant must provide, without cost to Visa, reasonable support requested by Visa for installing the V.I.P. System or BASE II, including: (I) providing a location that meets the requirements of Visa for installing one or more VisaNet Access Points on Merchants premises; (2) providing a sufficient number of qualified personnel that the Merchant will train to meet Visa specifications; (3) maintaining V.I.P. System and Base II records, documents, and logs required by Visa and providing them at the request of Visa; (4) providing access to its premises and cooperating with Visa and its authorized agents in conjunction with the installation, service. repair, or inspection of the VisaNet Access Points: (5) notifying Visa promptly of any failure of a VisaNet Access Point to operate properly on its premises or the premises of its agent or independent contractor; and (6) providing computer time and a sufficient number of qualified personnel required to ensure prompt and efficient installation and use of the V.I.P. System or BASE II Edit Package software supplied by Visa.

[Intentionally Omitted].

Health Care Merchants.
A qualifying Health Care Merchant must comply with the Operating Rules including without limitation those set forth or referred to at Visa Core Rules and Visa Product and Service Rules 5.9.2 "Health Care".


Visa ReadyLink.
Participating Merchants must comply with the applicable Operating Rules including without limitation those set forth or referred to in the Visa Core Rules and Visa Product and Service Rules, and the Visa ReadyLink Service Description and Implementation Guidelines, referred to therein.


Proximity/Contactless Payment Terminal Transactions.
Participating Merchants must comply with the applicable Rules including without limitation those set forth or referred to in Visa Core Rules and Visa

Product and Service Rules as applicable to Proximity/ Contactless Payment Transactions and the "Visa Contactless Payment Specification".

Fleet Service Merchants.
Participating Merchants must comply with all applicable Operating Rules including without limitation those set forth or referred to at Visa Core Rules and Visa Product and Service Rules 7.4.12 "Visa Fleet Card Transactions".

# Merchant Use and Disclosure of BIN Information Addendum

Bank may provide BIN information or other product-identifying data to the Merchant or its Merchant Servicer solely for purposes of identifying Visa or MasterCard Card product types at the point of sale. Bank must provide this Visa BIN information to any Merchant requesting it for the permitted purpose. Bank must provide a complete list of the BINs that apply to Debit MasterCard Cards to Merchants upon any form of reasonable request.

A U.S. Merchant or its Merchant Servicer that receives BIN information or other product-identifying data from Bank must not use such information for any reason other than to identify Visa or MasterCard Card product types at the point of sale and to implement acceptance practices permitted by the Visa or MasterCard Operating Rules (including, without limitation, "1.5.4.13 Discount Offer – US Region and US Territories" in the Visa Core Rules and Visa Product and Service Rules; and Rule 5.9.1 "Discrimination" in the Additional U.S. Region and U.S. Territory Rules in the MasterCard Rules manual) based on such information, unless authorized by Visa or MasterCard, as applicable.

A U.S. Merchant or its Merchant Servicer must not disclose BIN information or other product-identifying data to any third party without prior written permission from Visa or MasterCard, as applicable.

If Merchant provides BIN or other product data information to a Merchant Servicer, Merchant must:

Ensure that the Merchant Servicer complies with the substance of these "Merchant Use and Disclosure of BIN Information" requirements

Include the substance of these requirements in Merchant's agreement or contract with its Merchant Servicer

# VISA ACCOUNT UPDATER ADDENDUM

This Visa Account Updater ("VAU") Addendum and is made between the merchant ("Merchant") identified in the Application (the "Application"), Qualpay, Inc (the "Processor"), and Synovus Bank (the "Merchant Bank"). The Processor and Merchant Bank are collectively hereinafter referred to as the "Bank". The Processor and Merchant Bank reserve the right to allocate Bank's duties and obligations amongst themselves as they deem appropriate in their sole discretion, and Merchant Bank or Processor may jointly or individually assert or exercise any rights or remedies provided to Bank hereunder.

