UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

FEDERAL TRADE COMMISSION,

 Plaintiff,

v.                  Case No. 6:18-cv-862-Orl-37DCI

MOBE LTD.;
MOBEPROCESSING.COM, INC.;
TRANSACTION MANAGEMENT
USA, INC.; MOBETRAINING.COM,
INC.; 9336-0311 QUEBEC INC.; MOBE
PRO LIMITED; MOBE INC.; MOBE
ONLINE LTD.; MATT LLOYD
PUBLISHING.COM PTY LTD.;
MATTHEW LLOYD MCPHEE; SUSAN
ZANGHI; and RUSSELL W. WHITNEY,
JR.,

 Defendants.

## ORDER

Before the Court are the following motions: (1) Non-Party Qualpay, Inc's Motion for Emergency Relief from *Ex Parte* Temporary Restraining Order and, to the Extent Necessary, to Intervene and Memorandum of Law in Support (Doc. 32 ("**Qualpay Motion**")); and (2) Non-Party Synovus Bank's Special Appearance and Motion for Emergency Relief from *Ex Parte* Temporary Restraining Order and, to the Extent Necessary, to Intervene (Doc. 57 ("**Synovus Motion**")). The Court held a hearing on the Qualpay and Synovus Motions on July 17, 2017 ("**Hearing**"). Upon review, the Court finds Qualpay and Synovus' Motions are due to be denied.

## I. BACKGROUND

### A. Procedural History

Plaintiff Federal Trade Commission ("**FTC**") initiated this action under seal against Defendants MOBE Ltd., MOBEProcessing.com, Inc., Transaction Management USA, Inc., MOBETraining.com, Inc., 9336-0311 Quebec Inc., MOBE Pro Limited, MOBE Inc., Mobe Online Ltd., Matt Lloyd Publishing.com Pty Ltd., Matthew Llyod McPhee, Susan Zanghi, and Russell W. Whitney, Jr. (collectively, "**Defendants**" or "**MOBE**"). (*See* Doc. 1 ("**Complaint**").) Claiming MOBE violated Section 13(b) of the Federal Trade Commission Act ("**FTC Act**"), 15 U.S.C. § 53(b), the FTC sought "to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a)." (Doc. 1, ¶ 1.)

The FTC's allegations stem from Defendants' allegedly fraudulent business education program called "My Online Business Education" or "MOBE." (*Id.* ¶ 2.) Through online advertisements, social media, and live events, Defendants marketed a "simple 21-step system" that would allow subscribers to easily start a profitable online business. (*Id.* ¶ 3.) Although the initial fee is only $49, consumers advancing through the 21-steps are coaxed into buying membership packages that cost more. (*Id.* ¶¶ 4, 38.) As a result, consumers end up spending significant sums of money—collectively MOBE acquired over $125,000,000—without consumers netting much economic gain, if any. (*Id.* ¶ 7.) The FTC claims MOBE deceived consumers, and thus, sought to restrain this

conduct by moving under seal for an *ex parte* temporary restraining order. (Doc. 3 ("**XTRO**").)

The XTRO asserted that a temporary restraining order ("**TRO**") was necessary "[t]o protect consumers and preserve assets for consumer redress to Defendants' victims." (Doc. 3, p. 8.) The FTC requested the Court enjoin "Defendants' unlawful conduct, freeze[] their assets, appoint[] a temporary receiver over the Corporate Defendants, require[] Defendants to disclose their assets, and allow[] limited expedited discovery." (*Id.*) The Court granted that Motion on June 5, 2018. (Doc. 13 ("**TRO Order**").)

The TRO Order imposes an asset freeze on Defendants and certain third parties, directing them to "[h]old, preserve, and retain":

> (a) . . . any Asset that has been (i) owned or controlled, directly or indirectly, by any Defendant; (ii) held, in part of in whole, for the benefit of any Defendant; (iii) in the actual or constructive possession of any Defendant; or (iv) owned or controlled by, in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any Defendant[.]
> (b) . . . Asset[s] associated with credits, debits, or charges made on behalf of any Defendant, *including reserve funds held by payment processors*, credit card processors, merchant banks, acquiring banks, independent sales organizations, third party processors, payment gateways, insurance companies, or other entities[.]

