UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO BEACH DIVISION

FEDERAL TRADE COMMISSION,

               Plaintiff,

vs.                                    Case no. 6:18-cv-862-ORL-37DCI

MOBE LTD., et al.

               Defendants.

_____/

## RECEIVER'S INITIAL REPORT

August 16, 2018

Mark J. Bernet, Receiver
401 E. Jackson Street, Suite 1700
Tampa, Florida  33602
Telephone:  (813) 223-7333
Facsimile:  (813) 769-7592
Email:  mark.bernet@akerman.com
Secondary:  judy.barton@akerman.com

## TABLE OF CONTENTS

I.      PROCEDURAL BACKGROUND..................................................................................3

II.     NATURE OF DEFENDANTS' BUSINESS ....................................................................4

III.    THE RECEIVER'S APPOINTMENT .........................................................................10

    A.      WEBSITES AND SOCIAL MEDIA PAGES .......................................................11

    B.      EVALUATING RECEIVERSHIP ENTITIES' BUSINESS PRACTICES ..........12

    C.      SHUTTING MOBE DOWN..................................................................................18

    D.      REMOVING MANAGEMENT FROM CONTROL...........................................18

    E.      SECURING MOBE'S ESI ...................................................................................19

    F.      MOBE'S ASSETS ...............................................................................................21

        1.      Bank Accounts .......................................................................................21

        2.      Credit Card Reserves .............................................................................22

        3.      Escrowed Funds .....................................................................................25

        4.      Whitney Funds ........................................................................................26

        5.      McPhee Funds.........................................................................................28

        6.      Resort and other Properties....................................................................29

    G.      PUBLICIZING THE LAWSUIT, THE TRO AND THE RECEIVER'S APPOINTMENT ................................................................................................29

    H.      OTHERWISE COMPLYING WITH THE TRO .................................................30

IV.     EMPLOYING PROFESSIONALS ..............................................................................30

V.      PROFESSIONAL FEES ..............................................................................................32

VI.     BANK ACCOUNTS....................................................................................................32

VII.    PENDING AND POTENTIAL CAUSES OF ACTION..............................................33

VIII.   CONCLUSION............................................................................................................34

## INITIAL REPORT OF THE RECEIVER

Mark J. Bernet (the "Receiver"), as receiver for MOBE, Ltd., MOBEProcessing.com, Inc., Transaction Management USA, Inc., MOBETraining.com, Inc., 9336-0311 Quebec, Inc., MOBE Pro Limited, MOBE Inc., and MOBE Online Ltd. and their affiliates, subsidiaries, divisions, or business or sales operations, wherever located (collectively the "Receivership Entities" or "MOBE"), files his initial report.

### I.   PROCEDURAL BACKGROUND

The Federal Trade Commission (the "FTC") commenced this case by filing its Complaint on June 4, 2018, alleging that the Defendants had engaged in unfair and deceptive acts and practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §45(a).  (doc. no. 1). The same day, the FTC filed *Plaintiff's Ex Parte Motion and Memorandum of Law in Support of a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue* (doc. no. 3) ("Motion for TRO") and a separate *Plaintiff's Application for a Temporary Receiver* (doc. no. 6) ("Application for Receiver").  On June 5, 2018, the Court granted the Motion for TRO and approved the Application for Receiver by entering its *Order Granting Ex Parte Temporary Restraining Order* (the "TRO") (doc. no. 13).  Among other things, the TRO (i) enjoined the Defendants from violating Section 5(a) of the FTC Act, (ii) enjoined the Defendants from transferring, liquidating or otherwise encumbering or disposing of any of their assets, and (iii) appointed the Receiver as the temporary receiver of the "Receivership Entities," which is defined to include MOBE "as well as any other entity that has conducted any business related to Defendants' marketing and sale of purported money-making opportunities to consumers . . . that the Receiver determines

is controlled or owned by any Defendant."   TRO, pp. 5 & 13.  At the request of all of the parties, the Court has extended the TRO through September 13, 2018.

Under the TRO the Court charged the Receiver with various duties, including:

- Assuming full control of the Receivership Entities;

- Taking exclusive custody, control and possession of all Assets and Documents of, or in the possession, custody, or under the control of, the Receivership Entities, wherever situated (the terms "Assets" and "Documents" are broadly defined on pages 3 and 4 of the TRO);

- Obtaining possession of all Assets and Documents of the Receivership Entities from all third parties holding possession of them;

- Conserving, holding and managing all receivership Assets, and performing all acts necessary or advisable in the Receiver's opinion to preserve the value of those Assets; and

- Taking all steps necessary to secure the business premises of the Receivership Defendants.

As the court-appointed receiver and an agent of this Court, the Receiver takes each of his obligations seriously, and has worked diligently since his appointment to comply with the TRO.  The following report summarized the Receiver's activities since his appointment and the Receiver's preliminary conclusions as to various matters.

II.     NATURE OF DEFENDANTS' BUSINESS

The Receivership Entities, which were controlled (mostly) by the Defendant Matthew Lloyd McPhee, a/k/a Matt Lloyd, operated a business education program which they styled

"My Online Business Education," or MOBE.  The Defendants operated their business online, and accordingly marketed their business to consumers located everywhere in the world.  The Defendants claimed that they knew, and would reveal, a 21-step system that would show consumers how to easily start and operate an online business that would generate significant income for them, without consumers needing to obtain or create any product to sell.  When consumers visited the Defendants' websites they were directed to a registration page for the 21-step system, which was offered for $49.  The 21-step system was a series of online video productions offering vague teases about "funnels that have paid out millions and millions of dollars in commissions to people just like you who went through this training," plus promises to reveal the secret method for generating substantial online income in subsequent videos.[1]  However, little substantive marketing or other useful information was provided in these videos; instead, the videos were commercials, narrated by the Defendant McPhee (an Australian national), designed to entice consumers to purchase additional MOBE memberships.  The subsequent memberships were the

- "Silver Masterclass," which cost $2,497 (on top of the $49 initial registration fee, plus a $27 monthly subscription fee).  Members of the Silver Masterclass were, supposedly, entitled to a sales commission of 50 percent when they sold a Silver Masterclass membership to another consumer. However, the information revealed in return for the $2,497 payment did not permit most consumers to actually begin a successful online business.  Instead, Silver Masterclass members were encouraged to proceed to the next level, which was the

---

[1] Consumers who paid the $49 fee were called "Consultants."  To remain active in MOBE, Consultants also had to pay a $19.95 monthly subscription fee.

