No. 16-17197

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

FEDERAL TRADE COMMISSION,
*Plaintiff-Appellee,*

v.

AMG CAPITAL MANAGEMENT, LLC, et al.,
*Defendants-Appellants,*

On Appeal from the United States
District Court for the District of Nevada
(No. 2:12-cv-00536)

**WASHINGTON LEGAL FOUNDATION'S *AMICUS CURIAE* BRIEF IN SUPPORT OF DEFENDANTS-APPELLANTS' PETITION FOR REHEARING EN BANC**

Corbin K. Barthold
Cory L. Andrews
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave., NW
Washington, DC 20036
(202) 588-0302
cbarthold@wlf.org

*Counsel for Amicus Curiae
Washington Legal Foundation*

March 8, 2019

```
```

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTEREST OF *AMICUS CURIAE* ..................................................................... 1

SUMMARY OF ARGUMENT .............................................................................. 2

ARGUMENT ........................................................................................................... 4

    THE CIRCUIT'S READING OF FTC ACT §13(B) RELIES ON AN OUTMODED—AND ILLEGITIMATE—FORM OF STATUTORY INTERPRETATION .............................................................................................. 4

    A.   *Commerce Planet* Is, In Effect, An Exercise Of The Equity Of The Statute .................................................................. 5

    B.   The Equity Of The Statute Is A Relic From Before The Separation Of Powers ............................................................. 7

    C.   The Supreme Court Briefly Adopted, But Then Soundly Rejected, The Equity Of The Statute ..................................... 9

CONCLUSION ..................................................................................................... 13

i

## CORPORATE DISCLOSURE STATEMENT

Washington Legal Foundation has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Alexander v. Sandoval,*
 532 U.S. 275 (2001) .................................................................................. 12, 13

*Cannon v. Univ. of Chicago,*
 441 U.S. 677 (1979) .................................................................................. 11, 12

*FTC v. Commerce Planet, Inc.,*
 815 F.3d 593 (9th Cir. 2016) ................................................................. 5, 6, 9, 13

*FTC v. Pantron I Corp.,*
 33 F.3d 1088 (9th Cir. 1994) ............................................................................ 5

*FTC v. Shire ViroPharma, Inc.,*
 ___ F.3d ___, 2019 WL 908577 (3d Cir. Feb. 25, 2019) .................................... 1, 6

*J.I. Case Co. v. Borak,*
 377 U.S. 426 (1964) .............................................................................. 10, 11, 13

*Lemy v. Direct Gen. Fin. Co.,*
 884 F. Supp. 2d 1236 (M.D. Fla. 2012) ........................................................ 7, 8

*Owner-Operator Ind. Drivers Ass'n v. Swift Transp. Co., Inc.,*
 632 F.3d 1111 (9th Cir. 2011) .......................................................................... 12

*Platt v. Lock,*
 75 Eng. Rep. 57 (K.B. 1550) ............................................................................ 11

*Porter v. Warner Holding Co.,*
 328 U.S. 395 (1946) ............................................................................... *passim*

*United States v. Apex Oil Co., Inc.,*
 579 F.3d 734 (7th Cir. 2009) ............................................................................ 12


**Page(s)**

*Ziglar v. Abbasi,*
  137 S.Ct. 1843 (2017) .................................................................... 12

## STATUTES:

15 U.S.C. § 53(b) ............................................................................ *passim*

## OTHER AUTHORITIES:

W.H. Loyd, *The Equity of a Statute,*
  58 U. Pa. L. Rev. 76 (1909) .............................................................. 2

John F. Manning, *Textualism and the Equity
  of the Statute,* 101 Colum. L. Rev. 1 (Jan. 2001) ................... 7, 8, 9

Theodore F.T. Plucknett, *A Concise History of the
  Common Law* (5th ed. 1956) ........................................................... 8

## INTEREST OF *AMICUS CURIAE*[*]

Washington Legal Foundation is a nonprofit, public-interest law firm and policy center with supporters in all fifty states. WLF promotes free enterprise, individual rights, limited government, and the rule of law. It appears often as *amicus curiae* in cases involving the FTC Act. See, e.g., *FTC v. Shire ViroPharma, Inc.*, ___ F.3d ___, 2019 WL 908577 (3d Cir. Feb. 25, 2019).

