## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

FEDERAL TRADE COMMISSION,

      Plaintiff,

v.                                                            CASE # 6:18-cv-862-ORL-37DCI

MOBE LTD., et al.,

      Defendants.

_____ /

SYNOVUS BANK,

      Intervenor, Counter-Plaintiff,

v.

BURTON W. WIAND, SPECIAL RECEIVER,
and QUALPAY, INC.,

      Counter-Defendants.

_____ /

### CLAIMS AND DEFENSES OF INTERVENOR SYNOVUS BANK

By assertion of this pleading of Claims and Defenses, Synovus Bank ("Synovus") seeks return from the receivership of $6.3 million in reserve account funds (the "Reserve Fund") that Synovus conditionally paid to the Receiver Mark J. Bernet (the "Receiver") to be held in a constructive trust pursuant to an August 8, 2018 Order of this Court.  (Doc. 83) (The "Order, attached as Exhibit A").

Synovus files this pleading in response to claims asserted in this case against Synovus and the Reserve Fund by the Federal Trade Commission ("FTC") and by the Receiver.  This pleading is filed pursuant to Fed. R. Civ. P. 24, which calls for a pleading of claims and defenses for which intervention is sought.  In addition to ordering payments

of the Reserve Fund to the Receiver, the Order of August 8, 2018, permitted intervention of Synovus.  (*See,* Doc. 57, Non-Party Synovus Bank's Special Appearance and Motion for Emergency Relief from *Ex Parte* Temporary Restraining Order and, to the Extent Necessary, to Intervene. "Synovus Motion").  Synovus appealed the Order but, thereafter, voluntarily dismissed the appeal given the interlocutory and non-final nature of the Order. Synovus has produced documents to the FTC, the Receiver, and the Special Receiver.  The Court recently appointed the Special Receiver as to issues concerning Synovus.  (Doc. 182, May 23, 2019).

This pleading is the current statement of claims and defenses of Synovus, in line with Fed. R. Civ. P. 24, presented in the typical forms of defenses and counterclaims. Synovus alleges the following:

<u>INTRODUCTION TO DEFENSES</u>

1.      By the Order, entered without objection by the FTC or the Receiver, Synovus intervened in this case.

2.      Prior to intervention by Synovus and under §13(b) of the FTC Act, 15 U.S.C. § 53(b), the FTC filed its complaint in this case for injunctive and ancillary relief and, to preserve the possibility of effective final relief, *inter alia,* for a freeze of assets, refund of monies, disgorgement of ill-gotten monies, and other and additional just and proper relief.  (Doc. 1, "Complaint," p. 35 – 36).

3.      The FTC also filed its *Ex Parte* Motion for a temporary restraining order seeking a preliminary freeze of assets to make permanent relief possible.  (Doc. 3, "Motion for TRO," p. 34).  Pursuant to the Motion for TRO, the FTC requested and proposed the

Order Granting *Ex Parte* Temporary Restraining Order which the Court entered on June 5, 2018.  (Motion for TRO, p. 3; Doc. 13, "Order Granting TRO").

4.      As requested by the FTC under the form of the Order Granting TRO which the FTC proposed to the Court, the Order Granting TRO entered relief against non-parties. The Order Granting TRO denominated non-parties as "Asset Holders and Other Third Parties."  (Order Granting TRO, p. 8).  Synovus was one of those Third Parties.

5.      As requested by the FTC under its form of order, the Order Granting TRO ordered merchant and acquiring banks to hold, preserve, and retain control of any credits, debits or charges including reserve funds.  (Doc. 13, p. 8).  Therefore, the Order Granting TRO purported to assert judicial power over Synovus because Synovus held and controlled the Reserve Fund as credit.

6.      After the Synovus Motion sought intervention, the FTC reasserted its claims as to Synovus in its response to the Synovus Motion, alleging, *inter alia,* "that the MOBE reserve was funded by payments that defrauded consumers made to MOBE, that MOBE (and now the Receiver) owns the reserve funds, and that there are no equitable or other reasons to justify allowing Synovus or Qualpay to use MOBE reserve funds to reimburse themselves for chargebacks."  (Doc. 78, Federal Trade Commission's Opposition to Non-Party Synovus Bank's Motion for Emergency Relief, p. 10).

