# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**FEDERAL TRADE COMMISSION,**

      **Plaintiff,**

v.                                                **Case No:  6:18-cv-862-Orl-37DCI**

**MOBE LTD.,
MOBEPROCESSING.COM, INC.,
TRANSACTION MANAGEMENT USA,
INC., MOBETRAINING.COM, INC.,
9336-0311 QUEBEC INC., MOBE PRO
LIMITED, MOBE INC., MOBE
ONLINE LTD., MATT LLOYD
PUBLISHING.COM PTY LTD.,
MATTHEW LLOYD MCPHEE, SUSAN
ZANGHI and INGRID WHITNEY,**

      **Defendants.**

## REPORT AND RECOMMENDATION

This cause comes before the Court for consideration without oral argument on the following motion:

> **MOTION:**    **RECEIVER'S AMENDED MOTION TO APPROVE SETTLEMENT WITH MATTHEW LLOYD MCPHEE AND RELATED ENTITIES (Doc. 222)**
>
> **FILED:**      **September 6, 2019**
>
> **THEREON** it is **RECOMMENDED** that the motion be **GRANTED**.

On June 4, 2018, the Federal Trade Commission (the FTC), brought this action against several Defendants – including MOBE Ltd. and its related entities (collectively, MOBE), Matthew Lloyd McPhee, and others – for alleged violations of Section 5(a) of the Federal Trade Commission

Act, 15 U.S.C. § 45(a).  Doc. 1 (the Complaint).  In the Complaint, the FTC alleged, in sum, that Defendants operated a fraudulent internet business education program called "My Online Business Education," or the "MOBE" program, through which Defendants claimed they would reveal a "simple 21-step system that will show consumers how to quickly and easily start their own online business and make substantial income."  Doc. 1 at 2.  The FTC further alleged that contrary to Defendants' representations, "the vast majority of consumers who join the MOBE program and purchase . . . costly MOBE memberships lose money." *Id.* at 3.  According to the FTC, Defendants defrauded thousands of consumers who collectively paid Defendants over $125,000,000.00 based on misrepresentations by Defendants concerning the MOBE program.  *Id*. at 3-4.

Contemporaneous with the filing of the Complaint, the FTC also moved – pursuant to Federal Rule of Civil Procedure 65(b) – for a temporary restraining order, asset freeze, other equitable relief, and an order to show cause why a preliminary injunction should not issue against Defendants.  Doc. 3.  At the same time, the FTC made an application for a temporary receiver.  Doc. 6.  The next day, the Court granted the FTC's motions, issued a temporary restraining order, and appointed Mark J. Benet as temporary receiver (the Receiver).  Doc. 13 (the TRO).

Among other things, the TRO (i) enjoined the Defendants from violating Section 5(a) of the FTC Act, (ii) enjoined the Defendants from transferring, liquidating or otherwise encumbering or disposing of any of their assets, and (iii) appointed the Receiver as the temporary receiver of the "Receivership Entities."  The TRO has been converted into a series of agreed preliminary injunctions, containing essentially the same terms as were contained in the TRO.  *See* Doc. 94 (stipulated preliminary injunction pertaining to Russell W. Whitney); Doc. 95 (stipulated preliminary injunction pertaining to Susan Zanghi); Doc. 107 (stipulated preliminary injunction pertaining to McPhee and the MOBE Defendants).

Under the Order Approving Revised Stipulated Preliminary Injunction (Doc. 107, the Preliminary Injunction), the Court directed the Receiver to accomplish the following:

> B. Take exclusive custody, control, and possession of all Assets and Documents of, or in the possession, custody, or under the control of, any Receivership Entity, wherever situated.
>
> C. Conserve, hold, manage, and prevent the loss of all Assets of the Receivership Entities, and perform all acts necessary or advisable to preserve the value of those Assets. The Receiver shall assume control over the income and profits therefrom and all sums of money now or hereafter due or owing to the Receivership Entities. The Receiver shall have full power to sue for, collect, and receive, all Assets of the Receivership Entities and of other persons or entities whose interests are now under the direction, possession, custody, or control of, the Receivership Entities. Provided, however, that the Receiver shall not attempt to collect any amount from a consumer if the Receiver believes the consumer's debt to the Receivership Entities has resulted from the deceptive acts or practices or other violations of law alleged in the Complaint in this matter, without prior Court approval. . . .
>
> \* \* \*
>
> L. Institute, compromise, adjust, appear in, intervene in, defend, dispose of, or otherwise become party to any legal action in state, federal or foreign courts or arbitration proceedings as the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Entities, or to carry out the Receiver's mandate under this Order, including but not limited to, actions challenging fraudulent or voidable transfers.