This Visa Account Updater Addendum is made a part of the terms and conditions of the Merchant Agreement (the "Agreement") and Application that Merchant signed (including any electronic signature). Merchant understands that a request for VAU service is subject to approval by Visa and the Bank. Merchant signature on the Application signifies acceptance of the terms of this Visa Account Updater Addendum, including VAU pricing, in addition to the terms of the Agreement. Failure to comply with the terms of this Visa Account Updater Addendum or the Agreement may result in suspension of VAU service and all other payment processing services for Merchant.

The Visa Account Updater program enables U.S. card issuers to supply the most current cardholder account information through U.S. acquirers to U.S. acquired merchants whose businesses require electronic maintenance of customer account data. Participating merchants use updated cardholder account information to support subscription services, recurring payments, and other account-on-file functions, such as T&E "gold", preferred check-in programs, internet and registered user "one-click" capabilities. VAU service provides an automated, dedicated, secure clearinghouse to make changes to limited cardholder account information (such as account number, expiration date, account closure or other changes) available in a timely, efficient and cost-effective manner.

Merchant Security Requirements

Merchant must comply with all applicable laws, such as data protection laws (including gathering specific consent of cardholders for processing and transfer of their personal data, if applicable).

Merchant must ensure that cardholder information is securely stored, and that such information is available only to those employees of Merchant who have a legitimate business need and authorization to access the information.

Merchant must ensure that employees who have access to cardholder information are aware of, and familiar with Merchant's policies as they relate to the use of such information (and related personal data).

Merchant must delete all Visa Account Updater files with cardholder information after use to minimize the likelihood of improper access to, or use of, the data.

Merchant must be in compliance with Payment Card Industry Data Security Standards at all times.

**Merchant Participation Requirements.** Merchant must continue to meet Visa Merchant Participation Requirements as established by Visa from time to time including;
Merchant must be a U.S. acquired merchant.

Merchant must not have been disqualified from participating in the Visa system.

Merchant must be in compliance with the Merchant Requirements of the VAU Terms of Use, and the confidentiality and other applicable obligations set forth in the Visa Operating Regulations.

Merchant must have a valid business need to receive updated account information, including but not limited to:
Subscription services

"Express checkout services"

Membership (club) services

Recurring payment services

Merchant must meet the following risk management criteria:
Must not be engaged in business categorized by the following Merchant Category Codes: 5962, 5966, 5967, and 7995.

Must not be a merchant whose sales transactions are predominantly Quasi-Cash, Account Funding, or any combination thereof.

Merchant must comply with all applicable laws and regulations.

Merchant must be approved by Visa U.S.A. for participation.

Merchant will promptly notify the Bank of any change in Merchant's Participation Requirements.

## VAU Merchant Inquiry Records

Merchant must be registered with Visa for the Visa Account Updater program before merchant can submit account inquiries.

Merchant must request a VAU update through the Bank for every participating Visa account in merchant's customer VAU qualified database at least once every 180 calendar days.

Merchant must submit inquiries only for those accounts with which the merchant has an ongoing customer relationship as defined by Visa.

Merchant may not subsequently inquire on accounts that have previously returned a response of "Closed Account".

Merchant may not submit VAU inquiries on behalf of any other entity.

Merchant must submit account inquiries in the Bank-specified file format and manner.

## VAU Merchant Response Records

Merchant must update its customer account database within five (5) business days of a VAU update from Processor.

Merchant must ensure that information received from VAU is properly, completely, and accurately incorporated into the merchant's customer database for utilization in future Visa transactions.

## Error Resolution

Merchant must correct erroneous account information within five (5) business days of receipt of an error notification from the Bank or Visa.

Merchant must correct operational errors within five (5) business days of receipt of an error notification from the Bank or Visa.

**Issuer Exclusions:** Merchant understands that an issuer may request that VAU withhold account updates from one or more selected merchants.

## Account Updater Pricing:
Merchant will pay the Fees specified in the "Pricing and Fee Schedule" of the Application for Account Updater Service. All other terms and conditions of the Agreement apply to Fees payable by Merchant for Account Updater Service.