(Doc. 13, p. 8) (emphasis added.) The assets of third parties Qualpay and Synovus are allegedly included in this asset freeze—an inclusion that is disputed throughout their motions. (*See* Doc. 32, pp. 2–4; Doc. 57, p. 14.). (*See* Doc. 32, pp. 2–4; Doc. 57, p. 14.) They

claim an ownership interest in the frozen assets and demand the release of "their" funds, as explained next.

**B.     The Credit Card Processing Industry and Parties' Arguments**

Qualpay is a credit card processing company that processed MOBE's transactions. (*See* Doc. 38, p. 3.) Synovus is the bank where Qualpay maintains accounts for funds received on behalf of merchants during credit card processing. (*See id.*) Qualpay and Synovus' ownership claim to MOBE's proceeds is predicated on the convoluted relationship between the parties as part of the credit card payment processing industry.



(Doc. 32, p. 5.) As the figure indicates, the system revolves around "payment networks" (i.e. Visa and MasterCard), but there are intermediaries to ensure no direct interaction between payment networks and the consumer and merchant. (*Id.* at 4–5.) On one side, a consumer or "cardholder" obtains a credit card from an "issuing bank." (*Id.*) On the other side, the "merchant" is required to sign up with a credit card "processor" (i.e. Qualpay), the intermediary between the payment network and the merchant so that the payment network does not have to directly contract with the merchant. (*Id.* at 5.) The processor must have a "sponsoring bank" (also known as an "acquiring bank"), which is a trusted entity approved by Visa or MasterCard. (*Id.*)

When properly functioning, this process functions like a circuit: (1) a consumer swipes his card at a merchant's store; (2) the processor seeks authorization from the issuing bank; (3) if authorized, the issuing bank approves the card's acceptance and sends the issuing bank's own funds to the processor's bank account at the acquiring bank; (4) within a few days the processor pays the merchant the cost of the transaction, minus fees; and (5) the consumer pays the issuing bank. (*Id.* at 5–6 (citing *In re Nat'l Audit Defense Network*, 332 B.R. 896, 908 (Bankr. D. Nev. 2005).) However, if a cardholder does not pay the issuing bank, but rather decides to challenge the transaction, a "chargeback" is initiated. (*Id.* at 6.) If that occurs, the issuing bank will obtain the money from the processor's account at the acquiring bank, leaving the processor to turn to the merchant for its share. (*Id.*)

Reserve accounts are typically contractually defined, and, generally speaking, permit the processor to keep a portion of the money from a transaction in a separate reserve account before directing the remaining credit card settlement to the merchant. (Doc. 32, p. 6.) It is customary for processors to hold the reserve funds in accounts at the acquiring bank in order to protect against liability from credit card chargebacks. (*Id.*) Thus, the reserve accounts contain a certain predetermined percentage from each transaction which the processor withholds from the merchant until the potential exposure associated with a transaction expires. (*Id.* at 7.)

All of the pending motions boil down to a singular argument: who owns the funds in the reserve account. Qualpay argues that it and Synovus currently own the funds, and that equity favors awarding the funds to Qualpay to cover expenses and stay in business.

(Doc. 32, p. 3–4.) Synovus largely agrees with Qualpay, arguing that MOBE only has a future interest in the Reserve Funds and does not own the funds until they are processed and paid out. (Doc. 57, pp. 8–14.) Should the Court find for Qualpay and Synovus, they seek modification of the TRO Order to allow them access to the reserve account's funds so they can to satisfy consumer chargebacks for MOBE's transactions. (Doc. 32, p. 20, Doc. 57, p. 19.)

The FTC and "**Receiver**" Mark Bernet disagree. They argue that the relationship between the parties is akin to an escrow account, so Qualpay is merely holding the funds on MOBE's behalf. (Doc. 38, pp. 12–13; Doc. 39, pp. 3–7.) Additionally, they claim that Qualpay ignored countless red flags about MOBE's business practices, and significantly increased the reserve by initiating a "100% holdback" rate. (Doc. 76, pp. 1–2.) Last, they note that both Qualpay and Synovus may protect their respective interests by filing a claim with the Receivership instead of interfering with the TRO at this stage. (Doc. 38, p. 18; Doc. 77, p. 7.)