- "Gold Masterclass," which cost $4,997 (on top of the $49 initial registration fee and the $2,497 Silver Masterclass fee, plus a $64 monthly subscription fee). Gold Masterclass members were entitled to a 50 percent commission when they sold a Silver or Gold Masterclass membership to another consumer, but again, the "how to's" of online marketing and sales were sparse.[2] Instead, Defendants encouraged members of the Gold Masterclass to upgrade to higher levels because at the "Gold" level consumers were entitled to commissions only on sales to the Silver or Gold Masterclass, not higher levels. The next level up was the

- "Titanium Mastermind," which cost $9,997 (on top of the $49 initial registration fee, the $2,497 Silver Masterclass fee and the $4,997 Gold Masterclass fee, plus a $121 monthly subscription fee). Again, the focus of Titanium Mastermind members was to sell Silver, Gold or Titanium memberships, for which Titanium members were promised a 50 percent commission. However, a significant, if not the primary, objective of the Titanium Mastermind program was to encourage consumers to invest in the next level, which was the

- "Platinum Mastermind," which cost $16,997 (on top of the $49 initial registration fee, the $2,497 Silver Masterclass fee, the $4,997 Gold Masterclass fee, and the $9,997 Titanium Mastermind fee, plus a $198 monthly subscription fee). The Defendants pitched the benefit of the Platinum Mastermind program as entitling members to earn a 50 percent commission for selling a Silver, Gold, Titanium or Platinum membership to other

---

[2] Consumers were given videos to watch and access to "coaches." As best the Receiver can ascertain at this preliminary stage, the "coaches" encouraged members of the Silver and Gold Masterclasses to create websites and social media sites, such as Facebook pages, which marketed the MOBE program to other consumers. In other words, the MOBE program was to encourage its members to sell MOBE memberships to other consumers. This remained true for all subsequent levels as well. The Receiver has discovered no credible evidence that MOBE coaches have any special expertise or experience in the subject areas at issue.

consumers.  Defendants' main objective, however, was to encourage Platinum Mastermind members to upgrade to the

- "Diamond Mastermind," which cost $29,997 (on top of the $49 initial registration fee, the $2,497 Silver Masterclass fee, the $4,997 Gold Masterclass fee, the $9,997 Titanium Mastermind fee and the $16,997 Platinum Mastermind fee, plus a $295 monthly subscription fee).  Diamond Mastermind members were entitled to a 50 percent commission for selling Silver, Gold, Titanium, Platinum or Diamond memberships to other consumers.  At all levels, consumers were told that the "secret" to earning money under the MOBE program was to lure other consumers into the program and earn commissions when new consumers purchased the same MOBE memberships (*see* fn. 2, *supra*).[3]

Additionally, the Defendants hosted seminars and live events (which the Defendants called "Home Business Summits," "Supercharge Summits" and "Mastermind Summits") at resort facilities located throughout the world, including Orlando, Seattle, Los Angeles, Las Vegas, Dallas, Chicago, Vancouver, London, Costa Rica, Panama, Sydney (Australia), Kuala Lumpur (Malaysia), Bangkok (Thailand) and Fiji.  The Defendant Whitney organized most of these events, and he served as a keynote speaker for many of them.  "Home Business Summits" were available to entry-level members (i.e. those who had paid only the $49 initial registration fee), and involved MOBE speakers pitching the Silver and Gold memberships. The cost to attend a "Home Business Summit" was $500, plus travel and hotel costs.  The

---

[3] Attached as Exhibit "1" is a copy of a document titled "MOBE Consultant Memberships and Compensation Plan," which sets forth the various memberships and fees.  It was not possible to purchase a higher level MOBE membership without first purchasing all of the lower-level memberships.  Thus, a Diamond Masterclass MOBE affiliate paid a total of at least $64,534 for that level membership, excluding monthly maintenance fees and other add-on products.  MOBE was able to obtain, and even pushed, third-party financing for consumers who did not have sufficient funds to purchase particular membership levels.

"Supercharge Summits," which were available to the relatively-low "Silver" and "Gold" MOBE members, involved the Defendants' speakers making marketing pitches to persuade consumers to upgrade their memberships to the higher "Titanium," "Platinum" or "Diamond" levels.   The cost for the "Supercharge Summits," which was open to Silver and Gold members, was between $500 and $800, plus travel and hotel costs.   "Mastermind Summits" supposedly were available to the higher-level MOBE members (i.e. the Titanium, Platinum and Diamond members) to provide networking opportunities and learn from other MOBE members, but in reality these conferences were marketing opportunities for the Defendants to "upsell" additional MOBE products, including private mentorships with the Defendants McPhee or Whitney, or another high-level MOBE "mentor."   Mastermind Summits cost between $3,500 (for Titanium Mastermind Summits) to $7,000 (for Diamond Mastermind Summits), plus travel costs.

The Defendant Whitney pioneered an "add-on" product called private mentorships.  A MOBE consultant (frequently Whitney himself) would provide either group training or in-home mentorships to MOBE members, for prices ranging from $10,000 to $100,000. Whitney claimed that through these mentorships consumers would truly learn internet marketing; amazingly, Whitney testified that the 21-step program was essentially useless to consumers.  Whitney himself never went through the entire 21-step process.

While many consumers had sufficient resources to pay the initial $49 registration fee, or even the fees for the Silver and Gold Masterclasses, not nearly as many had the ability to pay for the Titanium, Platinum or Diamond level memberships.   For these consumers, MOBE could, and did, arrange for third-party financing by helping consumers obtain new

credit cards with sufficient credit limits to pay the membership fees.[4]  This placed consumers in debt to credit card and finance companies; the Receiver has communicated with consumers who claim to owe $60,000 or more to finance or credit card companies, including Seed Capital, a California company controlled by Anthony Mendrano.

The FTC has alleged that "the vast majority of consumers who join the MOBE program and purchase the costly MOBE memberships lose money."  Complaint, ¶5.  The Receiver's investigation confirms that this allegation is true:  Virtually all of the consumers with whom the Receiver has communicated did not earn back the amounts they paid to purchase MOBE memberships.  This is not to say that all MOBE members lost money utilizing the MOBE program.  For example, Michael Williams and Michael Giannulis reportedly earned over $23 million, and were awarded Rolex™ watches and platinum rings in May, 2018 by the Defendant McPhee.[5]  Similarly, the Defendant Whitney reportedly earned several million dollars through the MOBE programs.[6]  These, however, are exceptions.