Not many litigants seeking rehearing en banc can claim the explicit support of a majority of the underlying panel. Here, however, in a special concurrence, Judge O'Scannlain, joined by Judge Bea, urge the Circuit to "rehear this case en banc." (Slip Op. 22.) Judges O'Scannlain and Bea contend that this Circuit has erred in construing the word "injunction" in §13(b) of the FTC Act to encompass "equitable relief, including restitution." They argue, among other things, that "injunction" does not mean "equitable relief"; that nothing in the text or structure of the statute supports pretending that "injunction" means "equitable relief"; and that, in any event, restitution of the sort awarded

---

[*] No party's counsel authored any part of this brief. No one, apart from WLF and its counsel, contributed money intended to fund the brief's preparation or submission. All parties have consented to the brief's being filed.

1

here is not equitable relief. Judge O'Scannlain's concurrence is thorough and incisive. It fully justifies the rehearing for which it calls.

WLF writes separately to expand on the problems with relying, as this Circuit does when reading §13(b), on *Porter v. Warner Holding Co.*, 328 U.S. 395 (1946). As we will explain, that 73-year-old decision uses an obsolete mode of statutory interpretation that the Supreme Court has since rejected.

## SUMMARY OF ARGUMENT

The words "equity of the statute" are not on many lips these days. "The principle involved in the phrase has been relegated," one commentator wrote over a hundred years ago, "to the limbo of legal antiquities, reappearing now and then in altered form, the ghost of its former self." W.H. Loyd, *The Equity of a Statute*, 58 U. Pa. L. Rev. 76, 76 (1909). Dead the concept may be—but the ghost of its former self stalks this case.

The equity of the statute was "a vague and undefined power . . . vested in the judiciary . . . to disregard the letter of the law to attain the ends of justice." *Id.* at 77. It entered English law in the Late Middle Ages, and it receded in the nineteenth century. In the mid-twentieth

2

century it enjoyed a brief rebirth, in altered form, when our Supreme Court used something very like it to read "implied" rights and remedies into statutes; but the Court soon reversed course. It concluded, quite correctly, that unbridled judicial "equity" in statutory interpretation is incompatible with a system of separated powers and democratic lawmaking.

Yet the phantom wanders still. This Circuit, when interpreting the word "injunction" in §13(b) of the FTC Act, has ignored the modern Supreme Court cases rejecting the equity of the statute. Rather than adhere to the statutory text, the Circuit has invoked one of the obsolete mid-twentieth-century Supreme Court decisions as support for reading the word "restitution" into the word "injunction."

In a special concurrence, a majority of the panel in this case laments this Circuit's "unfortunate interpretation" of §13(b). (Slip Op. 22.) "The text and structure of the statute," they write, "unambiguously foreclose ... monetary relief." (*Id.*) Awarding restitution in defiance of the statute's text, they observe, "wrests from Congress its authority to create rights and remedies." (*Id.*) They urge

3

the Circuit to "rehear this case en banc to relinquish what Congress withheld." (*Id.*)

The Circuit should do so.

## ARGUMENT

### THE CIRCUIT'S READING OF FTC ACT §13(B) RELIES ON AN OUTMODED—AND ILLEGITIMATE—FORM OF STATUTORY INTERPRETATION.

This Circuit has repeatedly said that the word "injunction" in §13(b) unlocks the entire vault of equitable remedies. Rather than ground this conclusion in a rigorous analysis of the FTC Act's text and structure, the Circuit has simply relied on *Porter*, 328 U.S. 395. The approach in *Porter* strongly resembles the early common-law courts' use of the equity of the statute to engage in freewheeling statutory revision. Although the Supreme Court briefly wielded this form of power in *Porter* and a few other decisions, it had already begun to discard it by the time this Circuit began relying on *Porter* to expand §13(b) beyond its text. The Supreme Court has now sworn off using anything like the equity of the statute. This Circuit should do the same.

4

### A. *Commerce Planet* Is, In Effect, An Exercise Of The Equity Of The Statute.

The panel affirmed a $1.27 billion restitution award. It did so even though the purported authority for this remedy, §13(b) of the FTC Act, says merely that "in proper cases" a court may issue a "permanent injunction." 15 U.S.C. § 53(b). Despite the statute's mentioning only an "injunction," the panel was required by a line of Ninth Circuit decisions to permit restitution.

The most recent of these decisions is *FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016). *Commerce Planet* acknowledges that §13(b) "mentions only injunctive relief." 815 F.3d at 598. It then says, however, that §13(b) nonetheless "empowers district courts to grant any ancillary relief necessary to accomplish complete justice, including restitution." *Id.* (quoting *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994)).

But "injunction" does not mean "restitution." "Apples," after all, does not mean "oranges." Nor does "injunction" mean "equitable relief (including, at times, restitution)." That would be like saying that "apples" means "fruit (including, at times, oranges)." Nor, finally, can it be said that some aspect of the FTC Act's structure reveals Congress's

5

subtle intent to use "injunction" to mean "injunction, but maybe restitution too." "When Congress added Section 13(b), the provision was expected to be used for obtaining injunctions against illegal conduct pending completion of FTC administrative hearings." *Shire ViroPharma*, ___ F.3d ___, 2019 WL 908577 at *7. "The FTC's understandable preference for litigating" in federal court "under Section 13(b), rather than in an administrative proceeding, does not justify" an "expansion of the statutory language." *Id.* at *9.