7.      The Receiver asserted like claims in its response, alleging "[t]he $6.3 million held by Synovus in the reserve account is MOBE's money.  Because the funds are owned by MOBE, they should be turned over to the Receiver."  (Doc. 77, Receiver's Response in Opposition to Intervenor Synovus Bank's Emergency Motion to Modify Temporary Restraining Order and Incorporated Memorandum of Law, p. 4).  In addition,

the Receiver claimed "Synovus should be treated like any other claimant…. The Receiver should be able to broadly and equitably administer the Receivership fund amongst <u>all</u> injured consumers and claimants, using <u>all</u> of the Receivership Assets available." (*Id.,* p. 7). The Receiver incorporated claims of equitable powers which he had earlier asserted against Qualpay, Inc. ("Qualpay"), including purported equitable powers to prevent "inequitable distribution," and to fashion at the Court's direction an "equitable remedy taking into account all factors and all injured consumers and claimants, and with all the Receivership assets available to him in this process." (*Id.,* pp. 1, 2, 5, 7).

8.      The Synovus Motion contested the claims of the FTC and the Receiver. Synovus raised multiple defenses and claims including *inter alia* the following: (i) the Order Granting TRO imposed a damage remedy upon Synovus, and the FTC sought to impose liability on Synovus (Synovus Motion, pp. 1, 2); (ii) the FTC lacked jurisdiction over financial institutions such as Synovus (*Id.,* p. 2); (iii) Synovus had a right of control over, and a security interest as belt and suspenders in, the Reserve Fund (*Id.,* pp. 2, 11); (iii) the MOBE defendants had no extant interests in the Reserve Fund (*Id.,* pp. 8, 13); and (iv) the FTC and Receiver's claims were in contravention of federal regulatory rules. (*Id.,* p. 15).

9.      (a)      Ruling the Reserve Fund was owned by MOBE, and given the claims for relief of the FTC and Receiver, the Court by its Order directed turnover of the Reserve Fund, to which Synovus complied. The Court denied modification of the Order Granting TRO as requested by Synovus. (Order, p. 13). The Order was an interlocutory ruling pursuant to terms of the temporary restraining order, not a final judgment. The Court thereafter entered a preliminary injunction under the Complaint as stipulated by MOBE

defendants, but not stipulated by Synovus.  (Doc. 102, Order Approving Stipulated Preliminary Injunction, 9/5/2018).

(b)     Except for the grant of intervention, the interlocutory ruling on ownership, the denial of the request by Synovus to modify the Order Granting the TRO, and the turnover to the Receiver, the Court entered no rulings as to Synovus.  For example, the Court did not address other issues including, *inter alia,* issues of the FTC jurisdiction and hence the Court's power in respect to the Reserve Fund; equitable powers of the Court and the Receiver as against the Reserve Fund; and the right of Synovus to use the Reserve Funds to cover chargebacks.

10.     The FTC and Receiver acknowledged the Order is interlocutory.   The Receiver and FTC stated that Synovus as well as Qualpay are entitled to assert their claims to the Reserve Fund, as stated before the Eleventh Circuit Court of Appeals in the appeal of the Order which Synovus ultimately dismissed as follows: "The district court presumably will determine the disposition of the funds in the course of the litigation below and the order in which it does so will be reviewable on appeal from the final judgment," (Exhibit B, FTC's Response to Jurisdictional Question, before the Eleventh Circuit Court of Appeals p. 12, joined by Appellee/Receiver, "Mark J. Bernet's Response to Jurisdictional Question," attached as Exhibit C).

### ASSERTION OF DEFENSES OF SYNOVUS TO CLAIMS OF THE FTC AND THE RECEIVERSHIP AGAINST SYNOVUS

11.     Synovus asserts its defenses to the claims of the FTC, and the Special Receiver, as follows:

(a)     Jurisdiction of the FTC under Sections 5(a) and 13(b) (15 U.S.C. §§ 45(a), 53(b)) and the power of this Court incident to that jurisdiction, does not extend to

making claims against Synovus as a bank insured by the Federal Deposit Insurance Corporation, or ordering turnover of funds within the possession and control of Synovus, which would and did result in liability, loss, and disgorgement of Synovus.  Synovus incurred liabilities as a result of its obligation to pay chargebacks of approximately $20,000.000.  As a result, the Order of this Court imposed liability and loss of Synovus in the amount of the Reserve Fund which otherwise would have reduced the amount of liability and loss.