Doc. 107 at 15-18.

Now before the Court is the Receiver's Amended Motion to Approve Settlement with Matthew Lloyd McPhee and Related Entities. Doc. 222 (the Motion). In the Motion, the Receiver represents that he has been acting diligently to implement the Preliminary Injunction and has determined that McPhee used proceeds of MOBE's operations to purchase assets that properly belong to the receivership estate. And while the Receiver has asserted and continues to assert a constructive trust over those assets, the Receiver has identified certain, specific assets over which the Receiver has not been able to obtain control. Those assets include:

- Apartment 7A, an apartment (or condominium) owned by McPhee or by his company CAIF Property Holdings Ltd., a Hong Kong limited company ("CAIF Hong Kong"), located in Kuala Lumpur, Malaysia;

- Apartment 15B, an apartment (or condominium) owned by McPhee or by his company CAIF Hong Kong, located in Kuala Lumpur, Malaysia;

- the Fiji Resort Interests, consisting of an interest in the Serenity Island resort hotel in Fiji; and

- the Sunset del Mar Interests, consisting of an interest in the Sunset del Mar resort hotel on the Pacific Ocean in Costa Rica.

See Doc. 222 at 5 (collectively, the real property interests). In addition, the Receiver has asserted a constructive trust over tax refund claims owed to McPhee by the governments of Australia and Malaysia.

Through the Motion, the Receiver seeks court approval of a settlement with McPhee concerning all of those assets, explaining as follows:

> The Receiver engaged in extensive research as to the nature of the Assets identified above, and has concluded that liquidating them without McPhee's assistance would be difficult, costly and time consuming, and likely would require the Receiver to engage attorneys, accountants and brokers in various foreign countries and possibly travel personally to some of them. Starting in December, 2018, the Receiver therefore explored whether McPhee, an Australian national residing in Kuala Lumpur, would assist with liquidating and collecting the Assets. After extensive negotiations, and subject to the approval of the Court, the Receiver and McPhee have reached an agreement.

Doc. 222 at 6. The Receiver explains the terms of the settlement in detail and the basis for settlement as to each asset. *See generally* Doc. 222 at 6-18. In addition, the Receiver attaches to the Motion the settlement agreement. *See* Doc. 222-1.

"The district court has broad powers and wide discretion to determine relief in an equity receivership." *S.E.C. v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992); *see also S.E.C. v. Kaleta*, 530 Fed. Appx. 360, 362 (5th Cir. 2013).

As stated by the Receiver, the settlement agreement is fairly complex, and provides varying processes for McPhee to sell and, in most cases, buy back the real property interests at issue.[1] All of the real property interests are located in foreign countries and each involves unique circumstances that make it difficult – if not impossible – for the Receiver to take possession of the assets without significant assistance from McPhee and the entities he controls. As the Receiver explains, "the *authority* to obtain possession or control of the Real Property Interests is different than *actually* possessing or controlling them." Doc. 222 at 16 (emphasis in original). The real property interests at issue are located in Malaysia, Fiji, and Costa Rica and are all titled in the names of non-parties and subject to the laws of foreign jurisdictions. *Id*. The Receiver explains that due to the nature of the real property interests, those laws may actually preclude the Receiver gaining control over the interests. *Id*. Further, the Fiji Resort Interests and the Sunset Del Mar Interests appear to have limited or negative economic value. *Id*. In addition, the Receiver explains that the remoteness of the properties makes it extraordinarily difficult for the Receiver to manage them or to hire individuals to manage them. *Id*.