# MASTERCARD ACCOUNT BILLING UPDATER ADDENDUM

This MasterCard Account Billing Updater ("ABU") Addendum is made between the merchant ("Merchant') identified in the Application (the "Application"), Qualpay, Inc (the "Processor"), and Synovus Bank (the "Merchant Bank"). The Processor and Merchant Bank are collectively hereinafter referred to as the "Bank". The Processor and Merchant Bank reserve the right to allocate Bank's duties and obligations amongst themselves as they deem appropriate in their sole discretion, and Merchant Bank or Processor may jointly or individually assert or exercise any rights or remedies provided to Bank hereunder.

This MasterCard Account Billing Updater Addendum is made a part of the terms and conditions of the Merchant Agreement (the "Agreement") and Application that Merchant signed (including any electronic signature). Merchant understands that a request for ABU service is subject to approval by MasterCard and the Bank. Merchant signature on the Application signifies acceptance of the terms of this MasterCard Account Billing Updater Addendum, including ABU pricing, in addition to the terms of the Agreement. Failure to comply with the terms of this MasterCard Account Billing Updater Addendum or the Agreement may result in suspension of ABU service and all other payment processing services for Merchant.

The MasterCard Billing Account Updater program enables U.S. card issuers to supply the most current cardholder account information through U.S. acquirers to U.S. acquired merchants whose businesses require electronic maintenance of customer account data. Participating merchants use updated cardholder account information to support subscription services, recurring payments, and other account-on-file functions. ABU service provides an automated, dedicated, secure clearinghouse to make changes to limited cardholder account information (such as account number, expiration date, account closure or other changes) available in a timely, efficient and cost- effective manner.

Merchant Security Requirements

Merchant must comply with all applicable laws, such as data protection laws (including gathering specific consent of cardholders for processing and transfer of their personal data, if applicable).

Merchant must ensure that cardholder information is securely stored, and that such information is available only to those employees of Merchant who have a legitimate business need and authorization to access the information.

Merchant must ensure that employees who have access to cardholder information are aware of, and familiar with Merchant's policies as they relate to the use of such information (and related personal data).

Merchant must delete all Account Billing Updater files with cardholder information after use to minimize the likelihood of improper access to, or use of, the data.

Merchant must be in compliance with Payment Card Industry Data Security Standards at all times.

**Merchant Participation Requirements.** Merchant must meet MasterCard Participation Requirements as established by MasterCard from time to time, including:
Merchant must be a U.S. acquired merchant.

Merchant must not have been disqualified from participating in the MasterCard system.

Merchant must be in compliance with MasterCard Operating Regulations.

Merchant must have a valid business need to receive updated account information.

Merchant must comply with all applicable laws and regulations.

Merchant must be approved by MasterCard for participation.

Merchant will promptly notify Bank of any change in Merchant's Participation Requirements

ABU Merchant Inquiry Records

Merchant must be registered with MasterCard for the MasterCard Billing Account Updater program before merchant can submit account inquiries.

The MasterCard Automated Billing Updater application will identify account change information only for MasterCard accounts

Merchant must submit account inquiries in the Bank-specified file format and manner.

Merchant must submit inquiries only for those accounts with which the merchant has an ongoing customer relationship.

Merchant may not subsequently inquire on accounts that have previously returned a response of "Closed Account".

At this time, only MasterCard-branded card programs are included in this service. Therefore, no account number should be longer than 19 di

gits. All account numbers should begin within the range of 51 through 55. Merchant may not submit ABU inquiries on behalf of any other entity.

**ABU Merchant Response Records.** Merchant will update cardholder account data within ten days of receipt.

Account Updater Pricing
Merchant will pay the Fees specified in the "Pricing and Fee Schedule" of the Application for Account Updater Service. All other terms and conditions of the Agreement apply to Fees payable by Merchant for Account Updater Service.