The Qualpay Motion seeking relief from the TRO was filed on June 25, 2018. (Doc. 32.) On July 10, 2018, Synovus filed its own motion objecting to the TRO. (Doc. 57.) On July 17, 2018 the Court held the Hearing on both the Qualpay and Synovus Motions. Representatives from Qualpay, Synovus, the FTC, the Receiver, and defendant Russell W. Whitney, Jr. were present.

## II.   LEGAL STANDARD

A district court "has broad powers and wide discretion to determine relief in an equity receivership." *S.E.C. v. Wells Fargo Bank, N.A.*, 848 F.3d 1339, 1343-44 (11th Cir.

2017) (quoting *S.E.C. v. Elliot*, 953 F.2d 1560, 1566 (11th Cir. 1992)). That is especially true when a federal agency is involved. *See S.E.C. v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980) (collecting cases) ("The Supreme Court has repeatedly emphasized the broad equitable powers of the federal courts to shape equitable remedies to the necessities of particular cases, especially where a federal agency seeks enforcement in the public interest."). "When a district court creates a receivership, its focus is to safeguard the assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary." *SEC v. Vescor Cap. Corp.*, 599 F.3d 1189, 1194 (10th Cir. 2010) (quoting *Libertie Cap. Group, LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006)).

Only certain nonparties have a right to intervene. Federal Rule of Civil Procedure 24(a)(2) provides that the court must permit anyone who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." So to intervene, a party must show that:

> (1) his application to intervene is timely; (2) he has an interest relating to the property or transaction which is the subject of the action; (3) he is so situated that disposition of the action, as a practical matter, may impede or impair his ability to protect that interest; and (4) his interest is represented inadequately by the existing parties to the suit.

*Chiles v. Thronburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989). Additionally, the party seeking intervention must show that his application was timely and his claim and the "main

action" share a common question of fact or law. *Id.* Assuming all requirements are met, a district court has discretion in deciding whether to deny intervention. *Id.* (citing *Sellers v. United States*, 709 F.2d 1469, 1471 (11th Cir. 1983)).

### III.   DISCUSSION

**A.   Who Owns the Reserve Funds**

At first blush, Qualpay and Synovus' Motions assert a right to intervene. (*See* Docs. 32, 57.) Neither the FTC nor the Receiver contest this. (*See* Docs. 38, 39, 76, 77, 78, 79.) Thus, the Court finds that Qualpay and Synovus have met the *Chiles* requirements and may intervene. *See* 865 F.2d at 1213. With that, the Court turns to the primary issue: who owns MOBE's reserve account and funds ("**Reserve Account**" or "**Reserve Funds**"). *(See* Docs. 32, 38, 39, 57.) If MOBE is the owner, the Receiver may claim the Reserve Funds as part of the Receivership. But if Qualpay or Synovus own them, the Receiver cannot obtain them. *See Escher v. Harrison Sec. Co.*, 79 F.2d 777, 782 (9th Cir. 1935 (holding that receivers "have no greater rights in the property than the [entity] itself possessed"). As all parties rely on the same collection of cases to support their contradictory positions regarding the ownership of the funds, the Court starts there. (*Compare* Doc. 32, pp. 14–17; Doc. 57, pp. 8–9 *with* Doc. 38, pp. 14–17; Doc. 39, pp. 3–5).