The FTC also alleged that MOBE made misleading representations concerning its refund policies.  The FTC, accurately, alleged that MOBE's websites made unconditional statements that MOBE's registration fees were fully refundable if consumers were dissatisfied with the program.[7]  However, Defendants' actual practice was to deny refund

---

[4] The Receiver also has communicated with other consumers, including a Catholic nun, who borrowed $60,000 or more from family members.

[5] Williams and Giannulis hosted a number of Mastermind Summits at which they pitched the Titanium, Platinum and Diamond Memberships.  Both reportedly quit the MOBE program on June 7, 2018, immediately after learning that MOBE had been sued by the FTC.

[6] Like Williams and Giannulis, Whitney was a speaker at Mastermind Summits.

[7] The "unconditional" statements were prominently displayed on the various homepages of the websites, and elsewhere throughout the websites.  On some of the websites the Defendants included sections describing

requests, or make refunds only after a consumer involved or threatened to involve the Better Business Bureau, a private attorney or law enforcement officials.[8]  The Receiver does not yet have sufficient information to ascertain how widespread this practice was, although the Receiver has evidence that it occurred.   The Receiver is continuing to investigate this particular issue.

The Defendants accepted payments from consumers in various forms, including checks, cashier's checks, wire transfers and credit card payments.  The Defendants' billing and collection practices are discussed in more detail below.

The Defendants promoted their business through the use of websites and social media sites, such as Facebook and Instagram.  Specifically, consumers who purchased the MOBE programs were encouraged to create websites and social media accounts that marketed the MOBE system to others.  These are called "funnels" because they were supposed to "funnel" consumers into the MOBE program.  As discussed more fully below, the Receiver has taken control of MOBE's websites and placed a notice on them advising that under the Court's TRO MOBE has been shut down and that the Receiver has taken control of the companies and their business operations.  Other MOBE-related websites are owned by non-parties, and so the Receiver could not take physical control of them.

III.   <u>THE RECEIVER'S APPOINTMENT</u>

In May of 2018, the Plaintiff told the Receiver that it intended to file suit on June 4, 2018.  Because of the scope of MOBE's business operations, the Receiver began preparing

---

limitations and conditions on the refund policy, but these sections were often buried in the website and difficult to find.
[8] One of the Defendants' most-used tactics was to cite provisions in agreements signed by the consumers imposing difficult conditions on refund claims.  However, these agreements were not signed by the consumer until <u>after</u> they signed up for the MOBE program.

prior to that date.   The Receiver learned of his appointment on June 5, 2018, at approximately 2:30 p.m.  The Receiver's immediate objectives were:

     1.     To take control of the Defendants' websites and social media sites.

     2.     To evaluate the nature of the Receivership Entities' business practices.

     3.     In the event the Receiver concluded that the Receivership Entities were operating in violation of applicable law, to cause them to cease doing so.

     4.     To remove management from control of the Receivership Entities.

     5.     To secure the Receivership Entities' electronically-stored information ("ESI").

     6.     To obtain control of the Receivership Entities' bank accounts, accounts receivable, and other financial resources.

     7.     To take steps to notify consumers and others of the lawsuit, the TRO and the Receiver's appointment.

     8.     To otherwise comply with the TRO.

     A.     <u>WEBSITES AND SOCIAL MEDIA PAGES</u>

As of the commencement of this lawsuit MOBE owned and operated 431 separate websites, which were available to anyone in the world with an internet connection. Upon his appointment the Receiver discovered the web hosting companies for the websites and took control of all 431 MOBE websites.[9]  The Receiver removed the MOBE content from all 431 websites and substituted in its place a notice advising that MOBE had been sued, and that the Court had entered the TRO and appointed the Receiver as receiver for MOBE.  The Receiver's notice provided consumers with a link to the Receiver's website, located at www.bernet-receiver.com, for further information concerning the matter.  Attached

---

[9] Some of the web hosting companies were more cooperative than others, but ultimately the Receiver believes that he obtained control of all MOBE websites.  All administrative passwords have been changed, so that only the Receiver and his agents have access.

as Exhibit "2" is a screenshot of the Receiver's notice posted on one of the MOBE websites. The Receiver has paid the web hosting companies to keep the MOBE websites operating so that consumers will receive notice to refer to the Receiver's website for updates concerning the lawsuit.  The Receiver intends to discontinue paying for the MOBE websites after approximately September 15, 2018, because by that time consumers will know to review the Receiver's website for information concerning the matter.

The Receiver also has directed MOBE affiliates operating Facebook and other social media pages to discontinue promoting MOBE.  To the Receiver's knowledge, most affiliates have done so.

B.      EVALUATING RECEIVERSHIP ENTITIES'
          BUSINESS PRACTICES

The Receiver evaluated the Defendants' business practices in light of the FTC's complaint and the Court's TRO.  This involved reviewing the voluminous materials filed herein by the FTC, reviewing the online content on MOBE's websites and social media pages, watching over a dozen online videos, reviewing non-MOBE blogposts concerning MOBE, and speaking with various MOBE affiliates by e-mail and telephone.  From this review, the Receiver was satisfied that the Defendants utilized misleading statements to induce consumers to invest in the MOBE program.  The program itself is a multilevel marketing ("MLM") program, with the principal characteristic being for MOBE affiliates to recruit new MOBE affiliates to purchase MOBE memberships.  There is no underlying "product" being sold apart from a process to encourage new consumers to sign up and recruit additional new consumers to sign up.

The MLM business model, of itself, is not necessarily fraudulent or misleading.  For example, Avon, Mary Kay Cosmetics and Amway, to name a few, all utilize an MLM business model, where members are encouraged to recruit others to become members.  The difference, however, is that Avon, Mary Kay and Amway sell health, beauty and home care products.  MOBE, on the other hand, purported to sell an educational product designed to teach consumers how to sell MOBE memberships to other consumers through websites and social media pages, but the "educational product" was designed principally to encourage existing MOBE affiliates to pay more money to MOBE to reach higher MOBE levels.  Save for a small handful of individuals, such as the Defendant Whitney, MOBE affiliates did not earn enough to cover their investments, despite being promised that they would do so.