Why, then, did *Commerce Planet* conclude that "injunction" can mean "restitution"? *Commerce Planet* looks to *Porter*, 328 U.S. 395. *Porter*, *Commerce Planet* says, concluded that Congress's use of "injunction" in a statute "invoked the court's . . . inherent equitable powers." 815 F.3d at 598. Although by this *Commerce Planet* means that *Porter* read the word "injunction" to trigger the equity jurisdiction that originated in the Court of Chancery, there are distinct shades, in *Porter* and other mid-twentieth century Supreme Court cases, of another kind of "equity." These cases engage in a form of judicial lawmaking that harkens back to the ancient—and defunct—concept of the equity of the statute.

6

## B. The Equity Of The Statute Is A Relic From Before The Separation Of Powers.

"Until relatively modern times (the late eighteenth or early nineteenth century), the English judiciary always felt a significant freedom to engage in atextual interpretation" of a statute. John F. Manning, *Textualism and the Equity of the Statute*, 101 Colum. L. Rev. 1, 30 (Jan. 2001). To justify this extratextual authority, the English judges pointed to the doctrine of the equity of the statute. *Id.* The equity of the statute empowered a judge both to "restrict the general words of a statute when they produced harsh results" and to "br[ing] omitted cases within the reach of a statute, even when they admittedly lay outside its express terms." *Id.* at 31. So, for example, "a statute imposing liability on the 'Warden of the Fleet' might be extended . . . to all jailers," or "a statute applicable to the City of London might be stretched to include other municipalities." *Id.* (collecting cases).

But this "power to wield a roving equity in statutory interpretation arose in a political system with no meaningful separation of powers." *Lemy v. Direct Gen. Fin. Co.*, 884 F. Supp. 2d 1236, 1239 (M.D. Fla. 2012). "To a medieval common law judge—at the time a mere

7

agent of the King—writing the law and interpreting the law" tended to look "like one activity occurring at different times." *Id.* The judge hearing a case had often, in fact, had a hand in drafting the statute before him. "When," for instance, "counsel suggested an interpretation" of a statute to Ralph de Hengham, Chief Justice of the Common Pleas from 1301 to 1309, Hengham "had an authoritative answer." *Id.* (quoting Theodore F.T. Plucknett, *A Concise History of the Common Law* 331 (5th ed. 1956)). "'Do not gloss the statute,' he said, 'for we know better than you; we made it.'" *Id.* Until the Glorious Revolution of 1688, and even for a time after, "the line between lawmaking and judging" in England "was blurred." Manning, supra, 101 Colum. L. Rev. at 36-37. Propelled by the force of habit and tradition, the doctrine of the equity of the statute persisted in England well into the nineteenth century. *Id.* at 53-55.

"In contrast with the . . . English common law system," the "U.S. Constitution explicitly disconnects federal judges from the legislative power and, in so doing, undercuts any judicial claim to derivative lawmaking authority." Manning, supra, 101 Colum. L. Rev. at 59. "The sharp separation of legislative and judicial powers" in the United States

8

"was designed, in large measure, to limit judicial discretion—and thus to promote governance according to known and established laws." *Id.* at 61.

"The equity of the statute . . . was a doctrinal artifact of an ancient English governmental structure, one that had blended government powers." Manning, supra, 101 Colum. L. Rev. at 8. It is a doctrine foreign to our modern constitutional system.

### C. The Supreme Court Briefly Adopted, But Then Soundly Rejected, The Equity Of The Statute.

For a few decades in the mid-twentieth century, the Supreme Court played with a doctrine of implied rights and remedies redolent of the equity of the statute. Sometimes the Court did this while discussing a distinct "equity" concept—equity jurisdiction. *Porter*, 328 U.S. 395, for instance—the main authority relied on by *Commerce Planet*—involved a statute that empowered a court only to order compliance with, or to enjoin violations of, the pertinent statute. *Porter* holds that the statute's discussion of injunctive relief activates a court's broad equity jurisdiction, and that a court may therefore use the statute to "give whatever . . . relief may be necessary under the circumstances," including restitution. *Id.* at 398. The statute did not *say* "equity

9

jurisdiction"; the Court placed those words there itself; it held that "apples" means "fruit." It used the equity of the statute to grant itself equity jurisdiction.