(b)      Given the FTC does not have power to seek turnover of the Reserve Fund, the receivership ordered by this Court likewise is so limited in the exercise of powers beyond the reach of the FTC.

(c)      Given the lack of jurisdiction expressly stated under §5(a)(2) of the FTC Act, the FTC, this Court and the receivership have no power under §13(b) of the FTC Act to enter injunctive relief against Synovus or any other equitable or ancillary relief.

(d)      The equitable and ancillary powers as to disgorgement or seizure of funds asserted by the FTC and derivatively the Receiver to claim an interest in the Reserve Fund are an invalid extension of Section 13(b) of the FTC Act, under a well-founded argument for modifying existing law, and are invalid as against Synovus.

(e)      The claims of the FTC and the receivership fail to state claims for relief.  Synovus held rights to the Reserve Fund by way of rights of control, rights under Article 4 of the Uniform Commercial Code, and rights of a secured creditor under Article 9 of the Uniform Commercial Code.

(f)      Synovus holds superior rights to control, possession, and disposition of the reserve fund.

(g)     Synovus is a holder-in-due-course.

(h)     The receivership has no equitable powers to deny or avoid the rights of Synovus.

(i)     To the extent of any legitimate equitable power exercised or to be exercised by the receivership, the receivership is barred by the equitable doctrines of unclean hands and of she who seeks equity should do equity.  The receivership stands in the shoes of MOBE.

(j)     The receivership has limited to no standing.  The receivership stands in the shoes of MOBE.

(k)     The receivership is bound to the actions and omissions of the MOBE defendants, and is barred by the doctrine of *in pari delicto.*

(l)     To the extent the Order determined, or the FTC or the receivership argued that, Synovus had a security interest in the Reserve Fund, the FTC or the receivership is judicially estopped.

(m)     Any and all claims of the FTC and the receivership against Synovus are denied.

12.     Synovus files this Defense in its capacity as an intervenor for the limited purpose of asserting its rights to the Reserve Fund under the putative *in rem* and receivership jurisdiction of this Court.  Synovus does not consent to personal jurisdiction.

<u>COUNTERCLAIM OF SYNOVUS AGAINST</u>
<u>THE SPECIAL RECEIVER AND QUALPAY</u>

13.     This is an action to establish that Synovus is entitled to possession and control over the Reserve Fund in the form of a credit presently in a bank account of the receivership at Valley National Bank.  Synovus seeks a declaratory and/or final judgment

that the receivership shall promptly return the Reserve Fund to Synovus for purpose of securing and reducing liability and payments of Synovus for chargebacks of MOBE, and that Synovus has superior rights to the Reserve Fund as against the receivership and Qualpay.

14.     The Order did not extinguish the rights of Synovus in the Reserve Fund, but instead directed transfer of the Reserve Fund from Synovus to a bank account of the receivership to be held in a "constructive trust."  Synovus has the following rights to the Reserve Fund which Synovus acquired and perfected prior to transfer of the Reserve Fund to the Receiver:

(a)     Rights to control, to enforce, and/or to draw upon the Reserve Fund; and/or

(b)     Rights of perfected security interests in the Reserve Fund.  These security interests were and are for the purpose of securing liabilities and indebtedness owed, due, and payable to Synovus.

(Collectively "Rights in the Reserve Fund").

15.     The Rights in the Reserve Fund were not extinguished but instead carried over as against the receivership and any other interested persons including Qualpay.

16.     Synovus files this Counterclaim in its capacity as an intervenor for the limited purpose of asserting its rights to the Reserve Fund under the purported *in rem* and receivership jurisdiction of this Court.  Synovus does not consent to personal jurisdiction.

## BACKGROUND

A.    Merchant Agreement – Synovus

17.    (a)    The MOBE business ("Merchant"), by and through MOBEProcessing.com, Inc., a/k/a MOBE USA, entered into a merchant banking relationship with Synovus and Qualpay.  Under that relationship, Merchant agreed to and operated under a Merchant Card Processing Agreement with Synovus and Qualpay, a copy of which is attached as Exhibit D.  ("Merchant Agreement").