As to Apartment 7A in Malaysia, the settlement requires that McPhee cause the execution of all documents necessary to convey ownership of the property to the Receiver, with the transfer documents to be held in escrow pending performance under the settlement agreement. Doc. 222 at 6-7. Thereafter, McPhee would sell the property to a third party. Assuming the sale went

---

[1] The undersigned will reiterate a point made by the Receiver: although the Receiver attempted to summarize the settlement agreement in the Motion, and the undersigned has attempted to summarize both in this Order, the terms of the settlement agreement control.

through and netted a required minimum amount, 40 percent of the excess would be paid to the Receiver and 60 percent would be used to pay MOBE's Malaysian tax liabilities and accountants. From the amounts paid to the Receiver, $35,000 would be paid to McPhee's attorney in the United States. If the sale did not go through within 45 days, the Receiver would be able to break the escrow, sell the property, and retain all proceeds.

As to Apartment 15B in Malaysia, which is McPhee's primary residence, the settlement requires that McPhee cause the execution of all documents necessary to convey ownership of the property to the Receiver, with the transfer documents to be held in escrow pending performance under the settlement agreement. Doc. 222 at 7-9. Thereafter, McPhee would retain a 270-day exclusive right to re-purchase the property from the Receiver at an amount of 70 percent of the original purchase price that McPhee paid for the property in 2016. But after 120 days of that 270-day period, if McPhee has not re-purchased the property, the price would increase periodically. If McPhee does not repurchase the property within 270 days, the Receiver would be able to break the escrow, sell the property, and retain all proceeds.

The Fiji Resort Interests consists of an interest controlled by McPhee in the Serenity Island resort hotel in Fiji. Doc. 222 at 9-12. The Receiver explains the ownership structure of the resort as follows:

> Sala Levu Resort (Fiji) Limited ("Sala Levu") is a private limited liability company located in Fiji. Sala Levu owns an iTaukei lease of Serenity Island, on which it has constructed a resort hotel facility. The iTaukei lease is mortgaged in favor of a bank to secure repayment of a loan. The balance owed on the loan is approximately FIJ $6.6 million (approximately USD $3 million). Sala Levu is owned by Kadavulailai Development PTE Limited, a private limited company located in Fiji ("Kadavulailai"). Kadavulailai in turn is owned by joint venture partners (i) Seed Property Holdings (Fiji) Ltd. ("Seed"), a limited liability company located in Fiji and owned by a former MOBE employee, Athar Rashan, and (ii) CAIF Property Holdings – Fiji Ltd., a limited liability company located in Hong Kong and owned by CAIF Hong Kong. CAIF Hong Kong is owned by McPhee.

Doc. 222 at 9-10.  According to the Receiver, an "iTaukei lease" is a lease of native land granted to a third party by the iTaukei Land Trust Board (TLTB), a statutory board in Fiji vested with the control and administration of iTaukei land (formerly known as native land).  The TLTB has the authority to alienate iTaukei lands by way of leases and licenses.  The Receiver states that the lease is, in effect, from a foreign government agency and is subject to a number of restrictions and conditions such that McPhee may currently be in default of the lease due to his failure to take certain actions.  On the other hand, default may occur automatically if the Receiver takes control of McPhee's interest.  Further, the Receiver explains that the resort itself is in poor financial health because, among other reasons, a primary source of revenue for the resort was MOBE-related seminars, which have ceased.  The settlement requires that McPhee cause the execution of all documents necessary to convey ownership of his interest in the property to the Receiver, with the transfer documents to be held in escrow pending performance under the settlement agreement.  Doc. 222 at 11.  Thereafter, McPhee would retain a 270-day exclusive right to re-purchase his interest in the property from the Receiver at a price set in the settlement agreement.  But after 120 days of that 270-day period, if McPhee has not re-purchased the property, the price would increase periodically.  If McPhee does not repurchase the property within 270 days (or if the resort is not properly and competently managed during that period), the Receiver would be able to break the escrow, sell the property, and retain all proceeds.