# AMERICAN EXPRESS CARD ACCEPTANCE ADDENDUM

This American Express Card Acceptance Addendum made pursuant to the American Express OptBlue® Program ("AmEx Addendum") is made between Qualpay, Inc ("Qualpay"), a Delaware corporation, and a business identified in the Application defined below ("Merchant") that wishes to accept American Express Cards ("American Express Card"). This AmEx Addendum is made a part of the terms and conditions of the Merchant Account Application for processing services that Merchant signed (the "Application") and the Merchant Card Processing Agreement between Qualpay, Merchant and Merchant Bank as defined in the Merchant Card Processing Agreement (collectively the "Agreement"). Capitalized terms used in this AmEx Addendum and not defined herein shall have the meaning given them in the Agreement. Notwithstanding the foregoing or any other provision hereof, Merchant understands and agrees (A) that Merchant Bank does not sponsor Processor into the American Express Network, is not providing or agreeing to provide Merchant any services hereunder with respect to American Express transactions, does not determine or approve or agree upon any fees, charges, pricing, or any other terms and conditions (including without limitation those set forth in this Addendum), relating to American Express Card transactions, and has no responsibility or liability to Merchant for American Express Card transactions, and (B) that to the extent applicable to American Express Cards or transactions, any reference herein or in any of the other documents constituting part of the Agreement to the terms "Bank" or "Merchant Bank" (except only to the extent the reference constitutes a complete disclaimer of responsibility or liability on the part of Bank or Merchant Bank, or constitutes an obligation on the part of Merchant to indemnify, defend or hold harmless Bank or Merchant Bank from or against any responsibility or liability) means Processor only. Except as specifically modified or amended in this AmEx Addendum, Merchant agrees to comply with the

terms of the Agreement in accepting American Express Card Transactions. Merchant understands that a request to accept American Express Cards is subject to approval by American Express and Qualpay. Merchant accepts the terms of this AmEx Addendum, including the Pricing set forth in the application, in addition to the terms of the Agreement. Failure to comply with the terms of this AmEx Addendum or the Agreement may result in suspension of American Express Card processing services for Merchant.

American Express Terms and Conditions

Merchant must comply with the terms of the "American Express Merchant Operating Guide" for the OptBlue® Program; as such terms may be amended from time to time. All capitalized terms used in this AmEx Addendum and defined in this AmEx Addendum or the Application have the meaning given them in the American Express Merchant Operating Guide. The American Express Merchant Operating Guide may be found at http://www.americanexpress.com/merchantopguide.

With respect to American Express Card Transactions, Merchant expressly authorizes Processor to submit transactions to, and receive settlement from, American Express on behalf of Merchant. Merchant agrees not to assign to any third party any payments due under this AmEx Addendum, and all indebtedness arising from Charges will be for bona fide sales of goods and services (or both) free of liens, claims and encumbrances other than ordinary sales taxes. American Express shall have third party beneficiary rights, but not obligations, under the terms of this AmEx Addendum, including the rights to enforce the terms of this AmEx Addendum against Merchant.

Merchant agrees to provide Card Transaction data and other Merchant information as requested to American Express and any entities required by American Express, including information required for the Consortium Merchant Negative File (commonly referred to as MATCH).

Merchant expressly authorizes
Processor to disclose Transaction Data, Merchant Data, and other information about the Merchant to American Express; and

American Express to use such information to perform its responsibilities in connection with the OptBlue® Program, to screen and/or monitor Merchant in connection with Card marketing and administrative purposes, promote the American Express Network, perform analytics and create reports, and for any other lawful business purposes, including commercial marketing communications purposes within the parameters of the OptBlue® Program Agreement, and important transactional or relationship communications from American Express.

Merchant acknowledges that it may be converted from the OptBlue® Program to a direct card acceptance relationship with American Express if and when it becomes a High CV Merchant. Merchant further agrees that, upon conversion, the Merchant will be bound by American Express' then current Card Acceptance Agreement; and

American Express will set pricing and other fees payable by the Merchant for Card acceptance.

Marketing Opt-Out: Merchant may opt out of receiving future commercial marketing communications from American Express by written notice to Processor.

Merchant may not use, store or disclose Card Transaction data or Merchant information except as permitted under the terms of the American Express Merchant Operating Guide and the Agreement.

Merchant may not require a minimum or maximum purchase amount for use of American Express Card or impose any surcharge or convenience fee on American Express Card Transactions except as permitted by the American Express Merchant Operating Guide.

Merchant agrees to accept American Express Card Checks consistent with card checks of other card types and similar to Merchant's policies concerning personnel checks.

In the event the Agreement is terminated for any reason, whether for cause or without cause, this AmEx Addendum will immediately terminate. Either Qualpay or American Express may terminate this AmEx Addendum at any time without cause upon thirty (30) days advance written notice and may terminate this AmEx Addendum for cause in either's sole discretion, effectively immediately.

## American Express OptBlue® Program Marks

Merchant is prohibited from using the OptBlue® Program Marks, as defined below, other than as expressly authorized in writing by Qualpay or as provided in the Merchant Operating Guide. OptBlue® Program Marks mean the brands, emblems, trademarks, and/or logos that identify American Express Cards. Additionally, Merchant shall not use the OptBlue® Program Marks other than to display decals, signage, advertising, and other forms depicting the OptBlue® Program Marks that are provided to Merchant by Provider pursuant to the Merchant Program or otherwise approved in advance in writing by Provider. Merchant may use the OptBlue® Program Marks only to promote the services covered by the OptBlue® Program Marks by using them on decals, indoor and outdoor signs, websites, advertising materials and marketing materials; provided that all such uses by Merchants must be approved in advance by Provider in writing. Merchant shall not use the OptBlue® Program Marks in such a way that customers could believe that the products or services offered

by Merchant are sponsored or guaranteed by the owners of the OptBlue® Program Marks. Merchant recognizes that it has no ownership rights in the OptBlue® Program Marks. Merchant shall not assign to any third party any of the rights to use the OptBlue® Program Marks.

Additions to the Application

As to American Express Card Transactions, AUTHORIZATION FOR AUTOMATIC FUNDS TRANSFER (ACH) in the Banking Information section of the Application shall include the following: Qualpay is authorized to initiate or transmit automatic debit and/or credit entries and/or check entries to the Settlement Account identified in the Application for all services contemplated under this AmEx Addendum. Merchant agrees that Qualpay may charge the Settlement Account for the amount of any sales draft processed under this Agreement, or any agreement Qualpay may have with any Merchant Affiliate that results in a Chargeback, or for any Credit Voucher or other reimbursement or Processing Fees to which Qualpay may be entitled.

By executing this AmEx Addendum or accepting American Express Card with Qualpay as the American Express Card Transaction processor, Merchant agrees to be bound by the terms of this AmEx Addendum and will cancel Merchant's separate American Express Card Terms and Conditions from American Express.

Additions to the Merchant Agreement

As to American Express Card Transactions only, Section 4a.vii. of the Merchant Card Processing Agreement captioned "Payments to Merchant for Valid Charges" is amended to add the following language:
Qualpay will provide provisional credit to Merchant for each valid American Express Card Transaction Charge which Merchant submits to Qualpay by crediting Merchant's Settlement Account, provided Qualpay has received settlement for the valid Charge through the OptBlue® Program as specified by American Express. Qualpay is not obligated to provide provisional credit to Merchant for Charges submitted that are not valid Charges, and may suspend or discontinue any provisional credit in Qualpay's sole and absolute discretion, including for any reason that would justify termination of this Agreement. Each provisional credit from Qualpay to Merchant will be subject to Adjustment, including revocation, upon Qualpay's further review and verification. Provisional credit to Merchant for a Charge disputed by a Cardholder for any reason is not final.

Qualpay may deduct from any payment to Merchant the amount of any Credit Voucher processed for Merchant, any Chargeback to Merchant, any amount to be deposited in the Reserve Account and any Processing Fees and American Express fines or charges due from Merchant. Merchant must immediately pay Qualpay the amount by which a Credit Voucher processed on any day exceeds valid Charges submitted on that day. Without limiting Qualpay's remedies,

Qualpay may obtain the amount due by deducting it from the Settlement Account, Reserve Account or other accounts of or funds due Merchant.

Merchant acknowledges that all payments and credits provided to Merchant are provisional and subject to suspension, to Chargebacks and to Adjustments in accordance with this AmEx Addendum, the Agreement and the American Express Merchant Operating Guide.

As a condition to Qualpay providing American Express Card processing services under this AmEx Addendum, Merchant may be required to provide additional collateral security, beyond the amounts provided for under the Agreement, for Merchants obligations under this AmEx Addendum. The additional collateral security shall be of a kind, and in amounts, satisfactory to Qualpay and may include delaying payments to Merchant on American Express Card Transaction settlements.

American Express Pricing

Merchant will pay the Processing Fees specified in the "Pricing and Fee Schedule" of the Application for American Express Card Transactions. All other terms and conditions of the Agreement apply to Processing Fees payable by Merchant for American Express Card Transactions.

# Patriot Act Notification

To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each individual or business who opens an account. What this means for you: when you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We will also ask to see your driver's license and/or other identifying documents. Which may include:

Business Identification – Requires Government Issued Business License showing the Identification Number, Date of Issuance, State of Issuance and the Expiration Date. Other acceptable Business Identification documents include Tax Return, Corporate Resolution, Articles of Incorporation, Partnership Agreement or Business Financial Statements.

Personal Identification – Requires Driver's License showing the Driver's License Number, State of Issuance, Date of Issuance and the Expiration Date. Other

acceptable forms of Personal Identification include Passport, Mexican
Consulate ID, Military ID or Resident Alien

Case 6:18-cv-00862-RBD-DCI   Document 32-2   Filed 06/22/18   Page 75 of 83 PageID 4892

Dashboard (dashboard) »   Application Lookup (apps/list) »   Application Detail

## Application Overview

👁 Watch Application

| | |
|---|---|
| **App ID** | 101083 |
| **Current Status** | Complete |
| **Merchant ID** | 971000010633 (merchant/971000010633) ◪ (merchant/971000010633) |
| **Hierarchy Node** | 8971700022 - Platinum Payment Sys - Non-Chain |
| **Merchant DBA** | MOBE-Home Business Summit |
| **Created On** | Nov 30 2016 08:19am |
| **Channel** | Platinum Payments (ID 14) |
| **Created By** | Tracy Hinken<br>✉ thinken@platpay.com<br>📞 No Phone Number |
| **Sales Rep** | Tracy Hinken<br>✉ thinken@platpay.com<br>📞 No Phone Number |
| **Infusionsoft Company** | 8363 ↗<br>(https://ct209.infusionsoft.com/Company/manageCompany.jsp?view=edit&ID=8363) |



**Megan Hyde (user/869)** ▶ **Application**   ⋮
Jan 03 2017 01:48pm

SRenz reached out to TDodd: We could go ahead and approve this account or would you prefer that we hold off and approve all of them at the same time?

**Stacy Renz (user/344)** ▶ **Application**   ⋮
Dec 23 2016 12:01pm

Outstanding Items:

1) What is fulfillment timeframe for 3 day business summit from time card is charged?
2) What percent is upsold to Titanium/Platinum/Diamond pkg?

**Stacy Renz (user/344)** ▶ **Application**   ⋮
Dec 21 2016 10:20am

Per partner, there is the option to purchase one of the Mastermind pkgs via this account, so high ticket should be $20,000. Also, per partner, transactions are 100% retail/CP. OLA has been updated

**System** ▶ **Application**   ⋮
Dec 20 2016 07:45am

Application submitted.

## Tracy Hinken (user/524) ▸ Application

Dec 20 2016 06:17am

Application emailed to susan@mobe.com

⋮

---

## Application Process

[⊞ View Workflow]  ▲

| Station | Status | Started | Completed | Claimed By | Duration | Work Order |
|---------|--------|---------|-----------|------------|----------|------------|
| **Underwriting Support** | Completed | Dec 20 2016 07:45am | Dec 20 2016 08:17am | Jennifer Campbell ⬈ (/ops/user/375) | 32 minutes | View Detail () ⬈ |
| **Underwriting** | Approved | Dec 20 2016 08:17am | Jan 04 2017 11:23am | Megan Hyde ⬈ (/ops/user/869) | 15 days 3 hours 6 minutes | View Detail () ⬈ |
| **Account Load** | Completed | Jan 04 2017 11:23am | Jan 04 2017 11:25am | *System* | 1 minute | View Detail () ⬈ |
| **Build Merchant** | Completed | Jan 04 2017 11:25am | Jan 04 2017 11:30am | *System* | 5 minutes | View Detail () ⬈ |
| **Security Metrics Load** | Completed | Jan 04 2017 11:30am | Jan 04 2017 11:35am | *System* | 4 minutes | View Detail () ⬈ |
| **Build Pricing** | Completed | Jan 04 2017 11:35am | Jan 04 2017 01:41pm | *System* | 2 hours 6 minutes | View Detail () ⬈ |
| **Terminal Build** | Completed | Jan 04 2017 01:41pm | Jan 04 2017 01:41pm | *System* | 0 minutes | View Detail () ⬈ |
| **Support** | Completed | Jan 04 2017 01:41pm | Jan 04 2017 01:41pm | *System* | 0 minutes | View Detail () ⬈ |
| **Welcome Email** | Completed | Jan 04 2017 01:41pm | Jan 04 2017 01:41pm | *System* | 0 minutes | View Detail () ⬈ |
| **Fulfillment** | Completed | Jan 04 2017 01:41pm | Jan 04 2017 01:41pm | *System* | 0 minutes | View Detail () ⬈ |
| **Activation** | Completed | Jan 04 2017 01:41pm | Jan 19 2017 09:23am | *System* | 14 days 19 hours 42 minutes | View Detail () ⬈ |

---

## Documents (42)  ▼

---

## Clickthrough Agreements (1)  ▲

| | | | |
|---|---|---|---|
| **Signer** | Susan Zanghi (Application Owner) | **Remote IP** | 172.16.1.208 |
| **Title** | Office Manager | **Client IP** | 71.75.15.127, |
| **Agreement Time** | Invalid date | **Device** | Personal computer |
| | | **Browser** | ◉ 55.0.2883.95 |
| **Agreements** | ■ I have reviewed and agree to Qualpay's Pricing. | **Operating System** |  OS X 10.10 Yosemite 10.10.4 |
| | ■ I authorize Qualpay to obtain both business and | | |

personal credit reports.

■ Merchant Processing
Agreement
(https://www.qualpay.com/merchant-
agreement/v1)

■ Terms and Conditions
(https://www.qualpay.com/terms-
and-conditions/v1)

■ Visa Disclosure
(https://www.qualpay.com/visa-
disclosures/v1)

■ Electronic Signature Terms
(https://www.qualpay.com/authorize/v1)

■ Guarantor Terms
(https://www.qualpay.com/guarantor/v1)

## About You

| Your Name | Susan | Zanghi |

| Your Phone | (704) 724-8114 |

| Your Email | susan@mobe.com |

## Your Business

| Business Name | MOBE-Home Business Summit | ? |

| Business Phone | (844) 662-3787 | ? |

| Business Email | support@mobeprocessing.com |

| Business Website | http://www.mobe.com | ? ⊘ (http://www.mobe.com) |

| Business Address | 8207 GOLF RIDGE DR |

| | Apt or Suite |

| | CHARLOTTE | North Carolina |

| | 28277 | 8867 |

United States

Do you have a different mailing address?

Yes | **No**

---

### About Your Business

Business Entity Type

Corporation

Trading Status

Non-Public

Legal Name

MOBEPROCESSING.COM INC

State Filed

Delaware

Federal Tax ID

47-3489384

Business Start Date

12-01-2014

Business Industry

Schools and Educational Services

Business Description

3 day business summit

How are you selling?

☑ In Person

☐ Storefront

☐ Business Office

☐ Residence

☑ On-the-go

☑ Online

Other

NMI

☐ Mail

☐ Phone (inbound)

☐ Phone (outbound)

☐ Subscriptions / Recurring Billing

Do you advertise?

Yes | No

How do you advertise?

Is the order fulfilled immediately?

Yes | No

How is the order fulfilled?

My Business | Third Party

How is the order received?

Digitally | Pick-up | Delivery | Service

Does your business use a 3rd party call center?

Yes | No

Do you use any other Third Parties?

Yes | No ⑦

Is your business seasonal?

Yes | No ⑦

What is your Refund Policy

Other

Explain Other:

3 days unless law states longer

## Owner / Officer Information

Ownership

How many Owners have 25% or more interest?

0 or 1 Owner ⑦

1 or more Owners, 1 Control Person, and 1 Qualpay Administrator is required.

| Name | Roles | |
|---|---|---|
| Susan Zanghi | | ✏ Details |

## About Taking Payments

Have you processed credit cards before?

Yes | No

Name of previous acquirer

Chase

Has your acquirer relationship been cancelled previously?

Yes | No

Any prior bankruptcies?

Yes | No



| | |
|---|---|
| **Projected Total Annual Sales** (To include cash and check sales) | $200,000.00 |
| **Projected Annual Credit Card Volume** | $200,000.00 |
| **Typical sales amount** | $497.00 |
| **Largest expected sale** | $20,000.00 |
| **Online** Card not present transactions (CNP) | 0% |
| **Mail and phone** | 0% |
| **In Person** In-Person (Card Present Transactions) | 100% |

## Products

Have you processed with Qualpay before?   Yes | No

Products*

| Product | |
|---|---|
| **Voice Authorization** Merchants that require a voice authorization in the POS and virtual environment. | ✎ Details |
| **Qualpay Manager** Qualpay Manager - Reporting Only | ✎ Details |
| **NMI Payment Gateway** NMI Payment Gateway | ✎ Details |

Select Card Brands and Types*

With Qualpay, you can accept Visa, MasterCard, Discover, and American Express. (For Visa or MasterCard, you can choose to accept only Credit and Business type cards, or only Signature Debit type cards, if you wish). All card types for all card brands are preselected. To adjust your acceptance preferences as to any card brand, or any card types within a brand, click the button for that card.

* Synovus Bank does not provide, and bears no responsibility or liability for these products and services provided by Qualpay or American Express, Pin Debit and EBT transactions.

## Where should we deposit your money?

Bank Checking Routing #

Case 6:18-cv-00862-RBD-DCI    Document 32-2    Filed 06/22/18    Page 82 of 83 PageID 4899

053000196                                                                    (?)

Bank Checking Account #          xxxxxxxx3505                                 (?)

---

## Pricing

Platinum Payments

### Sales

| | |
|---|---|
| Visa, MasterCard, Discover | 1.50% + $0.25 |
| American Express OptBlue* | 1.50% + $0.25 |
| Interchange Pass-Through | At Cost |

### Other Fees

| | |
|---|---|
| Monthly Minimum Discount | $25.00 |
| Monthly Statement Fee | $10.00 |
| Monthly Service Fee | Waived |
| Monthly PCI Fee * | $10.00 |
| Yearly Administrative Maintenance Fee * | $34.99 |
| Authorization Fee | $0.30 |
| Authorization Fee (Amex) * | $0.30 |
| Setup | Waived |
| Early Termination | $95.00 ($50 in Arkansas) |
| Per Batch | $0.25 |
| Voice Authorization | $0.75 |
| Address Verification Service Fee | $0.05 |
| Per Chargeback | $30.00 |
| Per Retrieval | $15.00 |

* Synovus Bank does not provide, and bears no responsibility or liability for the products and services marked with a "*" or American Express, PIN Debit and EBT transactions.

† Visa, MasterCard, Discover and American Express Card Brand Assessment Fees and Sponsorship (.02% on gross Visa, MasterCard, and Discover Sales Volume - 0.15% on gross American Express Sales Volume) are passed through to you.