In *Federal Trade Commission v. NHS Systems, Inc.*, the receiver sought funds from Teledraft—a non-party payment processing company. 708 F. Supp. 2d 456, 458-59 (E.D. Pa. 2009). Like Qualpay and Synovus here, "Teledraft was a middleman between the customer and the health care providers." *See id.* at 459. In a similar dispute over reserve funds, Teledraft argued that as an independent payment processor, it held a contractual

right to withhold the reserve funds, and the merchant merely had a contract claim with respect to the funds. *Id.* at 464. Ultimately, the court disagreed and held, "it defies common sense that funds collected by Teledraft—which is essentially nothing more than a middleman—for the Receivership should be considered the property of Teledraft." *Id.* at 465–66. Rather, the reserve funds belonged to the merchants for whom Teledraft processed payments. *Id.*

Similarly, in *Federal Trade Commission v. Productive Marketing, Inc.*, a third party credit card processor, Equifax, directed funds to a third party instead of the receiver after a temporary restraining order was issued. 136 F. Supp. 2d 1096, 1100 (C.D. Cal. 2001). Finding the assets were property of the receivership, the court ordered the third party to turn them over or the entire purpose of the receivership would be defeated. *Id.* at 1106. Importantly, the court reached this conclusion even though it was undisputed that the only expenditure the third party made with the funds was "to pay chargebacks or fees deducted by Equifax." *Id.* at 1102.

Taking a cue from those cases, the Court concludes that MOBE is the rightful owner of the reserve account. Like Teledraft, Qualpay and Synovus are the "middleman" processors without additional entitlement to the funds—indeed, their sole function is to process MOBE's transactions. *See NHS Systems, Inc.*, 708 F. Supp. 2d at 459. An analogy to the lumber industry illustrates the parties' ownership interests. In that industry, the individual who pays to cut down a tree owns that lumber. Although, as part of processing, the lumber may pass through different entities who all take some interest or even part of the lumber (i.e. the bark, excess wood, etc.), the ownership status does not

correspondingly shift. The individual who paid to cut down the tree owns the wood throughout the entire process. Similarly, MOBE was the owner of the funds at the point of sale and remained the owner despite its funds being deposited and processed by Qualpay and Synovus before it received them.

Beyond support from precedent, the contractual language of the Merchant Card Processing Agreement ("**Merchant Agreement**") does not support Qualplay and Synovus' position. Three provisions stick out. First, the Merchant Agreement provides that "Merchant grants Bank security interest in each Charge and . . . the Reserve Account." (Doc. 32-2, p. 44.) As the FTC correctly points out, if MOBE may grant a security interest in the Reserve Account, it must be the owner. (Doc. 39, p. 6; Doc. 78, p. 6.) Second, the Merchant Agreement provides that "[i]f funds are not available in the Settlement Account, Bank without prior notice to Merchant may deduct from the Reserve Account." (Doc. 32-2, p. 43.) Such a provision would be wholly unnecessary if MOBE did not own the reserve account.

Last, as the FTC argued at the Hearing, the Merchant Agreement provides, "Without limiting Bank's other remedies or Bank's security interest . . . Merchant Bank may deduct, debit and withhold the amount of a Chargeback or anticipated Chargeback from the Settlement Account, Reserve Account, or any Merchant Account at Merchant Bank, or other ***property of Merchant held by Bank***[.]" (*Id.* at 27 (emphasis added).) That provision seemingly establishes that the Reserve Fund is legally owned by MOBE at all times, despite being held by Synovus and Qualpay. Thus, Qualpay and Synovus are contributing authors to their own misfortune. The Merchant Agreement supports finding

that the Reserve Account belongs to MOBE. The Court rejects their contrary arguments.

Next, even assuming that MOBE's ownership interest was merely contingent, enough time has passed that that interest should have materialized. The Merchant Agreement says that the funds will be held for "at least" 180 days or until "after Bank reasonably determines that the risk of Chargebacks and other Processing Fees has ended and after deducting all amounts that Merchant owes to Bank under this Agreement or any other agreement." (Doc. 32-2, p. 44.) However, as the Receiver points out, Synovus and Qualpay have been holding onto MOBE Reserve Funds for nine months. (Doc. 77, p. 6.) If the Court is to assume that MOBE only had a future interest in the Reserve Funds, at least some of those funds certainly should have vested by now. (*See* Doc. 32, p. 7 (Qualpay argues that MOBE has "[a]t best" a future interest in the reserve funds).) When pressed on this point at the Hearing, Qualpay and Synovus provided answers insufficient to convince the Court otherwise. Thus, MOBE has a current ownership interest in the Reserve Funds.

Last, it is a long-standing rule that contractual ambiguities will be resolved against the drafters. *See Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 1996). Here, ambiguity exists concerning the ownership of the Reserve Funds. Although Qualpay and Synovus agree that MOBE is not the owner, they cannot agree who amongst themselves owns the funds. (*See* Doc. 78, p. 5 n. 2; *Compare* Doc. 57, pp. 4, 18 (Synovus states that the MOBE reserve is owned by the "Acquirers," which Synovus defines as Qualpay and Synovus collectively) *with* Doc. 57, p. 10 (describing the reserve as "the property of Synovus").) Neither party definitively resolves that dispute, and they were unable to present a united

front at the Hearing. There is only one certainty here—MOBE did not draft the Merchant Agreement. So the Court cannot resolve ambiguities against MOBE, and thus, this argument fails.

In conclusion, the asset—the Reserve Funds—was created at the point of sale between the consumers and MOBE. Barring a clear transfer of interest, MOBE never ceded ownership over those Reserve Funds. The chargebacks are *MOBE's* liability. Synovus and Qualpay are simply stepping into MOBE's shoes to pay consumers pursuant to other banking regulations. If the Reserve Funds belonged to Synovus or Qualpay, it should not make a difference whether they pay any chargeback liability out of this particular account or any other account which they own. Furthermore, Synovus and Qualpay spoke at the Hearing about the due diligence that they perform before and during a relationship with various merchants. That they find it necessary to perform continued due diligence is another indication that the money is not theirs, but rather, is akin to collateral. Thus, the Court concludes that the Reserve Account belongs to MOBE. So both Qualpay and Synovus' Motions must be denied.

**B.     Constructive Trust**

Finding MOBE the owner of the Reserve Account, the Court must now decide where to place those funds for the duration of this matter. The FTC recommends placing the funds in a constructive trust. (*See* Doc. 39, pp. 16–17; Doc. 78, pp. 17–18.) The Court finds this agreeable, as: (1) courts in other FTC cases have created constructive trusts

under similar circumstances;[1] (2) the Supreme Court has confirmed that a trust may be established when property was acquired by fraud;[2] and (3) Florida, Georgia (where Synovus is located), and California (where Qualpay is located) all allow for equitable trusts.[3] Thus, the Court will impose a constructive trust over the Reserve Funds.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Non-Party Qualpay, Inc.'s Motion for Emergency Relief from *Ex Parte* Temporary Restraining Order and, to the Extent Necessary, to Intervene and Memorandum of Law in Support (Doc. 32) is **DENIED**.

2. Non-Party Synovus Bank's Special Appearance and Motion for Emergency Relief From *Ex Parte* Temporary Restraining Order and, to the Extent Necessary, to Intervene (Doc. 57) is **DENIED**.

3. Qualpay Inc. and Synovus Bank shall deliver the total value currently held in the MOBE Reserve Accounts, $6,314,342.09, to the Receiver no later than **Thursday, August 16, 2018**, by check payable to the Receiver, or in such other form as the Receiver and Qualpay Inc. or Synovus Bank may agree.

4. The Receiver shall place the funds received on deposit in a separate interest-

---

[1] *See, e.g.*, *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010) (finding that a constructive trust was an appropriate remedy); *FTC v. Think Achievement Corp.*, 312 F.3d 259 (7th Cir. 2002); *FTC v. QT, Inc.*, 605 F. Supp. 2d 999 (N.D. Ill. 2009) (holding that a constructive trust was appropriate where the third party had knowledge of the fraud).

[2] *Harris Trust & Sav. Bank v. Solomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000) (quoting *Moore v. Crawford*, 130 U.S. 122, 128 (1889)).

[3] *See Hallman v. Gladman*, 132 So. 2d 198, 204 (Fla. 2d DCA 1961); *Calistoga Civic Center v. City of Calistoga*, 143 Cal. App. 3d 111 (Cal. Ct. App. 1983); *Kelly v. Johnson*, 373 S.E.2d 7 (Ga. 1988).

bearing Receivership account. Unless otherwise ordered by this Court, such funds shall not be available to pay the expenses of the receivership estate.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on August 8, 2018.

ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record