The TRO directs the Receiver to "[s]uspend business operations of the Receivership entities if in the business judgment of the Receiver such operations cannot be continued legally and profitably."  TRO, Section XII. S., page 17.  For the business to operate "legally," it cannot mislead consumers, or make false or misleading statements to consumers.  However, MOBE's statements to consumers were misleading.  For example, on one of its 431 websites MOBE stated that it would show consumers how a "poisoned, brain-damaged man … RAKES IN A 6-FIGURE INCOME FROM HOME … and how you can too, GUARANTEED."  MOBE solicited consumers based on promises that they would make "substantial income," that MOBE would teach them "everything they need to know to become multi-millionaires," and that with the "right marketing system" consumers would "realistically generate $100,000 in the first year online."  These statements, and many others

similar in nature, are false or misleading, and are designed to allow MOBE to get "in" with a consumer so that MOBE then can focus on upselling to the Silver, Gold, Titanium, Platinum and Diamond levels.

The cost of the MOBE program caused significant damage to consumers. As noted, consumers were pushed to invest all the way up to the Diamond Mastermind level, which cost over $64,000 excluding monthly maintenance fees or add-ons such as seminars. Few consumers had that much money available, and so MOBE arranged for consumers to obtain third-party financing. *See* fn. 3, *supra*. But, because virtually no consumers were able to make the MOBE system work sufficiently to earn back their initial investments,[10] most were left with significant debts.

The Receiver also is troubled that MOBE's coaches lacked any special experience or expertise that would make them qualified to teach consumers "how to rake in a 6-figure income .... GUARANTEED" or "everything they need to know to become multi-millionaires."[11] According to consumers with whom the Receiver has communicated, coaches directed consumers to review online videos and gave them "homework" to complete, to prove that they had actually watched the videos. Coaches would give MOBE affiliates pep talks to encourage them to stay with the program and purchase higher membership levels, but actual substantive knowledge concerning internet marketing techniques and tactics were not part of the curricula. Instead, coaches, like speakers at seminars, encouraged consumers to purchase higher-level MOBE memberships. According to Whitney, this

---

[10]   In a small-print section buried in one of MOBE's websites (**mobe.com/income-disclosure/?aff_id=1760**). MOBE disclosed that "[t]he average Consultant, which includes both active and inactive, generates less than $250 per year ...."

[11]   *See* fn. 2, *supra*.

created tensions between coaches and speakers, as they would disagree about which was entitled to commissions on sales to consumers.

One consumer wrote the following:

I think it is actually possible to make money at MOBE if you can check off ALL of the following boxes: 1) You joined MOBE when it started back around 2011 or soon thereafter AND 2) you were already a millionaire [and] could invest $60k without any financial risk to you in the event you lost it AND 3) you already had about 10 years of internet marketing experience AND 4) out of that 10 years you already had some level of moderate to high-level success in internet marketing. But even then, success for you would ALSO mean that you were only successful because hard-working people lost their money to you.

Not only that, if you are truly a part of this MOBE, it's not about providing anything of real, actual value. It's about getting other people to sign up and give over their money. It's a true pyramid/ponzi/get-rich scheme.

The Receiver also has grave concerns about MOBE's refund policy.  Despite the bold, conspicuous promises of a "money-back guarantee," in fact refunds were extremely difficult to obtain.  The conditions for obtaining a refund included, at times, a requirement that the consumer operate the MOBE system for 12 months without making any sales. Further, despite the initial promises, the membership form signed by consumers and given to them <u>after they paid</u> states that purchases are non-refundable.

The Receiver also has received complaints from MOBE consultants about not being paid commissions they felt they had earned.  These fall into two categories:  First, consultants who made sales shortly before the entry of the TRO, and second, consultants who made sales long before the entry of the TRO.  The first category is the largest, and also the easiest to resolve, because the TRO creates a "bright line" concerning disbursements.  The

Receiver is not inclined to pay pre-receivership commissions, particularly when doing so will provide no tangible benefit to the receivership estates.  Instead, the Receiver intends to create a pot of money to be distributed to consumers *pro rata*.  The second category is more troubling.  According to more than one consultant, McPhee and his CFO, Athar Roshan, would target consultants with whom they were unhappy, frequently for non-work-related reasons.  If a consultant managed to make it onto this "list," then Roshan would divert that consultant's earned commissions to himself or to others with whom he was not unhappy.  The Receiver is continuing to investigate these allegations.[12]

For MOBE to operate "legally," all of the foregoing problems would need to be corrected.  MOBE would need to disclose prominently that it sells an "online education product" that is designed to teach consumers how to sell the very same "online education product" to other consumers, but that there is no other product.  MOBE would need to prominently disclose that virtually all consumers who purchase the MOBE products lose significant amounts of money.  MOBE's focus, in its online videos, on happy consumers driving expensive cars and yachts would need to change, to include a prominent disclosure that most consumers lose money at the MOBE system.  Sales scripts and materials would need to remove misrepresentations of expected earnings, and speakers would need to affirmatively disclose that most MOBE affiliates lose money (instead of representing that money is easy to make).  MOBE's efforts to upsell to higher levels would need to be changed so that consumers could clearly understand that the higher levels offer no additional

---

[12] Roshan reportedly is a Pakistani national in his mid-20s.  Reportedly, he is unqualified to serve as a CFO of any company.  He also reportedly claims to be a member of terrorist organizations, and reportedly has told MOBE consultants that he can arrange to have them killed.  Obviously, MOBE consultants are afraid of Roshan.

significant training or experience.  Coaches would need to have relevant online marketing experience, and the ability to communicate it to consumers; this would result in far fewer coaches.  The refund policy would need to be revamped, to disclose that (i) refunds were not possible, or (ii) refunds were possible only under certain, specific conditions, or (iii) refunds were guaranteed, and then the policy would have to be followed (something that MOBE did not do).  There are so many misrepresentations so imbedded in MOBE's culture, the Receiver believes that it is impossible to correct them all, and that MOBE therefore cannot be operated "legally."  However, even if all MOBE somehow could be changed to eliminate all of the misrepresentations it makes to consumers, the Receiver believes that MOBE could not be operated "profitably," because most consumers, armed with knowledge of how MOBE truly operated, would steer clear.

Finally, the Receiver acknowledges that he has received communications from consumers who are upset that MOBE has been shut down.  These consumers argue that they should be allowed to continue to operate the MOBE program because, they maintain, they can make the program work.  The Receiver disagrees with this sentiment and believes instead that the MOBE program cannot be operated "legally and profitably."  The MOBE program will not work for the vast majority of consumers.  In the Receiver's view, the only way that MOBE can operate "profitably" is by operating "illegally," by making false representations concerning the business and the likelihood of success.  The Court's TRO, properly, does not permit this.

C.      SHUTTING MOBE DOWN

In light of the foregoing, the Receiver has concluded that MOBE cannot be operated legally and profitably.   He therefore opted, in his business judgment, to shut the companies down.

As previously discussed, to implement his decision to shut MOBE down the Receiver took control of all of MOBE's websites and social media pages and removed all MOBE-related content, and instead directed consumers to the Receiver's website at www.bernet-receiver.com, where the Receiver has posted information about the lawsuit (the Receiver updates the website periodically).   At the time of the Receiver's appointment several seminars and live events had been planned at resort hotels located throughout the world, but when the Receiver determined that MOBE would accept no more payments, he contacted the resort facilities[13] and advised of the Court's TRO, and directed the hotels to cancel the events. In several instances, the resort hotels sent security teams to seminars while they were in progress and ordered everyone present to leave.[14]

D.      REMOVING MANAGEMENT FROM CONTROL

Upon his appointment, the Receiver determined that management of MOBE would need to be instructed that it was no longer authorized to take any actions on behalf of MOBE and that all members of management were required to work with the Receiver.   The CEO of MOBE was the Defendant McPhee, an Australian national residing in Kuala

---

[13] The Receiver contacted the particular resort facilities in which the live events were scheduled, and he also contacted the corporate headquarters for the larger hotel chains, including Marriott, Hilton and Hyatt.

[14] Attached as Exhibit "3" is a spreadsheet showing the resort facilities that the Receiver contacted and instructed not to host MOBE live events.

Lumpur, Malaysia, but immediately after the commencement of the lawsuit McPhee refused to respond to the Receiver.[15]

The Receiver was able to speak with the Defendant Zanghi the day after the lawsuit was filed. Zanghi, who resides in North Carolina, described her role as McPhee's personal assistant. She scheduled McPhee's calendar and booked his travel arrangements. She opened a number of bank accounts in the names of various MOBE companies and arranged for funds to be deposited into and moved out of those accounts. Zanghi also applied for, and obtained, credit card processing accounts for the MOBE entities.[16] She assisted the Receiver with identifying MOBE bank accounts and with regard to MOBE's structure.

E.     SECURING MOBE'S ESI

MOBE did not operate from any central office location, and maintained no central server. Instead, it utilized various web-based systems to create and store company records digitally. McPhee's lawyers have advised that the accounting information is located in Kuala Lumpur, but that MOBE's accounting staff has refused to cooperate because they have not been paid their wages or an employment termination fee that is customary in Kuala Lumpur. McPhee had the equivalent of approximately $20,000 cash in his possession in Kuala Lumpur, and the Receiver has authorized him to use a portion of those funds to pay MOBE's accounting personnel to obtain the accounting information.[17]

---

[15] Approximately 10 days after the lawsuit was filed, McPhee employed counsel, who have been responsive to the Receiver's questions and concerns.
[16] MOBE's credit card processing activities are discussed in detail in Section III.F.2, *infra*.
[17] McPhee maintained cash in safe deposit boxes in Kuala Lumpur, in several different currencies.

MOBE utilized a Customer Relationship Management (CRM) software program from a company called Ontraport.   CRM software is designed to manage a company's interaction with current and potential customers by utilizing data analysis about customers' history with the company to improve business relationships.   CRM programs compile data from multiple different communication channels, including company websites, telephone, e-mail communications, messaging/live chat, and social media.   The Ontraport program was an operational program, designed principally to integrate and, to the extent possible, automate sale, marketing and customer support.   Ontraport was extremely helpful and cooperative, providing administrative passwords and thus access to the entire MOBE database upon the Receiver's request.   The Receiver authorized the FTC's computer forensics specialists to download the ESI contained within the Ontraport CRM program.[18]   Access to the data now is restricted to the FTC and the Receiver.

MOBE also utilized Google Drive, which is a file storage and synchronization service developed and offered by Google.   MOBE utilized the Google drive to store files on cloud servers.   Additionally, each MOBE consultant was given a MOBE e-mail account that was hosted on the Google Drive.   The Google Drive contained information about each particular MOBE consultant.   Bill Futreal was MOBE's systems administrator.   When he learned of the lawsuit he immediately shut off access to the MOBE Google Drive.   The Receiver ultimately was able to contact Futreal, who willingly turned over passwords.   The

---

[18] MOBE also had utilized a CRM program with Oracle, a Fortune 500 company.  Oracle was less cooperative with the Receiver, although it eventually agreed to allow the Receiver access to the data.

Google Drive, and the ESI contained therein, remains under the Receiver's control.[19]   No other parties have access.

MOBE utilized the services of the Maschoff Brennan law firm for legal matters in the United States.   Maschoff Brennan represented MOBE in a lawsuit against Digital Altitude, and also in connection with other matters.   The Receiver requested that Maschoff Brennan provide records showing its representation of MOBE, but the firm has ignored the Receiver's requests.   The Receiver may choose to initiate contempt proceedings if Maschoff Brennan does not comply with is requests.

F.    MOBE'S ASSETS

As noted above, MOBE charged consumers hefty fees for memberships. Payments were accepted in several forms, including cash, cashier's checks, wire transfers and credit cards, with the latter representing the most common payment method.   The Receiver has recovered the following:

1.    Bank Accounts.

Since his appointment, the Receiver recovered the following amounts from bank accounts in the names of one or more of the Receivership Defendants:

| DATE | BANK | AMOUNT |
|------|------|--------|
| 06/25/2018 | Wells Fargo | $   55,980.34 |
| 07/13/2018 | Bank of America | 803,375.99 |
| 07/23/2018 | Credicorp Bank (Panama) | 335,475.00 |
| 08/02/2018 | UOB (Malaysia) | 231,022.35 |
| | TOTAL | $1,425,853.68 |

---

[19] The Receiver will soon pay Google $17,000 to maintain the MOBE Google Drive account.

The Receiver is continuing to work toward collecting additional funds from MOBE's banks and financial institutions

2. <u>Credit Card Reserves</u>.

The Receivership Entities maintained credit card processing accounts. Many of these accounts were opened by the Defendant Zanghi, on behalf of one or more of the Receivership Entities, based on application materials that were, to say the least, misleading. For example, Zanghi disclosed to one payment processor, Qualpay, that MOBE estimated that <u>annual</u> credit card transactions would be approximately $200,000; instead, <u>monthly</u> credit card transactions in some of the Qualpay accounts exceeded $4 million.

When a customer purchased any of MOBE's "products" and paid with a credit card MOBE, as the "merchant," would seek authorization from the customer's credit card issuer (the "issuing bank"). This authorization request, and the subsequent capture of the charge, is handled by credit card processing companies. If approved, the funds were paid by the issuing bank and deposited into a merchant account maintained for the benefit of MOBE with an "acquiring bank" or "merchant bank."

Money held in a merchant account is owned by the merchant (in this case, MOBE), and can be withdrawn by the merchant. However, if a customer successfully challenges a credit card payment posted to his or her credit card, then the merchant bank is obligated to refund the amount of the charge to the customer.[20] The merchant bank then must seek reimbursement from the merchant. To protect itself in high risk industries (such as

---

[20] If there is a credit card processor involved, then the obligation to refund payments to customers usually is contractually assumed by the credit card processor. Payment is made to the issuing bank, which then credits the amount to the customer's credit card statement.

those in which MOBE operated), a merchant bank may choose to establish a "reserve account."  This account typically is funded with a portion of the merchant's funds collected in the merchant account, with the amount of the reserve being determined based on the history of chargeback activity for the particular merchant.  The merchant bank claims an interest in the reserve account to secure the merchant's obligation to reimburse the merchant bank for any chargebacks it pays.

With significant legal support, the Receiver asserted that credit card reserves are "Assets" of the receivership estate that must be delivered to the Receiver. Almost all credit card processors and merchant banks agreed with the Receiver's position and delivered credit card reserves to the Receiver.  Attached as Exhibit "4" is a schedule showing credit card reserves received since the commencement of this case.

One of MOBE's larger credit card processors was Allied Wallet.  As of the commencement of the case, Allied Wallet reported that it held approximately $2.5 million in credit card reserves.  However, Allied Wallet maintained that MOBE's contract was not with Allied Wallet, Inc., a US corporation, but rather with an affiliate, Allied Wallet, Ltd., a UK company based in London.  Allied Wallet initially claimed that the acquiring bank, Wirecard bank (a German bank) refused to recognize the TRO and was continuing to process chargeback requests.  Recent media reports suggest that Allied Wallet and its founder, Ahmad Khawaja, "helped deploy sham websites and dummy companies to hide [dubious businesses'] tracks, even in cases where Allied Wallet's own staff deemed the underlying business activities to be 'very, very illegal.'"  *See Prominent Political Donor helps Pornographers, Payday Loan Debt Collectors and Offshore Gambling Operations*, published

by the Chicago Tribune on August 2, 2018.[21]   The Receiver engaged in extensive negotiations with Allied Wallet and ultimately agreed to a settlement under which Allied Wallet agreed to pay the Receive approximately $2.1 million of the $2.5 million in reserves. In making this deal, the Receiver weighed the costs and likelihood of success in pursuing litigation claims in Germany and the UK against the amount offered in settlement, and concluded that the best interests of the receivership estate would be served by agreeing to Allied Wallet's proposal.

There are two credit card processing companies that refused to comply with the Receiver's demand for turnover of credit card companies:  Peoples Trust, a Canadian processor operating in British Columbia, and Qualpay, a California-based processor.  Peoples Trust has ignored the Receiver's demand, taking the position that it is not subject to the jurisdiction of this Court.   The Receiver has engaged Canadian counsel to initiate legal proceedings.

Qualpay raised different issues.   Qualpay initially reported to the Receiver that it was holding $7.4 million in credit card reserves, and it stated that it would not turn them over because, it said, the reserves were Qualpay's property.  Qualpay then filed an emergency motion to alter the Court's TRO to provide that credit card reserves are not receivership property and therefore need not be turned over to the Receiver.[22]   It subsequently was joined by Synovus Bank, which serves as Qualpay's merchant bank. Synovus filed its own motion to modify the TRO and took the position that it (not Qualpay or

---

[21] The article can be viewed at this link:  http://www.chicagotribune.com/news/nationworld/ct-political-donor-allied-wallet-khawaja-20180802-story.html
[22] In its motion, Qualpay asserted that it was holding only $6.3 million in credit card reserves.  It attributed the $1.1 million difference in what it originally claimed to be holding as a mistake.

the Receiver) owned the reserve funds.  On August 8, 2018, the Court entered its *Order* (doc. no. 83) that denied the motions of Qualpay and Synovus and ordered them to turn over to the Receiver $6,314,342.09.   The Court imposed a constructive trust over the funds, for the benefit of injured consumers, and directed the Receiver to hold those funds in a segregated bank account.  The Court directed Qualpay and Synovus are to turn over the funds by August 16, 2018, and it denied Synovus's motion to stay the ruling.  Synovus has advised that it intends to appeal the Court's ruling.  The Receiver will oppose Synovus's efforts, and also may seek to charge interest on the withheld reserves.

The Receiver also is investigating a potential claim against Suitepay, a California-based payment processor.  Suitepay served as a payment processor and collected over $1.6 million in credit card receipts for MOBE.  However, Suitepay has absconded with the money.  The Receiver is investigating the matter, and may choose to file a criminal complaint.  *See* Section VIII, *infra*.

Finally, the Receiver continues to work toward recovering funds from other card processors and merchant banks.

3.   Escrowed Funds.

MOBE utilized the services of i-Payout, LLC, a Florida company that provided "escrow services."  As of the commencement of the case i-Payout was holding $101,779.55 of MOBE's funds.  When contacted, it asserted offsets totaling approximately $70,000, and offered to turn over the balance.  The Receiver served a subpoena on i-Payout and demanded the immediate turnover of the funds.  After brief negotiations, i-Payout turned over the entire $101,779.55 to the Receiver.  Also, i-Payout recently disclosed that it is

holding an additional $25,000 or so.  The Receiver expects this to be turned over as well.

4.      Whitney Funds.

The Defendant Whitney was a high-level coach and speaker for MOBE.  He also was MOBE's event coordinator who set up the various seminars and live events.  For many of the live events, Whitney was the keynote speaker.  As a speaker, Whitney represented to consumers that they were guaranteed to make money under the MOBE system (as outlined above, this was categorically untrue).  Whitney made money from MOBE not only as a speaker but also for referring consumers to a third-party finance company, Seed Capital, which would lend consumers money to enable them to purchase MOBE memberships (for which Whitney also received a commission).  Whitney also developed MOBE's mentorship programs, under which MOBE would provide additional training to MOBE members for prices ranging from $10,000 to $100,000 (Whitney was a mentor and earned a commission for selling mentorships).  Whitney left MOBE in the Spring of 2018 but continued to operate in the same industry.

As a result of the TRO Whitney's funds were frozen, as were funds held in accounts owned by companies that he controls.  With Whitney's cooperation, the Receiver has collected those funds, as follows:

| Company Name | Asset | Amount[23] |
|---|---|---|
| Wealth Building Technologies LLC | Funds in accounts with JPMorgan Chase | $113,733.27 |
| Wealth Building Technologies LLC | Funds in accounts with JPMorgan Chase | 89,009.17 |
| Wealth Building Technologies LLC d/b/a YGP Events | Funds in accounts with JPMorgan Chase | 136,215.66 |
| Expert Sales Agency LLC | Funds in accounts with JPMorgan Chase | 59,980.34 |
| Shark Speaker LLC | Funds in account with JPMorgan Chase | 39,440.48 |
| | TOTAL | $438,378.92 |

Under the TRO Whitney also was directed to repatriate all funds he held outside of the United States.  In compliance with the TRO, Whitney has repatriated $406,261.91 to the Receiver.[24]

As of the time he was served with the Complaint in this lawsuit, Whitney had received a check from Edward Jones in the amount of $207,405.94.  Whitney endorsed that check to the Receiver, who deposited it.  However, Edward Jones learned of

---

[23] JPMorgan Chase requested that the Receiver leave small amounts of money in each account so that the accounts could remain "open." This facilitates obtaining historical account information.  The $5,000 or so remaining in the JPMorgan Chase accounts will be sent to the Receiver at a later date.

[24] Whitney transferred $406,261.91 to the Receiver on July 30, 2018, representing an investment he had made in Costa Rica.

the TRO and stopped payment on the check before it cleared.  Whitney and the Receiver are working toward obtaining a replacement check.

The Receiver is looking at collecting other funds held by companies controlled by Whitney, or held in bank accounts in the names of Whitney or his companies.

5.      McPhee Funds.

Under the TRO McPhee is obligated to repatriate funds to the United States. To date he has transferred $288,377.61.  McPhee has encountered difficulties transferring additional assets:

- McPhee holds approximately $1.2 million in a brokerage account in Australia.  The account is titled in the name of an Australian company that he controls.  The brokerage firm, however, is aware of this lawsuit and has placed restrictions on how it will disburse the funds; specifically, it has advised that it will liquidate the account and transfer the funds only to an account in Australia owned by the same company that owns the brokerage account.  Most of the Australia banks are aware that McPhee has been sued and are careful about transferring money under his control.   The Receiver has engaged Australian counsel to assist in repatriating the money in the brokerage account to the Receiver.

- McPhee also has Malaysian bank accounts with relatively small balances.  McPhee is working to repatriate these funds.

- McPhee also is holding approximately $20,000 cash from safe deposit boxes.  As discussed above, the Receiver has authorized him to

spend some portion of those funds to assist in obtaining accounting information for MOBE.  *See* fn.17, *supra*, and text accompanying same.

6.    Resort and other Properties.

On his financial disclosure form McPhee stated that, through a series of companies, he owns a 49 percent interest in a resort hotel in Costa Rica.[25]  The resort was purchased with MOBE money and used as a facility to host the high-end mastermind summits.  It is not clear whether McPhee controls this resort hotel.  The Receiver has learned that, under Costa Rican law, no non-Costa-Rican citizen may own a majority interest in any beach front Costa Rican real property.  It is not clear whether the 51 percent interest in the resort not owned by McPhee is owned by a straw owner under McPhee's control.  The Receiver has requested further information on the Costa Rica resort hotel and expects to have it shortly.[26]

Similarly, McPhee disclosed a 60 percent ownership interest in a resort facility located on an island in Fiji.  McPhee's attorneys have agreed to provide further information on this property as well.

Finally, McPhee claims ownership of three apartments in Kuala Lumpur.  Again, McPhee's attorneys have agreed to provide further information.

G.    PUBLICIZING THE LAWSUIT, THE TRO
AND THE RECEIVER'S APPOINTMENT.

The Receiver took physical control of all of MOBE's 431 websites and posted a notice on them advising of the lawsuit, the TRO, and his appointment.  The notice also

---

[25] McPhee also disclosed ownership of a company in Costa Rica that in turn owns passenger vans used in connection with the resort hotel.

[26] The Receiver has discussed with McPhee's counsel the possibility of obtaining an appraisal of the property.

referred readers to the Receiver's website, at www.bernet-receiver.com.  On his website the Receiver has posted updates as information becomes available.

The Receiver also contacted certain media outlets and blog posts to advise of the lawsuit and to request that his website address be published.

Additionally, the Receiver has sent dozens of letters and e-mails to domestic and foreign banks, financial institutions, brokerage companies, and other entities that had relationships to MOBE, advising of the lawsuit, the entry of the TRO, and the Receiver's appointment, and also requesting the turnover of Assets and Documents.

H.    OTHERWISE COMPLYING WITH THE TRO.

The foregoing constitutes the Receiver's efforts to comply with the TRO. Additionally, the Receiver has taken scores of telephone calls from consumers and explained the lawsuit to them, and the likely progression.  The Receiver and his staff also receive and respond to e-mail inquiries from consumers.

IV.    EMPLOYING PROFESSIONALS

The TRO authorizes the Receiver to employ professionals as necessary.  The Receiver is an attorney and thus has handled a significant number of legal issues himself. However, the magnitude of this receivership engagement has required that he utilize other attorneys to handle certain matters.  The Receiver therefore has employed his law firm, Akerman, to provide legal services.

As noted above, the Receiver also has been compelled to employ counsel outside of the United States to handle certain matters.  In Canada, the Receiver has employed Blake, Cassels & Graydon LLP, in Toronto, to handle a lawsuit that the Receiver will need to bring

against certain Canadian banks and trust companies to recover MOBE funds in their possession.   Additionally, the Receiver contemplated hiring Borden Ladner Gervais LLP ("BLG"), in British Columbia, to continue with a pre-receivership lawsuit in which MOBE had sued certain companies and individuals for defamation.   MOBE's counsel had obtained an order striking the Defendants' pleadings as (what amounts to) a discovery sanction.   To finish the case, BLG advised that it will need to (i) complete an appeal, by the defendants, of the order striking their pleadings, and (ii) present evidence to demonstrate the amount of damages that MOBE suffered.   BLG claimed that, between it and its expert witness, MOBE owed CDN $86,000 (approximately $66,000), which it insisted be paid.   BLG also demanded a retainer of CDN $20,000 (approximately $15,000), meaning that BLG wanted payment of CDN $106,000 (approximately $81,000) to continue with the lawsuit.   BLG provided an analysis of the collectability of any judgment that MOBE might receive, but unfortunately the Receiver was concerned that any judgment obtained would be uncollectable.   The Receiver also was concerned about putting on evidence to show that MOBE's character and reputation were damaged by virtue of the defendants' representations that MOBE was a scam.   To complicate matters, MOBE has posted a bond with the court in the amount of CDN $130,000 (almost $100,000), which will be forfeited if MOBE does not continue and prevail.   BLG has moved to withdraw in the case, and the Receiver is communicating directly with the attorneys for the defendants to attempt to resolve the matter.[27]

The Receiver also intends to hire accountants.   Despite operating since 2013, MOBE has never filed tax returns in the United States, or anywhere that the Receiver has discovered.

---

[27] BLG has refused to provide the Receiver with copies of the pleadings in the lawsuit, but defendants' counsel has agreed to share them.

The domestic and international tax issues involved in this case are extraordinarily complex, and the Receiver requires the expertise of accountants.  The Receiver is interviewing one Big Four accounting firm as well as other accounting firms with international tax expertise.

V.      PROFESSIONAL FEES

The Receiver is filing with this Initial Report fee applications for himself and for his primary law firm, Akerman.  Draft copies of the fee applications were circulated to interested counsel herein prior to filing, and after discussions, the Receiver reports that no parties object to the amounts requested.  As noted in the fee applications, the Receiver has made downward adjustments to the fees requested.[28]   The Receiver specifically notes that the amounts requested in these fee applications are significant, but that this particular receivership engagement has required the Receiver's full-time attention during the initial two months.

VI.     BANK ACCOUNTS

As authorized by the TRO, the Receiver has opened bank accounts into which he has deposited receivership funds.  The Receiver has opened three accounts with Valley National Bank:  a regular checking account and two money market accounts.[29]   Attached as Exhibits "5," "6" and "7" are ledgers showing the activity in the accounts.[30]

---

[28] The Receiver wrote off over $10,000 on the Akerman fee application, or approximately 12.5 percent of the fees charged.  The Receiver also generally recorded only approximately 90 percent of the time he actually spent working on this file, and he also has reduced his hourly rate on this matter from his standard rate of $550 to $330.

[29] One of the money market accounts holds general receivership funds, while the second holds the $6.3 million received from Qualpay/Synovus as directed by the Court.

[30] The only expenditures to date are checks made payable to the Receiver's son, Daniel Bernet, as contract labor. Daniel communicated with Google, Oracle, Ontraport and other tech companies and arranged to transfer ESI so that it was under the Receiver's control.  Daniel also worked with the FTC's forensic computer team with respect to ESI, and he has begun analyzing the ESI.  Daniel also traveled to Fort Myers to retrieve an external hard drive containing MOBE ESI from a third party contractor (the Receiver traded a new, "clean" external hard drive for the hard drive containing the MOBE ESI).  The Receiver pays Daniel $15.00 per hour; comparable IT

VII.     PENDING AND POTENTIAL CAUSES OF ACTION

The Receiver has investigated several pending and potential causes of action. As noted above, the Receiver inherited a Canadian defamation lawsuit that MOBE brought against Kyle James Loudon, Carson Randall Lim, and Niche Marketing Inc. in British Columbia. The Defendants' pleadings were stricken as a discovery sanction, but the Receiver will still have to provide evidence to establish MOBE's monetary damages suffered as a result of the Defendants' online statements claiming that the MOBE program was a scam. The Receiver is negotiating directly with opposing counsel as to a resolution of this particular lawsuit.

The Receiver also is investigating a possible lawsuit against Payment USA, SuitePay Holdings, Matthew Hetland, Danielle M. Hetland, a/k/a Danielle Hernandez, E. W. Wright, Charina Wright, Pamela Bustos, Pamela Jean, Jessica Lopez and Andrew Thornhill,[31] for civil theft and conversion. SuitePay was a credit card payment processor that processed credit card transactions for MOBE, but it absconded with approximately $1 million of MOBE's money. MOBE hired Tyson Chandler, Esquire, of the Maschoff Brennan law firm to investigate the matter and bring suit, if necessary, to recover the money. Maschoff Brennan, however, has absolutely refused to cooperate with the Receiver, ignoring his repeated demands. The Receiver is contemplating contempt proceedings against Maschoff Brennan so that he can obtain an order directing it to turn over all of its MOBE files. The Receiver also intends to issue subpoenas to SuitePay and the others identified above.

---

services from third parties costs considerably more. The total amount paid to Daniel through July 31, 2018, was $907.50.

[31] Several of the listed individual names may be aliases.

The Receiver also is investigating potential claims against certain high-level MOBE affiliates.  As noted, most MOBE affiliates lost money as a consequence of investing in the MOBE program, although several affiliates were able to use the program to make money. The Receiver is analyzing precisely how the "successful" affiliates achieved their success; in particular, the Receiver is analyzing whether the "successful" affiliates utilized misleading and deceptive tactics to obtain new consumers to sign up for the MOBE program.  If so, the Receiver intends to address the particular situations.

VIII.   CONCLUSION

The Receiver invites the questions and comments of the Court and the parties.

/s/ Mark J. Bernet, Receiver
Mark J. Bernet, Receiver
401 E. Jackson Street, Suite 1700
Tampa, Florida  33602
Telephone:  (813) 223-7333
Facsimile:  (813) 218-5495
Email:  mark.bernet@akerman.com
Secondary:  judy.barton@akerman.com
Secondary:  serena.vasquez@akerman.com

<u>CERTIFICATE OF SERVICE</u>

I CERTIFY that a copy of the foregoing was served by CM/ECF to Benjamin R. Davidson, Esquire, Bikram Bandy, Esquire and Sung W. Kim, Esquire, Federal Trade Commission, Mail Stop CC-8528, 600 Pennsylvania Avenue NW, Washington, DC 20580, e-mail bdavidson@ftc.gov, bbandy@ftc.gov & skim6@ftc.gov, and David Lawrence Ferguson, Esquire, Kopelowitz Ostrow et al., One West Olas Boulevard, suite 500, Fort Lauderdale, Florida 33301, e-mail ferguson@kolawyers.com, this 16th day of August, 2018.

/s/ Mark J. Bernet, Receiver

cc: Andrew N. Cove, Esquire (via e-mail to ANC@covelaw.com) (Mr. Cove has not appeared in this case on behalf of any party)