The *Porter* dissent wanted to respect the statute's text—and thus democracy and the separation of powers. "Congress could not have been ignorant of the remedy of restitution," it wrote; "it knew how to give remedies it wished to confer." *Porter*, 328 U.S. at 405 (Rutledge, J., dissenting). Because "the remedy . . . sought" was "inconsistent with the remedies expressly given by the statute," the dissent would have withheld restitution. *Id.* at 408.

The Court's taste for adding rights and remedies to statutes reached its height in *J.I. Case Co. v. Borak*, 377 U.S. 426 (1964). A shareholder accused a company of circulating a deceptive proxy statement, but he invoked a section of the Securities Exchange Act of 1934 that says nothing about private suits. Notwithstanding the absence of a "specific reference to a private right of action," the Court allowed the suit to proceed, because it thought "private enforcement of the proxy rules" a "necessary supplement to [SEC] action." *Id.* at 432. The Court created a private right of action from whole cloth because, in

its view, doing so was a good idea. Cf. *Platt v. Lock*, 75 Eng. Rep. 57, 59 (K.B. 1550) ("Yet the bill shall be maintainable by equity of the statute . . . notwithstanding [that] the statute does not give the action by express words against any other than the warden of the Fleet . . . [because] the taking it by equity shall be more beneficial than prejudicial to the greater number of men.").

Note well: one of the authorities *Borak* cites to support its freshly invented right of action is *Porter*, the main case relied on by *Commerce Planet*. 377 U.S. at 434.

The tide began to turn against the new equity of the statute when Justice Powell called attention to its flaws while dissenting in *Cannon v. University of Chicago*, 441 U.S. 677 (1979). It is not for a court, wrote Justice Powell, to determine "what the goals of a [legislative] scheme should be" or "how those goals should be advanced." 441 U.S. at 740 (Powell, J., dissenting). Such a "mode of analysis," he believed, "cannot be squared with the doctrine of the separation of powers." *Id.* at 730. "When Congress chooses not to provide a private civil remedy," he concluded, "federal courts should not assume the legislative role of

11

creating such a remedy and thereby enlarge their jurisdiction." *Id.* at 730-31.

Justice Powell's view—and that of the *Porter* dissent—became the majority view in a series of decisions culminating in *Alexander v. Sandoval*, 532 U.S. 275 (2001). "Private rights of action to enforce federal law," *Sandoval* says, "must be created by Congress." 532 U.S. at 286. "The judicial task," it continues, "is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* Creating new rights or remedies "may be a proper function for common-law courts, but not for federal tribunals." *Id.* at 287. See also *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1855-56 (2017) (declaring *Borak*'s approach to statutory interpretation defunct); *Owner-Operator Ind. Drivers Ass'n v. Swift Transp. Co., Inc.*, 632 F.3d 1111, 1121 (9th Cir. 2011) (declining to use *Porter* to read monetary relief into a clause in a truth-in-leasing law that "list[s] only injunctive relief"); *United States v. Apex Oil Co., Inc.*, 579 F.3d 734, 737 (7th Cir. 2009) (declaring "dead" cases that use *Porter* to read monetary relief into an environmental law's injunction provision).

12

*Commerce Planet* bypasses the governing standard of statutory construction—a standard, embodied in *Sandoval*, of respect for the legislative role and the separation of powers. *Commerce Planet* reaches back and grasps an obsolete standard—a standard, embodied in *Porter* and *Borak*, of judicial aggrandizement and the blending of powers. This Court should rehear this case en banc, reject *Commerce Planet* and its predecessors, and align the Circuit's interpretation of §13(b) with the modern and binding rules of statutory interpretation.

## CONCLUSION

The petition for rehearing en banc should be granted.

March 8, 2019                    Respectfully submitted,

/s/ Corbin K. Barthold

Corbin K. Barthold
Cory L. Andrews
WASHINGTON LEGAL
FOUNDATION
2009 Massachusetts Ave., NW
Washington, DC 20036
(202) 588-0302
cbarthold@wlf.org

*Counsel for Amicus Curiae
Washington Legal Foundation*

13

# CERTIFICATE OF COMPLIANCE

I certify:

(i) That this brief complies with the page limit set forth in Circuit Rule 29-2(c)(2). The brief contains 2,432 words.

(ii) That this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared using Microsoft Office Word 2010 and is set in 14-point Century Schoolbook font.

March 8, 2019

/s/ Corbin K. Barthold

## CERTIFICATE OF SERVICE

I certify that on March 8, 2019, I filed the foregoing brief of Washington Legal Foundation via the CM/ECF system and served the foregoing via the CM/ECF system on all counsel who are registered CM/ECF users.

/s/ Corbin K. Barthold