(b)    The Merchant Agreement provided as follows:

> This Merchant Card Processing Agreement is for merchant card payment processing services between the merchant ("Merchant") that signed the Application (the "Application") and Synovus Bank (the "Merchant Bank") and Qualpay, Inc. (the "Processor").  The Processor and the Merchant Bank are collectively hereinafter referred to as the "Bank".  Processor and Merchant Bank reserve the right to allocate Bank's duties and obligations amongst themselves as they deem appropriate in their sole discretion, and Merchant Bank or Processor may jointly or individually assert or exercise any rights or remedies provided to Bank hereunder.

(Merchant Agreement, p. 1-2).

18.    (a)    Under the Merchant Agreement, Synovus agreed to serve as a merchant bank for processing credit card payments.  This involved an agreement to perform related services including, but not limited to: (a) providing settlement procedures for debits and credits to banking accounts and systems pursuant to the applicable rules of Visa, Inc. ("Visa"), MasterCard Corporation ("MasterCard") and Discover; and (b) contributing to the financial stability of financial institutions participating in the payment systems.

(b)    Synovus is what is known in the payments industry, and under the rules promulgated by the card brand (e.g., Visa, MasterCard, and Discover), as an acquiring

bank, meaning Synovus, through agreements with the card brands, was granted access to technological infrastructure through which payment card transactions were processed.

19.     Pursuant to the terms of the Merchant Agreement, Synovus, Qualpay, and Merchant agreed Merchant would only be entitled to payment related to charges associated with Merchant's business after satisfaction of chargebacks, as discussed more fully below. Any credits to which Merchant might have been provided were provisional:

> Merchant Bank will provide provisional credit to Merchant for each valid Charge which Merchant submits to Bank by crediting Merchant's Settlement Account, provided Merchant Bank has received settlement for the valid Charge through the interchange procedures specified by the Card Network….Merchant Bank is not obligated to provide provisional credit to Merchant for Charges submitted that are not valid Charges, and may suspend or discontinue any provisional credit in Merchant Bank's and/or Processor's sole and absolute discretion, including for any reason that would justify termination of this Agreement.  Each provisional credit from Merchant Bank to Merchant will be subject to Adjustment, including revocation, upon Bank's further review and verification. Provisional credit to Merchant for a Charge disputed by a Cardholder for any reason is not final.

(Merchant Agreement, p. 15).  Further, any payments to Merchant were to be made only after chargebacks and reserves (both as discussed more fully below) were satisfied:

> Merchant Bank may deduct from any payment to Merchant the amount of any Credit Voucher processed for Merchant, any Chargeback to Merchant, any amount to be deposited in the Reserve Account and any Processing Fees and Card Network fines or charges due from Merchant or due from any entity related to Merchant under a separate agreement with Merchant Bank.

(Merchant Agreement, p. 15).

20.     The Merchant Agreement defined "Bank" to be Synovus and Qualpay collectively, and defined "Merchant Bank" to be Synovus.  (Merchant Agreement, p. 2). As stated above, the Merchant Agreement called for provisional credits to an account of

Merchant which the Merchant Agreement denominated as Merchant's Settlement Account. (termed hereunder the "Settlement Account", Merchant Agreement, p. 15).

B.   <u>Sponsorship Agreement - Qualpay, ISO and MSP</u>

21.   Under a Sponsorship Agreement with Qualpay, Synovus agreed to maintain a clear and settle transaction program through the Visa, MasterCard, and Discover payment systems.  In return, Qualpay agreed to act as a service provider for Synovus.  (Exhibit E, "Sponsorship Agreement", p. 18, para. 4.1.2; p. 1).  Synovus in particular sponsored Qualpay as an Independent Sales Organization ("ISO") and as a Member Service Provider ("MSP").  (Sponsorship Agreement, p. 18, p. 4.1.1).

22.   Under the Visa and MasterCard payment system rules, Synovus was authorized to contract with service providers to carry out selected responsibilities. (Exhibits F and G; Visa Rule 1.1.7.1; MasterCard 1.9.3).

23.   (a)   Except as provided otherwise, Qualpay was engaged to direct, manage and administer the credit card programs of Synovus.  (Sponsorship Agreement, p. 11, par. 3.1.2).  Qualpay's responsibilities included administration of debits and credits to a reserve account and, under terms of the Sponsorship Agreement, to a "Merchant Settlement Account" at Synovus as follows:

> 6.1.1   <u>Merchant Settlement Account</u>.  Bank will maintain one or more special agency accounts for Merchant settlement (the "Merchant Settlement Accounts"), which will be owned by Bank, to receive settlement from Visa and MasterCard, through the Third Party Provider with respect to the Program, and to receive discount rates, fees, processing fees, transaction fees and other fees and charges owing by Merchants under their Merchant Agreements for the Program, through the Processing Services.  Company agrees it has no right, title or interest in the Merchant Settlement Accounts.

(b)     Under the above provision, Synovus maintained and owned the Merchant Settlement Account.  (Sponsorship Agreement, p. 24, para. 6.1.1).  The Merchant Settlement Account was a different settlement account than the "Settlement Account" referenced in the Merchant Agreement.

24.     For purpose of the Merchant Settlement Account, the parties used an account at Synovus bearing an identification number with the last two numerals of "53." Per agreement and actual practice, the Merchant Settlement Account was established and maintained in the name of "Synovus/Qualpay, Inc. Settlement" or "Qualpay, Inc. Settlement."  This was a common settlement account used by Synovus and Qualpay for all merchants serviced by Qualpay.

C.     Merchant Agreement - Chargebacks, Reserve Account and Reserve Fund

25.     To further carry out the purposes of the Merchant Agreement, specifically as part of the structure of the Visa, MasterCard, and Discover rules designed to ensure financial integrity, chargebacks by customers of Merchant were to be debited back against Merchant.  ("Chargebacks").

26.     (a)     Chargebacks were primary liabilities of the Merchant as follows:

> Bank will chargeback to Merchant and Merchant will pay Bank, the amount of each Charge which Merchant or a Merchant Affiliate submits to Bank for processing that is subject to Chargeback to Bank for any reason under the Operating Rules, or to the extent Bank receives claims regarding the Charges from Cardholders under other provisions of law.

(Merchant Agreement, p. 18).

(b)     Each Chargeback to Merchant was immediately due and payable by Merchant.  (Merchant Agreement, p. 19).

(c)     Chargebacks were defined as follows:

> Chargeback:  A return of a Charge to Merchant, typically initiated by a Cardholder through a Card Issuer, for transmittal to and payment by Merchant under Operating Rules established by the Card Networks.

(Merchant Agreement, p. 6).

27.     (a)     In addition, to further ensure financial integrity, the Merchant Agreement provided a safeguard for payment of Chargebacks in the form of the reserve account ("Reserve Account").

(b)     This was in conformity with incorporated rules of Visa, MasterCard, and Discover.  Those rules provided for establishment of reserve accounts in favor of and as security for Synovus, including as security for liabilities or losses of Synovus occasioned by Chargebacks not paid by Merchant.  (Exhibits H, Visa Core Rules, 10.1.1.3; Exhibit I, MasterCard Rules, 5.3.1).

(c)     Establishment of reserves for Chargebacks was also sanctioned by federal banking regulations, which recognize that liability for chargebacks (if not covered by a merchant) are a significant risk to acquiring banks, and even potentially lethal. (Exhibit J, Office of the Comptroller of the Currency, Comptroller's Handbook, Version 1.0, August 2014, p. 24; Exhibit K, FDIC – Division of Supervision and Consumer Protection, March 2007, pp. 166).  Hence, from a policy perspective, creation of reserves for purpose of mitigating risks was beneficial, reasonable and necessary.

28.     (a)     The Reserve Account was established at Synovus, identified by an account number with last two digits "58."  The Reserve Account was held in the name of "Qualpay, Inc., Merchant Reserve" or "Synovus Bank/Qualpay, Inc., Merchant Reserves."

(b)     The Reserve Account at Synovus held credited funds of numerous merchants including Merchant.  The amount of withheld reserve funds attributable to any particular merchant was tracked and accounted for separately.

29.     Synovus had right of control over the credits in the Reserve Account, as follows:

> The Reserve Account will be separate from the Settlement Account. Merchant shall have no right of withdrawal from the Reserve Account.  The Reserve Account shall be under the sole control of Merchant Bank, and Processor shall not have access to or hold funds in the Reserve Account.  Any and all earnings from deposits of the Merchant to the Reserve Account shall be the sole property of the Bank.

(Merchant Agreement, p. 34).

30.     (a)     In line with the above, Synovus, Qualpay and Merchant agreed Synovus had authority to establish and maintain the Reserve Account and to fund the account by way of various debits including debits to the Settlement Account under the Merchant Agreement.

> Merchant may be required to deposit, or Merchant Bank may deposit by deducting from any payment due to Merchant or from any funds in the Settlement Account or any other deposit account of Merchant, into an account maintained by Merchant Bank (or at another approved depository institution) (the "Reserve Account"), initially or at any time in the future as requested by Bank, sums sufficient to satisfy Merchant's current and/or future obligations as determined by Bank in its sole and absolute discretion.

(Merchant Agreement, p. 34).

(b)     In addition, Synovus was entitled to retain funds for the Reserve Account from the Merchant Settlement Account under the Sponsorship Agreement and was entitled to place holds and set off against other monies.  (Sponsorship Agreement, p. 10, para. 2.4).

31.     Under the above terms, funds were subject to credit to the Reserve Account by way of debits of funds from the Merchant Settlement Account under the Sponsorship Agreement, the Settlement Account under the Merchant Agreement, or other sources of funds.

32.     (a)     In the event credits in the Settlement Account or the Reserve Account were insufficient to cover charged-back debits, or Merchant failed to cover chargebacks, Qualpay (as between Qualpay and Synovus) agreed to bear responsibility for all losses.  (Sponsorship Agreement, p. 11, para. 3.1.1).

(b)     Under Federal law and its license agreements with Visa and MasterCard, Synovus was obligated to ensure that credits covering Chargebacks were transmitted to banks which issued credit cards used for transactions at Merchant, and the card issuing banks were in turn obligated to issue credits to their card holders for the Chargebacks.  (12 C.F.R. §§ 1026.12, and 1026.13, Regulation Z; 12 C.F.R. § 1005.11, Regulation E) (Exhibit L, Visa Rules pp. 154; Exhibit M, MasterCard Rules 2.2.1).

33.     At the time of the transfer to the receivership, the Reserve Account for Merchant held the Reserve Fund of approximately $6,300,000.  This was the amount and source of the Reserve Fund ultimately transferred to the receivership, and now held as a credit by the receivership at Valley National Bank, but as alleged, subject to Rights in the Reserve Fund of Synovus.

D.     Rights to the Reserve Fund –Merchant Agreement

34.     (a)     By agreement of Merchant, Synovus had ultimate rights and control over disposition of Reserve Fund in the Reserve Account.  (Merchant Agreement, pp. 33-34).

(b)     Rights of Merchant to credits were limited to valid and settled credits remaining only after settlement in favor of Synovus and others, and after posting of appropriate debits including debits to cover Synovus and/or Qualpay for Chargebacks and Reserve Account Deposits (Merchant Agreement, p. 15).

(c)     Merchant had no rights to credits in the Reserve Account:

> Merchant shall have no right of withdrawal from the Reserve Account.  The Reserve Account shall be under the sole control of the Merchant Bank …
>
> \*     \*     \*
>
> If funds are not available in the Settlement Account, Bank without prior notice to Merchant may deduct from the Reserve Account any obligation of Merchant to Bank under this Agreement, including all Processing Fees, Chargebacks, credit vouchers, damages, and any and all additional fees, and sums sufficient to reimburse Bank for the amount any fines, penalty amounts and charges due the Card Networks.

(Merchant Agreement, pp. 34-35).

(d)     Merchant granted Synovus the right to make deposits into the Reserve Account out of funds of Merchant or any charges to which Merchant may have had a contingent interest:

> Whenever the balance in the Reserve Account is less than the minimum balance required,, or is otherwise deficient, Merchant Bank may, without prior notice, deposit the deficiency into the Reserve Account by reducing any payment to Merchant required by this Agreement or deduct the deficiency from the Settlement Account or any other deposit account of Merchant with another depository institution … and deposit it into the Reserve Account.

(Merchant Agreement, p. 35).

35.     (a)     As to Merchant, the number and amount of actual Chargebacks greatly exceeded the credits in the Merchant Settlement Account and the Reserve Account,

foreclosing any possibility of rights of Merchant to receive a payment from Synovus or Qualpay from those accounts and in the Reserve Fund.

(b)    Absent the freeze on the Reserve Fund and the subsequent turnover of the Reserve Fund to the receivership under terms of the TRO Order and the Order granting disgorgement purportedly based on §13(b) of the FTC Act, the Reserve Fund would have been applied to cover Chargebacks.  The shut-down of Merchant resulted in the Merchant's inability to pay Chargebacks despite the Merchant's obligation to do so under the Merchant Agreement.  This resulted in the liability and loss to Synovus of over $6,300,000, which otherwise would have been covered by the Reserve Fund.

36.    In addition and alternatively, to the extent Merchant had any rights in the Reserve Fund, Merchant granted to Synovus and to Qualpay as the "Bank", security interests in the Reserve Fund:

> To secure Merchant's performance of its obligations under this Agreement, and any other agreement with Bank, Merchant grants Bank a security interest in each Charge and its proceeds, the Settlement Account, the Reserve Account and any other deposit account of Merchant with a financial institution, whether now existing or established in the future, and in the proceeds of all those accounts, any funds due Merchant from Bank and any of Merchant's property held by Bank.

(Merchant Agreement, p. 36).

37.    (a)    The Receiver and the FTC alleged in this case that Merchant had ownership or other rights in the Reserve Account which would necessarily confirm security interests of Synovus and Qualpay under the above grant.  (Doc. 38, pp. 12, 13 of 20; Doc. 77, pp. 2, 4 of 17; Doc. 78, pp. 6 – 7 of 21).

(b)    Likewise, on an initial basis this Court concluded in the Order that Merchant had an "ownership" interest in the Reserve Fund, which also if finalized would

necessarily confirm security interests of Synovus and Qualpay under the Order and the above grant of a security interest.

(c)     Accordingly, to the extent Merchant had any rights in the Reserve Fund as reasoned by the FTC and the receivership, and as found initially by this Court, the above facts established security interests of Synovus and Qualpay in the Reserve Fund.

F.     Rights to the Reserve Fund – Sponsorship Agreement.

38.     As a named account holder of the Reserve Account, and as a party holding a security interest, Qualpay had rights under the Uniform Commercial Code, subject to limitations agreed upon by Qualpay and Synovus.  (Fla. Stat. § 674.401, *et seq.*; Ga. Code § 11-4-401, *et seq.)*.

39.     By agreement of Qualpay and Synovus, even though Synovus had ultimate rights and control over disposition of Reserve Fund in the Reserve Account, Qualpay had certain rights and responsibilities to direct, manage and administer Reserve Fund. (Sponsorship Agreement, p. 9 Article 2; p. 10, section 2.4; p. 11, section 3.1.2).

40.     In addition, Qualpay had a right to consult with Synovus in respect to the Reserve Account, and Synovus was entitled to retain funds from the Reserve Account and was entitled to place holds and set off against other monies:

> Bank, in consultation with Company, may place holds on, or offset against, such Merchant Reserve Accounts and any other monies belonging to or payable to Merchants.  Company shall provide information to Bank to assist Bank in its determination whether to hold, or offset against, Merchant Reserve Accounts.

(Sponsorship Agreement, p. 10, para. 2.4).  Under the Sponsorship Agreement, Qualpay was named the "Company" and the term "Bank" referred solely to Synovus.  (Sponsorship Agreement, p. 1).

41.     (a)     Under the Sponsorship Agreement, Qualpay agreed Synovus held the Reserve Account for security, as follows:

> Bank shall be entitled to retain in Bank's possession or on deposit with Bank, any collateral security or reserves of Merchants ("Merchant Reserve Accounts") pledged as security for the performance of Merchants' obligations relating to the Merchant Agreements.

(Sponsorship Agreement, p. 10, para. 2.4).

(b)     In addition, Qualpay granted a security interest to Synovus in the Reserve Fund of the Reserve Account under other provisions of the Sponsorship Agreement.   First, Qualpay granted to Synovus a security interest in the Merchant Settlement Account as follows:

> Company hereby grants Bank a continuing first priority security interest in and to the …Merchant Settlement Account… to secure the payment and performance in full of all of Company's obligations under this Agreement, and any other agreement or document executed in connection with this Agreement.

(Sponsorship Agreement, p. 29, section 6.4).  Once the security interest attached to funds in the Merchant Settlement Account, to the extent funds flowed from the Merchant Settlement Account the security interest followed those funds into the Reserve Account as proceeds under terms of the Uniform Commercial Code.

(c)     Second, Qualpay granted to Synovus a security interest in all funds in which Qualpay may have had an interest:

> Company grants Bank a continuing first priority security interest in and to … all funds belonging or payable to Company or in which Company may have an interest … to secure the payment and performance in full of all of Company's obligations under this Agreement, and  under any other agreement or document executed in connection with this Agreement.

(Sponsorship Agreement, p. 29, section 6.4).

G.      Perfection of Security Interests

42.     Under the above provisions, and the fact Synovus controlled funds deposited as credits to accounts at Synovus, Synovus had perfected security interests in the Reserve Fund held in the Reserve Account at Synovus, under the provisions of the Uniform Commercial Code. (Fla. Stat. §§ 679.2031(2)(b), 679.3121(2)(c), and 679.3131(1); Ga. Code 11-9-2003(b)(2), 11-9-312(b)(3), and 11-9-313(a)).

H.      Default, Liability and Indebtedness

43.     Merchant defaulted in its responsibility to cover Chargebacks.

44.     For its default Merchant bore liabilities to Synovus and Qualpay.

45.     For its default Merchant became indebted to Synovus and Qualpay.

46.     On account of Merchant's default and the corresponding losses, Qualpay became liable and indebted to Synovus.

47.     The liabilities and indebtedness owed to Synovus were covered by the Rights to the Reserve Fund of Synovus as alleged above.  The liabilities and indebtedness were in excess of the Reserve Fund.

## COUNT ONE

48.     Paragraphs 13-47 are incorporated by reference.

49.     This is a counterclaim against the Special Receiver and Qualpay for declaratory judgment that Synovus held and continues to hold Rights to the Reserve Fund, that any interest of the receivership in the Reserve Fund either does not exist or is junior and subsidiary to the rights of Synovus, that the receivership is obligated to return the Reserve Fund to Synovus, and that any interest of Qualpay is inferior and subsidiary to the rights of Synovus.

50.     The jurisdiction and power of this Court in this action is based on the receivership proceeding before this Court.

51.     The receivership, as evidenced by papers previously filed in this action, disputes the Rights to the Reserve Fund of Synovus. There is a genuine case and controversy in this matter.

52.     Qualpay is a necessary party to this action under Fed. R. Civ. P. 19.

53.     All conditions precedent have occurred or been performed.

WHEREFORE, Synovus requests judgment as follows:

a.     Synovus is entitled to the Reserve Fund including earned interest;

b.     The receivership is obligated to immediately transfer to Synovus the Reserve Fund with earned interest;

c.     Recovery of costs of this action; and

d.     All other just and proper relief.

Dated: June 3, 2019

/s/Charles F. Ketchey, Jr.
Lara R. Fernandez, Esq. – FBN 0088500
lfernandez@trenam.com
Charles F. Ketchey, Jr., Esq. – FBN 0181735
cketchey@trenam.com
Rhys P. Leonard, Esq. – FBN 0059176
rleonard@trenam.com
TRENAM, KEMKER, SCHARF, BARKIN,
   FRYE, O'NEILL and MULLIS, P.A.
101 E Kennedy Boulevard, Suite 2700
Tampa, FL  33602
Tel: (813) 223-7474 | Fax: (813) 227-0404

-and-

/s/ Steven M. Kaufmann
Steven M. Kaufmann
Washington DC Bar No. 1022365

(*pro hac vice*)
MORRISON FOERSTER, LLP
2000 Pennsylvania Avenue NW, Suite 6000
Washington, DC 20006-1888
Tel: (202) 887-1500
Fax: (202) 887-0763
skaufmann@mofo.com
*Counsel for Intervener Synovus Bank*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has been electronically filed on June 3, 2019, with the Clerk of Court by using the CM/ECF system, which will send notice of electronic filing to all registered CM/ECF participants and email service directly to Benjamin R. Davidson, Bikram Bandy, and Sung W. Kim, Federal Trade Commission, Mail Stop CC-8528, 600 Pennsylvania Avenue NW, Washington, DC 20580, email bdavidson@ftc.gov, skim6@ftc.gov, bbandy@ftc.gov, and to Burton W. Wiand and George Guerra, 5505 West Gray Street, Tampa, Florida, 33609, email bwiand@wiandlaw.com, and guerra@wiandlaw.com, and Edward A. Marshall, Suite 2100, 171 17th St., NW, Atlanta, Georgia 30363, email Edward.marshall@agg.com.


*/s/ Charles F. Ketchey, Jr.*
Attorney