The Costa Rica Resort Interests consists of an interest controlled by McPhee in a resort in Costa Rica on the Pacific Ocean.  Doc. 222 at 12-14.  The Receiver explains the ownership structure of the resort as follows:

> McPhee owns a 49 percent interest in Sunset del Mar Investments S.R.L, a company located in Costa Rica ("Sunset del Mar"). Sunset del Mar in turn owns 100 percent of Mar y Tierra del Oeste M.T.O., S.A., another corporation in Costa Rica ("Mar y Tierra"). Mar y Tierra owns a lease, or concession, of beachfront

> property, located in the "Maritime Zone," or a 200 meter strip starting from the average high tide line, on the Pacific Ocean on which is located the Sunset del Mar Resort hotel. Under Costa Rican law McPhee, as a non-Costa Rican citizen who has not resided in Costa Rica for the previous five years, cannot own a majority interest in any entity with a concession of beachfront property. He therefore owned only a minority interest in Sunset del Mar, with the majority interest being owned by a Costa Rican citizen.

Doc. 222 at 12-13. Like the resort in Fiji, the Receiver explains that the Costa Rica resort was used by MOBE to host seminars, and both resorts suffered financially when MOBE ceased operations. Further, the Receiver states that the Costa Rica resort is located in a remote area that is difficult to access and the resort is losing funds. The settlement requires that McPhee cause the execution of all documents necessary to convey ownership of his interest in the property to the Receiver, with the transfer documents to be held in escrow pending performance under the settlement agreement. Doc. 222 at 13-14. Thereafter, McPhee would retain a 270-day exclusive right to re-purchase his interest in the property from the Receiver at a price set in the settlement agreement, but the purchase price would be at a discount if McPhee made the purchase within 180 days. If McPhee does not repurchase the property within 270 days (or if the resort is not properly and competently managed during that period), the Receiver would be able to break the escrow, sell the property, and retain all proceeds.

As to the tax refund owed to McPhee by the government of Malaysia, the settlement agreement requires that the first $140,000 of that amount be paid to the Receiver, the next $10,000 be retained by McPhee, and any amount over $150,000 be split, with McPhee retaining 60 percent and the Receiver taking 40 percent. Doc. 222 at 14-15. As to the tax refund owed to McPhee by the government of Australia, the settlement agreement requires that all proceeds be paid to the Receiver, except that $1,500 would be paid to McPhee's Australian accountants. *Id*.

In sum, the settlement agreement allows McPhee a right to repurchase all of the real property interests, with the exception of Apartment 7A. The Receiver recognizes that allowing McPhee to repurchase assets obtained with funds related to MOBE may raise concern but explains that McPhee has made no guarantee to repurchase those interests and is attempting to secure third-party financing. Further, while recognizing a right to all of the assets at issue in the Motion, the Receiver discusses the reality that it may not be able to secure these interests at all without McPhee's assistance, let alone at a reasonable cost to the receivership estate. Indeed, the Receiver explains that attempting to secure the assets at issue in the Motion would require expensive and time-consuming litigation with no guaranty of success. Thus, the Receiver suggests that obtaining the documents necessary to convey ownership to all of the assets described in the Motion has a substantial value. Finally, the Receiver asserts that the resort properties at issue have complex ownership structures, are unprofitable, and would require significant capital infusions to become profitable.

After carefully considering the terms of the proposed settlement and the arguments and representations of the Receiver – and noting there are no objections to the Motion by any party or by those entities seeking to intervene in this action – the undersigned agrees with the Receiver in full and recommends that the Court grant the Motion. In doing so, the undersigned finds that the settlement agreement is fair, reasonable, and in the best interest of the receivership estate and the affected consumers as a whole, especially given the unique circumstances described by the Receiver concerning each of the assets. *See Sterling v. Stewart*, 158 F.3d 1199, 1202 (11th Cir. 1998) (holding that the determination of fairness of the settlement [in an equity receivership] is left to the sound discretion of the trial court and that the court's decision will not be overturned absent a clear showing of abuse of discretion).

Accordingly, it is respectfully **RECOMMENDED** that the Motion (Doc. 222) be **GRANTED**.

### NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

Recommended in Orlando, Florida on November 4, 2019.

DANIEL C. IRICK
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy